

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 18, 2022**



**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JACK COUNTY HOSPITAL DISTRICT d/b/a | ) | |
| FAITH COMMUNITY HEALTH SYSTEM | ) | Case No. 20-42012-mxm9 |
| | ) | |
| Debtor. | ) | Chapter 9 Case |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER
CONFIRMING THE SECOND AMENDED PLAN OF ADJUSTMENT
OF JACK COUNTY HOSPITAL DISTRICT, AS MODIFIED**

Jack County Hospital District d/b/a Faith Community Health System (the "Debtor")

commenced the above-captioned municipal debt adjustment case (the "Case") by filing a

voluntary petition for relief (the "Petition") under chapter 9 of Title 11 of the United States Code

(the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas

(the "Court") on June 11, 2020 (the "Petition Date").

An official committee of unsecured creditors has not been appointed in the Case. An

*Order for Relief in a Chapter 9 Case* [Docket No. 53] was entered by the Court on October 1,

2020.

On October 4, 2021, the Debtor filed its *Second Amended Plan of Adjustment of Jack County Hospital District* (the "Second Amended Plan") [Docket No. 128] and its *Disclosure Statement with Respect to the Second Amended Plan of Adjustment of Jack County Hospital District* (the "Disclosure Statement") [Docket No. 129]. On February 18, 2022, the Debtor filed its *First Modification to the Second Amended Plan of Adjustment of Jack County Hospital District* (the "Modification") [Docket No. 165]. The Second Amended Plan, as modified by the Modification, is hereafter referred to as the "Plan." Defined terms in the Plan are given the same meaning in this Order.

On December 14, 2021, the Court entered an *Order Granting Debtor's Second Amended Motion to Approve Disclosure Statement, Plan Solicitation and Voting Procedures and Related Notices and Ballots, and to Schedule Confirmation Dates and Deadlines* (the "Disclosure Statement Order") [Docket No. 148]. The Disclosure Statement Order, among other things: (a) approved the Disclosure Statement for use in soliciting votes on the Second Amended Plan; (b) approved the Debtor's proposed form of Notice of Confirmation Hearing, Voting Deadline, Confirmation Objection Deadline, and Executory Contract and Unexpired Lease Assumption Objection Deadline Regarding the Second Amended Plan of Adjustment of Jack County Hospital District (the "Confirmation Hearing Notice"); (c) established January 18, 2022 at 5:00 p.m., Central Time (the "Voting Deadline"), as the deadline for voting on the Second Amended Plan; (d) established January 18, 2022 (the "Plan Objection Deadline") as the deadline for filing and service of objections to confirmation of the Second Amended Plan and/or objections to the Debtor's assumption of any executory contract or unexpired lease proposed under the Second Amended Plan ("Confirmation Objections"); (e) scheduled a hearing to commence on February 23, 2022 at 1:30 p.m., Central Time, to consider confirmation of the Second Amended Plan (the "Confirmation Hearing"); and (f) approved procedures for the solicitation of votes on the Second Amended Plan, voting on the Second Amended Plan, and

tabulation of votes on the Second Amended Plan (the "Solicitation and Voting Procedures").

On December 16, 2021, the Debtor transmitted solicitation packets including the Disclosure Statement (which included the Second Amended Plan as an exhibit thereto), Disclosure Statement Order, Confirmation Hearing Notice and Ballots for voting on the Second Amended Plan (the "Solicitation Packets") in accordance with the Disclosure Statement Order as reflected in the *Certificate of Service* filed on December 16, 2021 as Docket No. 149. The Solicitation Packets were transmitted to all creditors entitled to receive a Solicitation Packet. The Second Amended Plan and Disclosure Statement, in the forms in which they were transmitted for solicitation of votes on the Second Amended Plan, are attached to the *Certificate of Service* filed on December 16, 2021 as Docket No. 149. Also on December 16, 2021, the Debtor served the Confirmation Hearing Notice on all other creditors and parties in interest entitled to receive the same in accordance with the Disclosure Statement Order as reflected in the *Certificate of Service* filed on December 16, 2021 as Docket No. 150.

On January 25, 2022, the Debtor filed the *Tabulation of Ballots in Connection with Confirmation of Jack County Hospital District's Second Amended Plan of Adjustment* (the "Ballot Tabulation") [Docket No. 152] in accordance with the Disclosure Statement Order. The Debtor agreed to extend the Voting Deadline and Plan Objection Deadline with respect to Cigna to February 16, 2022 at 5:00 p.m., Central Time, although Cigna did not ultimately submit a Ballot.

Due to construction work being performed at the courthouse, the Confirmation Hearing had to be rescheduled from February 23, 2022 to March 7, 2022. The Debtor served notice of the rescheduled Confirmation Hearing on all creditors and parties in interest on February 1, 2022 [*see* Docket No. 158].

The Court commenced the Confirmation Hearing on March 7, 2022. The Court closed the evidentiary record except for evidence relating to the identity of the Plan Trust Administrator and the terms of the Plan Trust, and the Confirmation Hearing was recessed to be resumed on

March 17, 2022. The Confirmation Hearing was attended either remotely or in person by, among others: (a) counsel for the Debtor; (b) counsel for Regions; (c) counsel for SOTB; (d) counsel for BCBS; (e) counsel for Aetna; and (f) and counsel for Cigna. The Confirmation Hearing was concluded on March 17, 2022, at which time the Court announced its ruling that the Plan would be confirmed.

Reference is here made to the Plan for all purposes. Capitalized terms not defined in this Order shall have the meaning attributed to such terms in the Plan.

NOW THEREFORE, the Court having considered the Plan, the Ballot Tabulation, all evidence proffered, adduced or introduced at the Confirmation Hearing, the arguments of counsel at the Confirmation Hearing and the entire record of this Case, and after due deliberation thereon and good cause appearing therefore, the Court hereby makes and issues the following findings of fact and conclusions of law and hereby orders:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

All findings of fact or conclusions of law made by the Court on the record at the Confirmation Hearing are hereby incorporated in their entirety into this Order. The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, made applicable by Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 7052 and 9014. Any and all findings of fact shall constitute findings of fact even if they are stated as conclusions of law and any and all conclusions of law shall constitute conclusions of law even if they are stated as findings of fact.

A.     Jurisdiction and Venue Generally.  The Court has subject matter jurisdiction to confirm the Plan pursuant to 28 U.S.C. sections 157 and 1334. Venue is proper before the Court pursuant to 28 U.S.C. sections 1408 and 1409. Confirmation of the Plan is a core proceeding under 28 U.S.C. section 157(b)(2)(L) and (O) over which the Court has exclusive

jurisdiction and full constitutional jurisdiction and authority to enter a final order with respect thereto.

B.     *In Rem* Jurisdiction and the Debtor's Consent to Exercise of Jurisdiction.  This Court has *in rem* jurisdiction over both the Debtor and its property.  *Cent. Va. Cmty. College v. Katz*, 546 U.S. 356, 369, 126 S. Ct. 990, 163 L. Ed. 2d 945 (2006) ("Bankruptcy jurisdiction. . .is principally *in rem*.").  This *in rem* jurisdiction is based upon the Court's jurisdiction over the debtor and the debtor's property and estate.  *Id.* (citing *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 447, 124 S. Ct. 1905, 158 L. Ed. 2d 764 (2004)).  The bankruptcy court has exclusive jurisdiction over the debtor's property wherever located.  *Hood*, 541 U.S. at 447 (citing 28 U.S.C. § 1334(e)(1)).  In the context of a Chapter 9 case, this Court has exclusive jurisdiction over all of the debtor's property based on both 28 U.S.C. § 1334(e)(1) and section 902(1) of the Bankruptcy Code.  The Debtor has consented to the exercise of jurisdiction by this Court through the Plan and this Order, thereby removing any Eleventh Amendment limitations on the Court's exercise of exclusive jurisdiction over the Debtor and the Debtor's property.  *See* 11 U.S.C. §§ 904(2) and (3).  Consequently, this Court has exclusive *in rem* jurisdiction through this Chapter 9 Case over both the Debtor and its property and this Order is binding upon the Debtor and all holders of Treated Claims.

C.     Consent to Entry of Confirmation Order and Further Orders.  Pursuant to and for purposes of section 904 of the Bankruptcy Code, the Debtor has consented to entry of this Order on the terms and conditions set forth in the Plan and to entry of any further orders as necessary or required to implement the provisions of the Plan or any and all related transactions.

D.     Eligibility for Relief.  As determined by the Court in the *Order for Relief in a Chapter 9 Case* [Docket No. 53] entered on October 1, 2020, the Debtor satisfied each of the requirements set forth in section 109(c) of the Bankruptcy Code and was and is eligible to be a

debtor in a Chapter 9 case under the Bankruptcy Code.

E.  Burden of Proof.  The Debtor, as proponent of the Plan, has the burden of proving the elements of sections 943(b) and 1122 of the Bankruptcy Code, and the subsections of sections 1123 and 1129 of the Bankruptcy Code made applicable to this Case by section 901(a) of the Bankruptcy Code, by a preponderance of the evidence.  As set forth below, the Debtor has met that burden by demonstrating that the Plan complies with the applicable provisions of the Bankruptcy Code.

F.  Judicial Notice.  The Court takes judicial notice of the entire record of proceedings in this Case, including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Court during this Case, including, without limitation, the Confirmation Hearing.

G.  The Record.  The record established at the Confirmation Hearing (the "Record") to support confirmation of the Plan includes:

1.  All documents identified by the Debtor at the Confirmation Hearing and all exhibits admitted into evidence at the Confirmation Hearing, including but not limited to those admitted exhibits listed on the *Debtor's Witness and Exhibit List in Connection with Plan Confirmation Hearing Set for March 7, 2022* [Docket No. 176] filed with the Court on March 3, 2022 and the *Debtor's Supplemental Witness and Exhibit List in Connection with Plan Confirmation Hearing Reset for March 17, 2022* [Docket No. 182] filed with the Court on March 14, 2022;

2.  The *Notice of Filing of Plan Documents Supplementing Debtor's Second Amended Plan of Adjustment* [Docket No. 164] filed with the Court on February 11, 2022;

3.  The Ballot Tabulation; and

4.  The statements and arguments of counsel and the testimony of witnesses (including proffered testimony) on the record at the Confirmation Hearing, and all papers and pleadings filed with the Court in connection with confirmation of the Plan.

The Record supports confirmation of the Plan and all related matters demonstrate, by a

clear preponderance of the evidence, that the Plan should be confirmed.

H.    Objections.    No Confirmation Objections, timely or untimely, were filed by any party or raised at the Confirmation Hearing.

I.    Claims Bar Dates.    Pursuant to this Court's *Order Granting Debtor's Motion for Entry of Order (I) Approving Form of Notice of Commencement of Case, (II) Approving Manner of Required Publication Notice, (III) Establishing Certain Deadlines and Notice Procedures, and (IV) Granting Related Relief* (the "Procedures Order") [Docket No. 32] entered in this Case: (a) October 9, 2020 was fixed as the Bar Date for all holders of alleged Claims against the Debtor (except for governmental units) to file proofs of Claim against the Debtor; (b) December 8, 2020 was fixed as the Bar Date for all holders of alleged Claims against the Debtor that constitute governmental units to file proofs of Claim against the Debtor; (c) based on the timing of notice of this Case given by the Debtor, October 19, 2020 was established as the Bar Date by which U.S. Bank – Direct Lending was required to file a proof of Claim against the Debtor (*see Certificate of Service* filed by the Debtor on September 4, 2020 as Docket No. 45); (d) based on the timing of notice of this Case given by the Debtor, June 3, 2021 was established as the Bar Date by which each Named Outreach Defendant (other than Athenahealth) was required to file a proof of Claim against the Debtor (*see Certificate of Service* filed by the Debtor on April 19, 2021 as Docket No. 113); and (e) based on the timing of notice of this Case given by the Debtor, November 15, 2021 was established as the Bar Date by which Athenahealth was required to file a proof of Claim against the Debtor (*see Certificate of Service* filed by the Debtor on September 29, 2021 as Docket No. 127).

J.    Claim Objections and Resolutions.    Pursuant to the Plan, the Plan Trust Administrator has the sole power and exclusive standing to object to the allowance of any Class 4 Claim.  Class 4 Claims, and any objections by the Plan Trust Administrator to the allowance thereof, shall be administered as set forth in the Plan Trust Agreement.  Pursuant to the Plan,

the Debtor has the sole power and exclusive standing and authority to object to the allowance of any Claim that is not a Class 4 Claim. Without limiting the generality of the foregoing, and except as otherwise provided in the Plan, the Debtor shall, with respect to any Claim that is not a Class 4 Claim, have the power: (i) to object to any such Claim on any legal or equitable basis; (ii) to seek subordination of any such Claim on any legal or equitable basis; (iii) to assert any right of setoff or recoupment, including without limitation, any such right pursuant to section 553 of the Bankruptcy Code; (iv) to assert any and all Debtor Defenses to any such Claim, whether legal or equitable, including any affirmative defenses or any right of setoff; (v) to assert all Debtor Claims as a counterclaim against any such Claim, whether arising out of the same or different transactions, both for an affirmative recovery and as an offset against any such Claim; and (vi) to object to any such Claims on the basis of section 502(d). Vesting such exclusive power and standing in the Plan Trust Administrator and the Debtor, as applicable, is reasonable and appropriate, and is authorized by, and in compliance with, section 1123(b)(3) of the Bankruptcy Code.

K.      Disclosure Statement Order Compliance. The Debtor has complied with the Disclosure Statement Order, including the Solicitation and Voting Procedures contained therein, in all respects.

L.      Transmittal and Mailing of Solicitation Materials; Notice. Due, adequate and sufficient notice of the Second Amended Plan and the Confirmation Hearing, together with all deadlines for voting on or objecting to the Second Amended Plan, has been given by the Debtor to known holders of Treated Claims in compliance with the Bankruptcy Rules and Disclosure Statement Order. The Solicitation Packets and all other materials relating in any way to the solicitation process were transmitted and served in compliance with the Disclosure Statement Order and in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Solicitation and Voting Procedures, and all other applicable rules, laws and

regulations. The notice provided was due and proper with respect to all matters relating to the solicitation of votes on, and the confirmation of, the Second Amended Plan, and satisfied the requirements of due process with respect to all Creditors and other parties in interest. Because such transmittal and service were adequate and sufficient, all parties in interest in this Case had a full and fair opportunity to appear and be heard at the Confirmation Hearing and no other or further notice is necessary or shall be required.

M. <u>Adequacy of Solicitation</u>. The Debtor distributed Solicitation Packets to all holders of impaired Claims entitled to vote on the Second Amended Plan and sufficient time was prescribed for such holders of Claims to accept or reject the Second Amended Plan in compliance with the Disclosure Statement Order and the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Solicitation and Voting Procedures, and all other applicable rules, laws and regulations. Transmittal and service were adequate and sufficient, and no further notice is or shall be required. In addition, parties in interest that were not entitled to vote to accept or reject the Second Amended Plan were provided with certain non-voting materials approved by the Court in compliance with the Disclosure Statement Order. All procedures used to distribute Solicitation Packets to holders of Claims entitled to vote on the Second Amended Plan were fair and conducted in accordance with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws and regulations.

N. <u>Voting Tabulation and Voting by Impaired Classes Entitled to Vote</u>. All procedures used to tabulate the Ballots were fair and conducted in accordance with the Disclosure Statement Order, the Solicitation and Voting Procedures, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws and regulations. As set forth in the Second Amended Plan and Disclosure Statement, Classes 1, 2, 3 and 4 are impaired and eligible to vote on the Second Amended Plan. As evidenced by the Ballot Tabulation, Classes

1, 2, 3 and 4 voted to accept the Plan under section 1126(c) of the Bankruptcy Code (made applicable to this Case by section 901(a) of the Bankruptcy Code) and for purposes of section 1129(a)(8)(A) of the Bankruptcy Code (made applicable to this Case by section 901(a) of the Bankruptcy Code).

O.    Timeliness of the Plan.  The Debtor did not file the Second Amended Plan with the Petition.  The filing of the Second Amended Plan was nevertheless timely under section 941 of the Bankruptcy Code because the Court has not established a deadline by which the Debtor was required to file a plan of adjustment in this Case.

P.    Bankruptcy Rule 3016.  The Second Amended Plan is dated, thereby satisfying Bankruptcy Rule 3016(a).  The filing of the Disclosure Statement satisfied Bankruptcy Rule 3016(b).  The Second Amended Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.  Bankruptcy Rule 3016(c) is satisfied because both the Second Amended Plan and the Disclosure Statement describe in specific and conspicuous language all acts to be enjoined and identify the entities subject to such injunction.

Q.    Bankruptcy Rule 3017.  The Debtor gave notice of the Confirmation Hearing as required by the applicable provisions of Bankruptcy Rule 3017 and the Disclosure Statement Order.  The Solicitation Packets and notice given by the Debtor to holders of Claims entitled to vote on the Second Amended Plan and the materials transmitted by the Debtor to other parties-in-interest satisfy the applicable provisions of Bankruptcy Rules 3017(d) and (f) and the Disclosure Statement Order.  Therefore, the requirements of Bankruptcy Rule 3017 have been satisfied.

R.    Bankruptcy Rule 3018.  The solicitation of votes to accept or reject the Second Amended Plan satisfies Bankruptcy Rule 3018.  The Second Amended Plan was transmitted to all holders of Claims entitled to vote, sufficient time was prescribed for such parties to accept or reject the Second Amended Plan, and the materials used and Solicitation and Voting

Procedures followed comply with applicable provisions of sections 1125 and 1126 of the Bankruptcy Code, thereby satisfying the requirements of Bankruptcy Rule 3018. Further, the Debtor filed the Ballot Tabulation in accordance with the provisions of the Disclosure Statement Order.

S.    Modification of the Second Amended Plan. As permitted by section 942 of the Bankruptcy Code, the Debtor filed the Modification prior to the Confirmation Hearing. The Modification is appropriate under section 942 of the Bankruptcy Code because the modifications made to the Second Amended Plan by the Modification do not result in the Second Amended Plan failing to meet any requirements of Chapter 9 of the Bankruptcy Code.

T.    Confirmation Requirements. By a clear preponderance of the evidence demonstrated by the Record and the provisions of the Plan, the Plan satisfies each and every requirement of confirmation set forth in section 943 of the Bankruptcy Code, to the extent applicable, as follows:

1.    Section 943(b)(1). The Plan complies with all provisions of the Bankruptcy Code made applicable to Chapter 9 cases by sections 103(f) and 901 of the Bankruptcy Code. Specifically:

a.    Section 1122. The classification of Claims under the Plan is proper under the Bankruptcy Code. Pursuant to section 1122(a) of the Bankruptcy Code, Article IV of the Plan provides for the separate classification of Claims into four Classes (and two subclasses of one such Class), based on differences in the legal nature or priority of such Claims (other than Administrative Expense Claims, which are addressed in Article III of the Plan, and which are not required to be designated as separate Classes pursuant to section 1123(a)(1) of the Bankruptcy Code). Valid business, factual, and legal reasons exist for the separate classification of the various Classes of Claims and subclasses created under the Plan. The classifications were not designed for any improper purpose and the creation of such

Classes and subclasses does not unfairly discriminate between or among the holders of Claims. In accordance with section 1122(a) of the Bankruptcy Code, each Class of Claims (and subclass of a Class of Claims) contains only Claims that are substantially similar to the other Claims within that Class (or subclass). Accordingly, the requirements of section 1122(a) of the Bankruptcy Code have been satisfied. Section 1122(b) of the Bankruptcy Code is inapplicable because the Plan does not designate a separate class of claims consisting solely of unsecured claims less than or reduced to a certain amount for administrative convenience.

   b.  Section 1123(a)(1). In accordance with section 1123(a)(1) of the Bankruptcy Code, Article IV of the Plan properly classifies all Claims that require classification, and the classifications in the Plan comply with section 1122(a) of the Bankruptcy Code, as described above.

   c.  Section 1123(a)(2). Section 1123(a)(2) is inapplicable because there are no unimpaired classes under the Plan.

   d.  Section 1123(a)(3). Each Class of Claims is impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code and is identified as impaired in the Plan. Article IV of the Plan specifies the treatment of each Class of Claims. Therefore, the requirements of section 1123(a)(3) of the Bankruptcy Code have been satisfied.

   e.  Section 1123(a)(4). Article IV of the Plan provides for the same treatment for each Claim within a particular Class or subclass of a Class (and here no holder of a particular Claim has agreed to less favorable treatment). Therefore, the requirements of section 1123(a)(4) of the Bankruptcy Code have been satisfied.

   f.  Section 1123(a)(5). The Plan provides adequate and proper means for its implementation as demonstrated by, *inter alia*, the provisions of Articles VI and VII of the Plan. Therefore, the requirements of section 1123(a)(5) of the Bankruptcy Code have been satisfied.

g.      Section 1123(b).  The Plan contains various provisions that are properly construed as discretionary and not required for confirmation of the Plan under the Bankruptcy Code.  All such discretionary provisions comply with section 1123(b) of the Bankruptcy Code, are not inconsistent with the applicable provisions of the Bankruptcy Code, and are hereby approved.  Therefore, section 1123(b) of the Bankruptcy Code has been satisfied.

h.      Section 1123(d).  Except to the extent that a Claim for a Cure Amount has been resolved pursuant to the terms of the Plan, any potential Cure Amount to be paid by the Debtor in connection with the assumption of an Executory Contract has been determined by the Debtor in accordance with the underlying agreements and applicable nonbankruptcy law and set forth on Exhibit "B" to the Plan, or shall be determined in accordance with the underlying agreements and applicable nonbankruptcy law.  Therefore, the requirements of section 1123(d) of the Bankruptcy Code are satisfied.

i.      Section 1128.  The Court commenced the Confirmation Hearing on March 7, 2022 and resumed and concluded the Confirmation hearing on March 17, 2022, all after appropriate notice and opportunity for objections by Creditors and other parties in interest in compliance with the Bankruptcy Code and Bankruptcy Rules.  Therefore, the requirements of section 1128 of the Bankruptcy Code have been satisfied.

j.      Section 1129(a)(2).  The Debtor, as proponent of the Plan, has complied with all applicable provisions of the Bankruptcy Code with respect to the Plan and the solicitation of acceptances or rejections thereof.  In particular, the Second Amended Plan and the Debtor's solicitation of acceptances or rejections of the Second Amended Plan complied with the requirements of sections 1125 and 1126(a)-(c) and (e)-(g) of the Bankruptcy Code (made applicable in Chapter 9 cases by section 901 of the Bankruptcy Code) as follows:

(i).     Section 1125(b).  As reflected in the *Certificate of Service*

filed on December 16, 2021 as Docket No. 149, the Debtor complied with section 1125(b) of the Bankruptcy Code by transmitting the Solicitation Packets to holders of Allowed Claims entitled to vote on the Second Amended Plan.

(ii).      Section 1125(c).  In compliance with section 1125(c) of the Bankruptcy Code, the Debtor transmitted the same Disclosure Statement to all holders of Claims within each Class under the Second Amended Plan.

(iii).      Section 1125(e).  In accordance with section 1125(e) of the Bankruptcy Code, the Debtor solicited acceptances or rejections of the Second Amended Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

(iv).      Section 1126(a).  In accordance with section 1126(a) of the Bankruptcy Code, holders of Allowed Claims classified in the Second Amended Plan were given the opportunity to vote to accept or reject the Second Amended Plan using Ballots and the Solicitation and Voting Procedures previously approved by the Court in the Disclosure Statement Order.

(v).      Section 1126(b).  Section 1126(b) of the Bankruptcy Code is inapplicable to the Second Amended Plan.

(vi).      Section 1126(c).  The Ballot Tabulation was timely and properly filed and identifies the amount and number of Allowed Claims of each Class accepting or rejecting the Second Amended Plan.  All Classes of Claims voted, by requisite majorities of at least two-thirds in amount (the dollar amounts stated below are based on the dollar amounts reflected in the Ballots submitted, and the inclusion of such amounts in this Order does not constitute a judicial determination by this Court of the ultimate Allowed amounts of such Claims) and more than one-half in number of those Ballots cast, to accept the Second Amended Plan:

Class 1 – Regions Claim        Yes: 1 Vote = 100%;        $19,406,000.00 = 100%

Class 2 – SOTB Claims        Yes: 1 Vote = 100%;        $3,699,000.00 = 100%

Class 3 – Poynor Claim          Yes: 1 Vote = 100%;          $1,000,000.00 = 100%

Class 4 – Unsecured Claims     Yes: 3 Votes = 100%;         $57,902,965.15 = 100%

                               No: 0 Votes = 0%;            $0.00 = 0%

(vii).     <u>Section 1126(f)</u>.  Section 1126(f) of the Bankruptcy Code is inapplicable because all Classes of Claims are impaired under the Second Amended Plan.

(viii).     <u>Section 1126(g)</u>.  Section 1126(g) of the Bankruptcy Code is inapplicable because all Classes of Claims are to receive or retain some kind of property under the Second Amended Plan on account of such Claims.

(ix).     <u>Section 1127(d)</u>.  Pursuant to section 1127(d) of the Bankruptcy Code, each holder of a Claim that voted to accept the Second Amended Plan is deemed to have accepted the Second Amended Plan as modified by the Modification.  No holder of a Claim that voted on the Plan prior to the filing of the Modification requested that the Court establish a time period during which such holder would be permitted to change its vote on the Plan.

k.     <u>Section 1129(a)(3)</u>.  The Debtor has proposed the Plan (and all other agreements, documents, and instruments necessary to effectuate the Plan) in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  The Debtor's good faith is evident from the Record and other proceedings held in this Case.  The Plan was proposed with the legitimate and honest purpose of effectuating a successful adjustment of the Debtor's debts in accordance with the purpose of Chapter 9.  The Debtor's good faith is further shown by the fact that the Plan is supported by Aetna, BCBS, Cigna, Humana, Regions, SOTB and Poynor, with whom the Debtor has worked closely throughout the Case and negotiated the Plan treatments.

l.     <u>Section 1129(a)(6)</u>.  The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission.  Therefore, section

1129(a)(6) is not applicable to the Plan.

m.  Section 1129(a)(8).  Based on the results of the balloting reflected in the Ballot Tabulation and as set forth above, all Classes of Claims voted to accept the Second Amended Plan.  Therefore, the requirements of section 1129(a)(8) of the Bankruptcy Code have been satisfied.

n.  Section 1129(a)(10).  Based on the results of the balloting reflected in the Ballot Tabulation and as set forth above, at least one Class of Claims that is impaired under the Second Amended Plan has accepted the Second Amended Plan without including the acceptance of the Second Amended Plan by any Insider.  Therefore, the requirements of section 1129(a)(10) of the Bankruptcy Code have been satisfied.

o.  Sections 1129(b)(1), 1129(b)(2)(A) and 1129(b)(2)(B).  Because the Plan satisfies section 1129(a)(8) of the Bankruptcy Code, resort to confirmation by cram down is not necessary and sections 1129(b)(1), 1129(b)(2)(A) and 1129(b)(2)(B) are therefore inapplicable to the Plan.

2.  Section 943(b)(2).  As required by section 943(b)(2) of the Bankruptcy Code, the Plan complies with the relevant provisions of Chapter 9 of the Bankruptcy Code.

3.  Section 943(b)(3).  As required by section 943(b)(3) of the Bankruptcy Code, all amounts previously paid and to be paid by the Debtor for services and expenses of professionals in this Case or incident to the Plan have been fully disclosed to the Court in the *Debtor's Professional Fee and Expense Disclosure Pursuant to 11 U.S.C. § 943(b)(3)* [Docket No. 137], the *Debtor's First Supplemental Professional Fee and Expense Disclosure Pursuant to 11 USC § 943(b)(3)* [Docket No. 168], and at the Confirmation Hearing (collectively, the "Fee Disclosures").  The Court hereby finds that all such amounts previously paid and to be paid by the Debtor are reasonable.

4.  Section 943(b)(4).  In accordance with section 943(b)(4) of the

Bankruptcy Code, the Debtor is not prohibited by law from taking any action necessary to carry out the Plan.

5.      <u>Section 943(b)(5)</u>.  The Plan reflects that the Debtor, as permitted by section 904 of the Bankruptcy Code, has paid the reasonable and ordinary expenses incurred in operating its business from and after the Petition Date in the ordinary course of its business. The Plan provides that the Debtor shall continue to pay, after the Effective Date, in the ordinary course of business, the reasonable and ordinary expenses incurred in operating the Debtor's business before the Effective Date.  The Plan therefore satisfies the requirements of section 943(b)(5) of the Bankruptcy Code that, unless the holder of an Administrative Expense Claim has agreed to a different treatment of its Claim, the Plan provides that such Administrative Expense Claims shall be paid in full in cash on the Effective Date of the Plan.

6.      <u>Section 943(b)(6)</u>.  In accordance with section 943(b)(6) of the Bankruptcy Code, the Record indicates that any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the Plan has been obtained, and that no further regulatory or electoral approvals are required.

7.      <u>Section 943(b)(7)</u>.  It is this Court's judgment that the Plan is in the best interests of Creditors and is feasible:

a.      <u>Best Interests of Creditors</u>.  The Plan is in the best interests of Creditors because it provides Creditors, as a whole, with a better alternative than dismissal of this Case and provides all that Creditors can reasonably expect under the circumstances. Because the Debtor is a municipality, the Debtor is not eligible for court-supervised liquidation under Chapter 7 of the Bankruptcy Code.  If this Case were dismissed, Creditors would be left with only state law rights to pursue recovery on their Claims.  Dismissal would potentially lead to chaos and a race to the courthouse by such Creditors, with the Debtor facing substantial unpaid debts and millions of dollars in asserted liabilities that have otherwise been resolved through the

Plan. The valuations of the Debtor's business enterprise, real estate, and personal property reflected in the Disclosure Statement and Exhibit "C" to the Disclosure Statement indicate that, in the event of a dismissal of this Case, Creditors would likely recover little on their Claims beyond the value of Secured Creditors' collateral. Therefore, the Plan satisfies the requirement of section 943(b)(7) of the Bankruptcy Code that the Plan be in the best interest of the collective Creditor body.

                b.        <u>Feasibility</u>. The Debtor's Projections attached as Exhibit "B" to the Disclosure Statement set forth the Debtor's best estimates of revenues and expenses through the end of its fiscal year ending May 31, 2026. The Debtor formulated the Plan and determined the treatment of Creditors under the Plan based on such Projections after careful consideration by the Debtor and its advisors. The Projections support the Court's conclusion that the Plan is feasible under section 943(b)(7) of the Bankruptcy Code. In the context of a Chapter 9 plan of adjustment, feasibility requires that the debtor have a reasonable prospect of successfully implementing its plan of adjustment while continuing to provide government services. In this Case, it is more likely than not that the Debtor will be able to make the Distributions contemplated by the Plan and, at the same time, continue to provide the health care services to the communities it serves. The Record demonstrates the Debtor's reasonable prospect of successfully implementing the Plan. The Plan therefore satisfies the requirement of section 943(b)(7) of the Bankruptcy Code that the Plan be feasible.

        U.        <u>Assumption of Executory Contracts</u>. The Debtor has satisfied the provisions of section 365 of the Bankruptcy Code with respect to the assumption and rejection of the Executory Contracts pursuant to the Plan. The Debtor has exercised reasonable business judgment prior to the Confirmation Hearing in determining whether to assume or reject each of the Executory Contracts as set forth in Article IX of the Plan, Exhibit "B" to the Plan, or otherwise. Each assumption or rejection of an Executory Contract pursuant to this Order and in

accordance with Article IX of the Plan, or otherwise by order of this Court, shall be valid, legal, and binding upon the Debtor and all non-Debtor persons or entities party to such Executory Contract. Executory Contracts not previously assumed by order of this Court and which the Debtor has determined to assume are identified in Exhibit "B" to the Plan. Because no defaults exist under those certain Executory Contracts identified in Exhibit "B" to the Plan as having Cure Amounts of "$0.00," the Debtor is not required to make any cure payments, provide any other compensation, cure any nonmonetary defaults, or provide adequate assurance of future performance under section 365(b) of the Bankruptcy Code as a condition to the assumption of such Executory Contracts. With respect to the Payor Agreements, including any Payor Agreements identified in Exhibit "B" to the Plan, any Cure Amounts associated with the Debtor's assumption of the Payor Agreements shall be determined and satisfied as set forth in section 9.04 of the Plan. With respect to the leases reflected in Proofs of Claim 8-1 and 9-1 respectively filed by Wells Fargo Vendor Services, LLC and U.S. Bank, N.A., d/b/a U.S. Bank Equipment Finance, such leases shall ride through bankruptcy pursuant to section 9.08 of the Plan.

V.       Clarifications Regarding Cigna's Payor Agreement and Effect of Assumption of Payor Agreements on Timely Filed Proofs of Claim. The Payor Agreement between the Debtor and Cigna means that certain Hospital Services Agreement with an effective date of February 1, 2013, as amended pursuant to section 6.8.1 thereof by (a) that certain notice given to the Debtor by Cigna by letter dated February 15, 2018, and (b) that certain notice given to the Debtor by Cigna by letter dated February 16, 2018. The Debtor's assumption of the Payor Agreements shall not eliminate or in any manner cause the disallowance of any timely filed proof of Claim filed by a Payor, and all timely filed proofs of Claim filed by the Payors shall constitute Class 4A Claims and shall be administered, treated and satisfied in accordance with the provisions of the Plan and the Plan Trust Agreement.

W.      Qualification of the Proposed Plan Trust Administrator.  Jason Rae shall serve as the Plan Trust Administrator.  Based on the Record, Mr. Rae is qualified to serve as the Plan Trust Administrator.  As required by the Plan, BCBS and the Payors, in consultation with the Debtor, have selected Mr. Rae to serve as the Plan Trust Administrator.

X.      Plan Trust Agreement.  The Plan Trust Agreement was prepared by BCBS and the Payors, and approved by the Debtor, in accordance with the requirements of the Plan.  The Plan Trust Agreement is reasonable and appropriate, and contains terms and provisions that are, in all material respects, consistent with the Plan.  On the Effective Date, the Plan Trust shall be created pursuant to the Plan Trust Agreement.

Y.      Compromise and Settlement.  The Court finds and concludes that, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration of the Distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Treated Claims and controversies resolved pursuant to the Plan.  Each of such settlements and compromises, which were made at arm's length in exchange for good and valuable consideration, are in the best interests of the Debtor, the Debtor's Creditors and other parties in interest, are within the range of possible litigation outcomes, are fair, equitable, and reasonable, and are and shall be upon entry of this Order and the occurrence of the Effective Date valid and legally binding and enforceable as between the respective parties thereto.

Z.      Plan Injunction.  The injunction set forth in section 11.04 of the Plan (the "Plan Injunction") is necessary and appropriate to facilitate the transactions and Distributions to Creditors pursuant to the Plan.  The Plan Injunction constitutes an essential and integral part of the Plan without which the holders of Treated Claims against the Debtor could potentially interfere with implementation and performance of the Plan.  The Plan Injunction protects the best interests of the holders of Allowed Treated Claims and facilitates the efficient performance

of the Plan. Consequently, the Plan Injunction is appropriate pursuant to sections 105(a) and 1123(a)(5) of the Bankruptcy Code.

AA. <u>Compliance with Technical Requirements</u>. Pursuant to Bankruptcy Rule 3020(c), if a plan of adjustment provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code, the order confirming the plan of adjustment must: (a) describe the acts enjoined in reasonable detail; (b) be specific in its terms with regard to the injunction; and (c) identify the entities subject thereto. The Plan Injunction as set forth in this Order satisfies each of these requirements. The description of acts enjoined is specific and particular and the language of the Plan Injunction is therefore reasonably detailed. The Plan Injunction is also specific in its terms. The Plan Injunction also specifically identifies the entities subject to its terms. Therefore, the Plan Injunction satisfies all requirements of the applicable Bankruptcy Rules.

BB. <u>Retention of Jurisdiction</u>. This Court finds and concludes that this Court's retention of jurisdiction as set forth herein and in the Plan comports with 28 U.S.C. sections 157 and 1334 and section 945(a) of the Bankruptcy Code. Consequently, the Court may properly retain jurisdiction over the matters set forth in Article XII of the Plan.

CC. <u>Implementation of Necessary Documents and Agreements</u>. All Plan Documents and other documents and agreements necessary to implement the Plan are essential elements of the Plan and entry into and consummation of the transactions contemplated by each of such documents and agreements is in the best interests of the Debtor and the holders of Treated Claims. The Debtor has exercised reasonable business judgment in determining which agreements to enter into and has provided sufficient and adequate notice of such documents and agreements. The terms and conditions of such documents and agreements have been negotiated in good faith, at arm's length, are fair and reasonable, are reaffirmed and approved, and are and shall be upon entry of this Order and the occurrence of the Effective Date valid and

legally binding and enforceable as between the respective parties to such documents and agreements.

DD. <u>Conditions Precedent to the Effective Date</u>. Each of the conditions precedent to the Effective Date, as set forth in Article X of the Plan, has been satisfied or waived in accordance with the provisions of the Plan, or is reasonably likely to be satisfied or waived.

**<u>ORDER</u>**

Accordingly, it is hereby ORDERED:

1. <u>Findings of Fact and Conclusions of Law</u>. The above-referenced findings of fact and conclusions of law are incorporated by reference as though fully set forth herein. To the extent any of the prior findings of fact or conclusions of law constitute an order of this Court, they are adopted as such.

2. <u>Plan Confirmed</u>. All requirements for confirmation of the Plan have been satisfied. The Plan is hereby **CONFIRMED** in its entirety pursuant to section 943 of the Bankruptcy Code, and all terms and conditions set forth in the Plan are hereby **APPROVED**. A copy of the Second Amended Plan is attached hereto as **Exhibit "A."** A copy of the Modification is attached hereto as **Exhibit "B."** The terms of the Plan are incorporated by reference into, and are an integral part of, this Order.

3. <u>Construction</u>. In the event of any conflict between the Plan or the Plan Trust Agreement and any portion of the Disclosure Statement, the provisions of the Plan or the Plan Trust Agreement shall control. In the event of any conflict between the Plan and any portion of the Plan Trust Agreement, the provisions of the Plan shall control. In the event of any conflict between the Plan and any portion of the other Plan Documents, the provisions of the Plan Documents shall control. In the event of any conflict between this Order and any portion of the Plan, the Plan Trust Agreement, other Plan Documents, or the Disclosure Statement, the provisions of this Order shall control.

4. <u>Solicitation and Notice</u>. Notice of the Confirmation Hearing complied with the terms of the Disclosure Statement Order, was appropriate and satisfactory based on the circumstances of this Chapter 9 Case, and was in compliance with the provisions of the Bankruptcy Code and Bankruptcy Rules. The solicitation of votes on the Second Amended Plan and the Solicitation Packets complied with the Disclosure Statement Order and the Solicitation and Voting Procedures, was appropriate and satisfactory based upon the circumstances of this Chapter 9 Case, and was in compliance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

5. <u>Reference to Plan Provisions</u>. The failure specifically to include or to refer to any particular article, section, or provision of the Plan, or any related document in this Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Court that the Plan and any related documents be confirmed and approved in their entirety.

6. <u>Plan Classification Controlling</u>. The terms of the Plan shall solely govern the classification of Claims for purposes of Distributions to be made thereunder. The classifications set forth on the Ballots tendered to or returned by the holders of Claims in connection with voting on the Second Amended Plan: (a) were set forth thereon solely for purposes of voting to accept or reject the Second Amended Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims under the Plan for distribution purposes; (c) may not be relied upon by any holder of a Claim as representing the actual classification of such Claim under the Plan for distribution purposes; and (d) shall not be binding upon the Debtor except for voting purposes.

7. <u>Immediate Binding Effect</u>. Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtor and any and all holders of Claims, all entities that are parties to or are subject to the settlements, compromises,

releases, discharges, and injunctions described in the Plan or herein, any and all non-Debtor parties to Executory Contracts with the Debtor, and all other persons or entities receiving notice of the Plan.

8.    Approval of the Plan Trust Agreement and Other Plan Documents.  The Plan Trust shall be established and governed by the form of the Plan Trust Agreement attached to this Order as **Exhibit "C."**  The Plan Trust Agreement attached hereto as Exhibit "C" is hereby approved in all respects.  The form and substance of all other Plan Documents are hereby approved in all respects.  The parties to the Plan Trust Agreement shall execute and deliver the same as soon as practicable after the Effective Date.

9.    Approval of the Plan Trust Administrator and Approval of Compensation.  The appointment of Jason Rae as the Plan Trust Administrator is hereby approved.  In acting as the Plan Trust Administrator, Mr. Rae shall have the rights and powers granted to the Plan Trust Administrator as set forth in the Plan and in the Plan Trust Agreement, and shall be compensated pursuant to the terms set forth in the Plan Trust Agreement.  The terms of such compensation are fair and reasonable and are hereby approved in all respects.

10.    Plan Implementation.   The Debtor, the Plan Trust Administrator, and their respective officers, employees, representatives, agents and attorneys are hereby fully authorized, empowered and directed to take all actions to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents, including but not limited to the Plan Documents, and to take all other actions necessary or appropriate to implement, effectuate or consummate the Plan, the terms of this Order and the transactions respectively contemplated therein, and to otherwise fully perform and execute their duties under the Plan or this Order without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant hereto.  Without limiting the generality of the foregoing, pursuant to section 1142(b) of the Bankruptcy Code, each and every Person, to the extent

necessary, is hereby directed to execute and deliver and file, as appropriate, or to join in the execution or delivery of, any Plan Document or other instrument required to implement, effectuate, consummate, or remain consistent with, the Plan or this Order, and to make the Plan effective. This Order shall constitute all approvals and consents, if any, required by the laws, rules and regulations of all states and any other state or federal governmental entity which has any jurisdiction with respect to the implementation and consummation of the Plan or otherwise with respect to the matters contemplated therein. In the event of an appeal of this Order, the Debtor and the Plan Trust Administrator are hereby authorized and directed to take all steps necessary to make the Plan effective and, from and after the Effective Date, execute their duties, responsibilities and obligations under the Plan, this Order and the Plan Documents unless and until this Order is stayed by order of a court of appropriate jurisdiction.

11.    Retention of Assets.  On the Effective Date, without any other or further order by the Court, all Assets of the Debtor shall be retained by the Debtor, free and clear of all rights, title, interests, Claims, liens, encumbrances and charges in relation to the holders of any Treated Claims, except as expressly set forth in the Plan or any agreement, instrument, or other document incorporated therein, or this Order.

12.    Transfers of Assets to the Plan Trust Administrator.  As of the Effective Date, the Debtor shall transfer, in accordance with and on the terms set forth in the Plan, the following Assets to the Plan Trust Administrator: (a) the Plan Trust Outreach Claims; and (b) the cash sum of two hundred fifty thousand dollars ($250,000.00).  The Debtor shall not be required to transfer any other Assets to the Plan Trust Administrator.

13.    Retention and Assertion of Causes of Action and Defenses.  Except as expressly set forth in the Plan, all causes of action, claims, counterclaims, defenses and rights of offset or recoupment (including but not limited to all Debtor Claims, Debtor Defenses and Avoidance Actions) belonging to the Debtor (collectively the "Retained Actions") shall, upon the occurrence

of the Effective Date, be retained by the Debtor. Without limiting the scope of the foregoing, all Plan Trust Outreach Claims shall be retained by the Debtor for the limited purpose of assignment to the Plan Trust Administrator on the Effective Date. Except as expressly set forth in the Plan, the rights of the Debtor or the Plan Trust Administrator, as appropriate, to commence, prosecute or settle any Retained Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against them as any indication that the Debtor or the Plan Trust Administrator will not pursue any and all available causes of action (including all Retained Actions, Plan Trust Outreach Claims, Debtor Defenses and Avoidance Actions) against them.** Unless any Retained Action against a Person is expressly waived, relinquished, exculpated, released, compromised or settled, or otherwise deemed Allowed in the Plan or a Final Order, the Retained Actions shall be reserved for later adjudication or assignment to the Plan Trust Administrator. Therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Retained Actions upon or after the confirmation or consummation of the Plan. The Debtor may also assert Debtor Defenses as a defense to the allowance of any Claim not otherwise Allowed. The right of any counterparty to any Executory Contract other than the Payor Agreements to payment of any Cure Amount shall be subject to all of the Debtor's Retained Actions and Debtor Defenses. The holders of Untreated Claims are not affected by the Plan. Consequently, the Debtor shall also retain, unaffected and unimpaired, all rights, claims and defenses against all holders of Untreated Claims, including all rights of netting whether based upon offset or recoupment.

14. <u>Provisions Governing Distributions</u>. The distribution provisions of Articles VII and VIII of the Plan are hereby approved in their entirety. The Debtor shall make all Distributions

required under the Plan, other than Trust Distributions. Trust Distributions shall be made by the Plan Trust Administrator in the manner set forth in the Plan Trust Agreement.

15. <u>Claims Objection Deadline</u>. The Objection Deadline shall be the day that is ninety (90) days after the Effective Date; <u>provided</u>, <u>however</u>, the Objection Deadline shall not apply to Claims which are not reflected in the claims register, including any alleged informal proofs of Claim. Either the Debtor or the Plan Trust Administrator may seek to extend the Objection Deadline, each as to the Claims as to which they have standing to object, pursuant to a motion filed on or before the then applicable Objection Deadline with respect to any Claims. Any such motion may be granted without notice or a hearing. In the event that the Debtor or Plan Trust Administrator files such a motion and the Court denies such motion, the Objection Deadline shall nevertheless be automatically extended to that date which is ten (10) Business Days after the date of entry of the Court's order denying such motion. Any proof of claim filed more than thirty (30) days after the Effective Date shall be of no force and effect and need not be objected to by either the Debtor or the Plan Trust Administrator. Nothing contained in the Plan or this Order shall limit the right of the Debtor or the Plan Trust Administrator to object to Claims, if any, filed or amended after the Objection Deadline.

16. <u>Procedures for Resolving Contested and Contingent Claims</u>. The Claims resolution procedures contained in Article VIII of the Plan are hereby approved; <u>provided</u>, <u>however</u>, that the Claims resolution procedures set forth in sections 8.03 through 8.06 of the Plan shall not apply to holders of Class 4 Claims. Class 4 Claims shall be administered as set forth in the Plan Trust Agreement.

17. <u>Administrative Expense Claims (Generally)</u>. The Debtor shall continue to pay, after the Effective Date, in the ordinary course of its business, the reasonable and ordinary expenses incurred in operating the Debtor's business before the Effective Date.

18.     <u>Professional Fee Claims</u>.  All amounts previously paid and to be paid by the

Debtor for services and expenses of professionals in this Case or incident to the Plan have

been fully disclosed to the Court through the Fee Disclosures, and are hereby approved in all

respects.  Any unpaid Professional Fees owed by the Debtor may be paid on or as soon as

reasonably practicable following the date of entry of this Order, or at such other time as may be

agreed upon in writing by such professionals and the Debtor.  In the ordinary course of

business, the Debtor may pay for professional services rendered and expenses incurred after

the Effective Date.

19.     <u>Treatment of Executory Contracts and Unexpired Leases</u>.  The Executory

Contract provisions of Article IX of the Plan are hereby approved in their entirety.  The

assumption of Executory Contracts as set forth in the Plan, this Order, and Exhibit "B" to the

Plan are hereby approved and such Executory Contracts are hereby deemed assumed as of the

Effective Date.  Because no defaults exist under those certain Executory Contracts identified in

Exhibit "B" to the Plan as having Cure Amounts of "$0.00," the Debtor's assumption of such

Executory Contracts does not require the Debtor to make any cure payments, provide any other

compensation, cure any nonmonetary defaults, or provide adequate assurance of future

performance under section 365(b) of the Bankruptcy Code with respect to such Executory

Contracts.  Likewise, the rejection of certain contracts pursuant to section 9.02 of the Plan is

hereby approved.  With respect to the Payor Agreements, including any Payor Agreements

identified in Exhibit "B" to the Plan, any Cure Amounts associated with the Debtor's assumption

of the Payor Agreements shall be determined and satisfied as set forth in section 9.04 of the

Plan.  Any Rejection Claims must be filed within the time specified in section 9.05 of the Plan,

failing which any such Rejection Claim shall be forever barred and shall not be enforceable

against the Debtor or the Assets, and the holder of any such barred Rejection Claim shall be

precluded from receiving any Distribution pursuant to the Plan on account of such barred

Rejection Claim.

20.    Schedule B to the Plan is hereby corrected as to executory contract number 15

to reflect the identity of the counterparty as the  assignee of Flex Financial, a division of the

Striker Sales Corp., as follows:

> TCF Equipment Finance, a division of TCF National Bank
> 111 West San Marnan Dr., Suite A2 West
> Waterloo, IA 50701

Schedule B to the Plan is also corrected to add the following lessor and executory contract to

the list of assumed contracts:

> Wells Fargo Vendor Fin. Svs. – Bky Admin f/k/a GE Capital, Info.
> Tech Solutions
> c/o A Ricoh USA Program fka Ikon
> P.O. Box 13708
> Macon, GA 31208-3708

21.    Notices relating to the Plan and its confirmation were served upon both of the

above parties as reflected in Docket nos. 158, 164 and 180.  The Notice regarding the

Confirmation Hearing, the assumption of Executory Contracts, and the determination of Cure

Amounts (Docket no. 150) was also served on both such parties on December 16, 2021.  No

response or objection was filed by either of such parties.

22.    <u>Compromise and Settlement</u>.  In consideration for the classification, potential

Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan

constitute a good faith compromise of all Treated Claims and controversies resolved pursuant to

the Plan.  This Court hereby approves each of the foregoing compromises and settlements, and

all other compromises and settlements provided for in the Plan, and all such compromises and

settlements are and shall be upon entry of this Order and the occurrence of the Effective Date

valid and legally binding and enforceable as between the respective parties thereto.

23. **Discharge**. On the Effective Date, the Debtor and its Assets are forever discharged and released from all Treated Claims to the fullest extent permitted under section 944 of the Bankruptcy Code. Except as otherwise set forth in the Plan or this Order, the terms, covenants and consideration under the Plan are in exchange for and in complete satisfaction, discharge, and release of all Claims resolved pursuant to the Plan of any nature whatsoever against the Debtor or the Assets. Except as set forth in the Plan or this Order, and as provided in section 524(a)(1) of the Bankruptcy Code, made applicable to this Case pursuant to section 901(a) of the Bankruptcy Code, this discharge voids any judgment against the Debtor at any time obtained to the extent that it relates to a discharged Claim. Pursuant to section 944(a) of the Bankruptcy Code, this discharge is binding on all Creditors, whether or not such Creditor filed a proof of claim, or was deemed to have filed a proof of claim, whether such Claim has been Allowed, or whether such Creditor accepted the Plan. <u>Notwithstanding the foregoing, this discharge shall not apply to any Untreated Claim. The occurrence of the Effective Date shall not operate to discharge any Untreated Claim. The rights of a holder of an Untreated Claim, as well as all rights and defenses by the Debtor, with respect to such Untreated Claim, shall not be affected, impaired, or prejudiced in any manner by the Plan, the confirmation of the Plan, this Order, or the occurrence of the Effective Date.</u>

24. **Plan Injunction**. Pursuant to section 11.04 of the Plan, on the Effective Date and <u>except</u> as otherwise provided in the Plan, all Persons who have been, are, or may be holders of Treated Claims against the Debtor provided for in the Plan shall be permanently restrained and enjoined from (a) taking any of the following actions against or affecting the Debtor or the Assets with respect to such Claims (other than actions brought to enforce any rights or obligations under the Plan), or (b) taking any of the following actions against the individuals included in the Officers and Directors or Spiller

with respect to such Claims or other or further claims or causes of action arising out of or relating to the Hospital Outreach Program (other than actions brought to enforce any rights or obligations under the Plan or Plan Documents): (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind with respect to (A) any such Claim or (B) such other or further claims or causes of action arising out of or relating to the Hospital Outreach Program; (ii) enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind; (iv) asserting any control over, interest, rights or title in or to any of the Assets except as expressly provided in the Plan; (v) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Debtor, except upon order of this Court; and (vi) performing any act, by any manner or means, whether directly or indirectly, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; provided, however, that this injunction shall not bar any Creditor from asserting any right granted pursuant to the Plan or any Plan Documents; provided, further, however, that each holder of a Contested Claim shall be entitled to enforce its rights under the Plan, including seeking allowance of such Contested Claim pursuant to the Plan. Notwithstanding the foregoing, the Plan Injunction shall not apply with respect to any Untreated Claim. The occurrence of the Effective Date shall not operate to enjoin or restrain a holder of an Untreated Claim from taking any action or exercising any of its rights with respect to such Untreated Claim.

25. **Statutory Injunction.** Except as set forth in the Plan or this Order, upon the Effective Date all Persons shall be forever precluded and enjoined, pursuant to section 524(a)(2) of the Bankruptcy Code, made applicable to this Case by section 901(a) of the

**Bankruptcy Code, from prosecuting or asserting any discharged Claim against the Debtor and its Assets, in any manner inconsistent with the Plan. The statutory injunction pursuant to section 524(a)(2) of the Bankruptcy Code (the "Statutory Injunction") is hereby incorporated into this Order. All holders of discharged Claims shall be enjoined and restrained, jointly, severally and jointly and severally, in accordance with and pursuant to the Statutory Injunction without further order of the Court immediately upon the Statutory Injunction becoming effective.**

26. Setoffs. Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Debtor may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim (before such Distribution is made), any claims, rights, Debtor Claims and Debtor Defenses of any nature that the Debtor may hold against the holder of such Allowed Claim, to the extent such claims, rights, Debtor Claims and Debtor Defenses against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtor of any such claims, rights, Debtor Claims and Debtor Defenses that the Debtor may possess against such Claimant. In no event shall any Claimant be entitled to set off any Claim against any claim, right, or Debtor Claim of the Debtor without the consent of the Debtor unless such holder files a motion with the Court requesting the authority to perform such setoff notwithstanding any indication in any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise. Notwithstanding the foregoing or anything to the contrary herein, this paragraph of this Order shall not apply to the Payors in respect of any of the Payor Agreements.

27.  <u>Recoupment</u>.  All rights by the Debtor to recoupment are hereby specifically preserved.  Except as otherwise expressly provided for in the Plan, in no event shall any holder of a Claim be entitled to recoup any Claim against any claim, right, account receivable, or Debtor Claim of the Debtor unless (a) such holder actually provides notice thereof in writing to the Debtor of its intent to perform a recoupment; (b) such notice includes the amount to be recouped by the holder of the Claim and a specific description of the basis for the recoupment, and (c) the Debtor has provided a written response to such Claimant, stating unequivocally that the Debtor consents to the requested recoupment.  The Debtor shall have the right, but not the obligation, to seek an order of the Court allowing any or all of the proposed recoupment.  In the absence of a written response from the Debtor consenting to a recoupment or an order of the Court authorizing a recoupment, no recoupment by the holder of a Claim shall be allowed.  Notwithstanding the foregoing or anything to the contrary herein, this paragraph of this Order shall not apply to the Payors in respect of any of the Payor Agreements.

28.  <u>No Effect on Untreated Claims</u>.  The Plan only affects the rights of the Debtor and Creditors holding Treated Claims that are provided for in the Plan.  The rights of the holders of Untreated Claims, including but not limited to any Lien rights or rights of setoff or recoupment, are not affected or altered in any manner by the Plan or this Order.  Each Untreated Claim constitutes a debt that is excepted from discharge by the Plan and this Order pursuant to section 944(c)(1) of the Bankruptcy Code.  The Plan Injunction and the Statutory Injunction shall not apply to any act taken with respect to an Untreated Claim.

29.  <u>Automatic Stay and Injunctions</u>.  The automatic stay pursuant to sections 362 and 922 of the Bankruptcy Code, except as previously modified by order of the Court, shall remain in effect as to the Debtor and the Assets until the occurrence of the Effective Date when it shall be replaced by the Plan Injunction.  All injunctions or stays contained in the Plan or this Order shall remain in full force and effect in accordance with their terms.

30.     <u>Patient Care Ombudsman</u>.  On the Effective Date of the Plan, the Patient Care

Ombudsman appointed in this Case by the United States Trustee pursuant to section 333 of the

Bankruptcy Code and as directed by this Court's *Order Directing Appointment of a Patient Care*

*Ombudsman Under 11 U.S.C. § 333* [Docket No. 29] entered on July 16, 2020 shall be released

and fully discharged of her duties in this Case.

31.     <u>Retention of Jurisdiction</u>.  The Court may properly, and upon the Effective Date

shall, to the full extent set forth in the Plan, retain jurisdiction over all matters arising in, arising

under, and related to, this Chapter 9 Case, including the matters set forth in Article XII of the

Plan and section 1142(b) of the Bankruptcy Code.

32.     <u>Binding Effect</u>.  The Court has exclusive *in rem* jurisdiction over the Debtor and

its property.  Based on this exclusive *in rem* jurisdiction over the Debtor and its property: (a) the

Plan, this Order and the Plan Documents are binding upon the Debtor and all Creditors who are

holders of Treated Claims, and (b) no other or further consent or authorization, other than this

Order, is necessary to authorize or permit the Debtor, its officers, directors, and representatives,

to proceed with the consummation and performance of the terms of the Plan and this Order,

including the execution and delivery of all Plan Documents.  The provisions of the Plan and this

Order shall be binding upon the Debtor, the Plan Trust Administrator, all holders of Treated

Claims, any other party in interest or Person making an appearance in this Chapter 9 Case, as

well as their respective heirs, successors, assigns, affiliates, agents, representatives and similar

officers or any Person claiming by, through or in the right of any such Person.

33.     <u>Release of Liens</u>.  Except as otherwise provided in the Plan, this Order, or in any

contract, instrument, or other agreement or document entered into or delivered in connection

with the Plan, on the Effective Date all Liens against any of the Assets are hereby deemed to be

released, terminated and nullified without the necessity of further order of this Court; <u>provided</u>,

<u>however</u>, this paragraph does not apply to or in any manner affect the Liens securing all or any portion of either the Regions Claim or the SOTB Claims.

34. <u>Notice of Confirmation</u>. No later than the third Business Day after the entry of this Order, the Debtor shall serve a copy of this Order pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c)(2) on all known holders of Claims, other parties in interest, and Persons identified as subject to an injunction under the Plan against conduct not otherwise enjoined under the Bankruptcy Code.

35. <u>Notice of Effective Date</u>. Any term of the Plan notwithstanding, the Debtor may take the Plan effective immediately upon the entry of this Order. No later than the third Business Day after the occurrence of the Effective Date, the Debtor shall file a notice of occurrence of the Effective Date with the Clerk of the Court, and serve a copy on all known holders of Claims and other parties in interest.

36. <u>Filing and Recording</u>. A certified copy of this Order is hereby deemed to be in recordable form and shall be binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any document or instrument. Each and every federal, state and local government agency is hereby directed to accept any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan and this Order.

37. <u>Headings</u>. Paragraph headings contained in this Order are for convenience of reference only and shall not affect the meaning or interpretation of this Order.

38.     <u>Waiver of Bankruptcy Rule 3020(e)</u>.  The stay of this Order provided by any Bankruptcy Rule (including, without limitation, Bankruptcy Rules 3020(e) and 6004(h)), whether for fourteen (14) days or otherwise, is hereby waived, and this Order shall be effective and enforceable immediately upon its entry by the Court.

39.     <u>Final Order</u>.  This Order is a Final Order and the period in which an appeal must be filed shall commence upon the entry hereof.

40.     <u>Appeal or Motion for Reconsideration; Reversal</u>.  In the event this Order is appealed or a motion for reconsideration is filed, the Debtor and the Plan Trust Administrator, and their respective representatives, agents and attorneys, are all hereby authorized to proceed with the consummation and performance of the Plan unless and until this Order is stayed, reversed or modified by a court of competent jurisdiction.  If any or all of the provisions of this Order are hereafter reversed, modified, or vacated by subsequent order of this Court or any other court of competent jurisdiction, such reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Debtor's or the Plan Trust Administrator's, as applicable, receipt of written notice of any such order of reversal, modification or vacatur.  Notwithstanding any such reversal, modification, or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Order and the Plan (including the Plan Documents) and any amendments or modifications thereto.

**### END OF ORDER ###**

L:\BFORSHEY\Jack County Hospital District #6046 (Ch 9)\Plan and DS\Order Confirming Second Amended Plan (final) 03.17.22.doc

Page 36 of 36

# EXHIBIT "A"

## TO FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE SECOND AMENDED PLAN OF ADJUSTMENT OF JACK COUNTY HOSPITAL DISTRICT, AS MODIFIED

J. Robert Forshey
State Bar No. 07264200
Matthew G. Maben
State Bar No. 24037008
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
bforshey@forsheyprostok.com
mmaben@forsheyprostok.com

ATTORNEYS FOR THE DEBTOR

David Spiller
State Bar No. 18934950
Mason Spiller
State Bar No. 24095168
Reid Spiller
State Bar No. 24111067
Spiller & Spiller
P.O. Drawer 447
Jacksboro, Texas 76458
Telephone: (940) 567-6644
Facsimile: (940) 567-3999
david@spillerlaw.net
mason@spillerlaw.net
reid@spillerlaw.net

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JACK COUNTY HOSPITAL DISTRICT d/b/a | ) | |
| FAITH COMMUNITY HEALTH SYSTEM | ) | Case No. 20-42012-mxm9 |
| | ) | |
| Debtor. | ) | Chapter 9 Case |

**<u>SECOND AMENDED PLAN OF ADJUSTMENT OF JACK COUNTY HOSPITAL DISTRICT</u>**

Dated: September 30, 2021.

# TABLE OF CONTENTS

Page

Article I    **DEFINITIONS** ....................................................................................1

Article II    **CLASSIFICATION OF CLAIMS**.........................................................10

2.02    Claims.....................................................................................10
2.03    No Equity Interests ................................................................11
2.04    Impaired Classes of Claims ...................................................11
2.05    Impairment or Classification Controversies ...........................11

Article III    **TREATMENT OF ADMINISTRATIVE EXPENSES** ...............................11

3.01    Administrative Expenses. ......................................................11
3.02    No Other Priority Claims.........................................................11

Article IV    **TREATMENT OF CLAIMS**................................................................12

4.01    Class 1 – Regions Claim. ......................................................12
4.02    Class 2 – SOTB Claims.........................................................13
4.03    Class 3 – Poynor Claim. ........................................................13
4.04    Class 4 – Unsecured Claims .................................................14
4.05    Interest and Attorneys' Fees..................................................15
4.06    PPP Loan...............................................................................15

Article V    **ACCEPTANCE OR REJECTION OF PLAN** ........................................15

5.01    Classes Entitled to Vote. .......................................................15
5.02    Class Acceptance Requirement. ............................................15
5.03    Elimination of Vacant Classes. ..............................................15
5.04    Cramdown...............................................................................15

Article VI    **MEANS OF IMPLEMENTATION OF THE PLAN**...................................15

6.01    Consent..................................................................................15
6.02    Payment of Allowed Claims....................................................15
6.03    Actions by the Debtor to Implement Plan...............................16
6.04    Retention of Assets; Continuation of Operations ..................16
6.05    Source of Funding for Plan Obligations .................................16
6.06    Future Tax Anticipation Note Transactions............................16
6.07    IGT Transactions....................................................................16
6.08    Retention and Assertion of Causes of Action and Defenses....16
6.09    Professional Fee Disclosure ..................................................17
6.10    The Tax Account ....................................................................17
6.11    CARES Act Funds..................................................................17
6.12    Plan Trust...............................................................................17
6.13    No admission ..........................................................................20
6.14    Indemnity Rights of the Management Group ..........................20
6.15    Post-Effective Date Additions to the Management Group.......20

| | 6.16 | U.S. Trustee's Fees | 21 |

**Article VII  PROVISIONS GOVERNING DISTRIBUTION** ................................................ **21**

| | 7.01 | Source of Distributions. | 21 |
| | 7.02 | Timing and Amount of Distributions. | 21 |
| | 7.03 | Proofs of Claim by Holders of Untreated Claims | 21 |
| | 7.04 | Means of Cash Payment | 21 |
| | 7.05 | Record Date for Distributions. | 21 |
| | 7.06 | Delivery of Distributions. | 22 |
| | 7.07 | Time Bar to Cash Payments. | 22 |
| | 7.08 | Cure Period. | 22 |
| | 7.09 | Distributions after Substantial Consummation. | 22 |

**Article VIII  PROCEDURES FOR RESOLVING AND TREATING CONTESTED AND CONTINGENT CLAIMS** ................................................ **22**

| | 8.01 | Objection Deadline. | 22 |
| | 8.02 | Contested Class 4 Claims | 23 |
| | 8.03 | Responsibility for Objecting to Claims and Settlement of Claims. | 23 |
| | 8.04 | Distributions on Account of Contested Claims. | 23 |
| | 8.05 | No Waiver of Right to Object. | 23 |
| | 8.06 | Offsets and Defenses. | 23 |
| | 8.07 | Claims Paid or Reduced Prior to Effective Date. | 23 |

**Article IX  EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ................................................ **24**

| | 9.01 | Assumption and Rejection of Executory Contracts | 24 |
| | 9.02 | BCBS Contracts and BCBS Cure Amount Claims | 24 |
| | 9.03 | Cure Amount Payments | 24 |
| | 9.04 | Payor Agreement Cure Amounts | 25 |
| | 9.05 | Bar to Rejection Claims | 26 |
| | 9.06 | Rejection Claims | 26 |
| | 9.07 | Reservation of Rights | 26 |
| | 9.08 | Ride-through of Executory Contracts | 26 |

**Article X  CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF PLAN** ................................................ **26**

| | 10.01 | Conditions to Confirmation and Effectiveness of Plan. | 26 |

**Article XI  EFFECT OF THE PLAN ON CLAIMS** ................................................ **27**

| | 11.01 | Compromise and Settlement. | 27 |
| | 11.02 | Satisfaction of Claims. | 27 |
| | 11.03 | Discharge. | 27 |
| | 11.04 | Injunction. | 28 |
| | 11.05 | Setoffs. | 28 |
| | 11.06 | Recoupment. | 28 |
| | 11.07 | No Effect on Claims Not Resolved Under the Plan | 29 |
| | 11.08 | Automatic Stay. | 29 |

 11.09   Patient Care Ombudsman ....................................................................29

**Article XII   JURISDICTION OF COURTS AND MODIFICATIONS TO THE PLAN.................29**

 12.01   Retention of Jurisdiction.......................................................................29
 12.02   Abstention and Other Courts. ..............................................................30
 12.03   Modifications of the Plan. .....................................................................30

**Article XIII MISCELLANEOUS PROVISIONS .....................................................31**

 13.01   Severability. .........................................................................................31
 13.02   Oral Agreements; Modification of Plan; Oral Representations or Inducements.......31
 13.03   Waiver...................................................................................................31
 13.04   Construction. .......................................................................................31
 13.05   Notice...................................................................................................31
 13.06   Compliance with All Applicable Laws. .................................................32
 13.07   Binding Effect. .....................................................................................32
 13.08   Governing Law, Interpretation. ............................................................32
 13.09   Payment of Statutory Fees. .................................................................33
 13.10   Filing of Additional Documents. ...........................................................33
 13.11   Computation of Time. ..........................................................................33
 13.12   Elections by the Debtor. ......................................................................33
 13.13   Release of Liens. .................................................................................33
 13.14   Rates. ...................................................................................................33
 13.15   Compliance with Tax Requirements. ...................................................33
 13.16   Notice of Entry of Confirmation Order..................................................33
 13.17   Notice of Occurrence of the Effective Date..........................................33

# ARTICLE I

# DEFINITIONS

**A.** **Defined Terms.**

In addition to such other terms as are defined in other sections of this Plan, the following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural, masculine and feminine forms of the terms defined).

1.01 "2013 Bond Certificate" means that certain Jack County Hospital District Revenue Bond, Series 2013 Registered No. T-1, dated August 1, 2013, issued in the name of Regions in the amount of $27,825,000.00.

1.02 "2013 Bond Documents" means all documents executed or delivered in connection with the 2013 Bonds, including without limitation the 2013 Bond Certificate, 2013 Resolution, CCA and 2013 Deed of Trust.

1.03 "2013 Bonds" means the Jack County Hospital District Mortgage Revenue Bonds, Series 2013 issued by the Debtor in the amount of $27,825,000.00 on August 15, 2013 and purchased by Regions.

1.04 "2013 Deed of Trust" means that certain Deed of Trust, Security Agreement – Financing Statement dated effective as of August 13, 2013, recorded at Book No. 0929, Page No. 0037 *et seq.*, in the Official Public Records of Jack County, Texas, as subsequently amended by a First Amended and Restated Deed of Trust, Security Agreement – Financing Statement dated effective as of August 13, 2013, recorded at Book No. 0981, Page No. 0158 *et seq.*, in the Official Public Records of Jack County, Texas, and a First Amendment to First Amended and Restated Deed of Trust dated effective as of August 13, 2013, recorded at Book No. 0999, Page No. 0788 *et seq.*, in the Official Public Records of Jack County, Texas.

1.05 "2013 Resolution" means that certain Bond Resolution for the 2013 Bonds adopted July 25, 2013, as subsequently amended by an Amendment Agreement dated November 20, 2015 by and between the Debtor and Regions.

1.06 "2021 Bonds" means the $999,000 Jack County Hospital District Mortgage Revenue Refunding Bonds, Series 2021 purchased by SOTB.

1.07 "2021 Resolution" means that certain Resolution No. 2021-0210 adopted by the Debtor's Board of Directors at a meeting held on January 25, 2021 approving issuance of the 2021 Bonds.

1.08 "AAA" means American Arbitration Association and any of its affiliates.

1.09 "Adjuvant" shall mean Adjuvant Health Solutions, LLC and any affiliates, parents, subsidiaries, and successors thereof, or any other entities related thereto.

1.10 "Administrative Expense" includes any cost or expense of administration of the Debtor's Case allowed under subsections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of operating the business of the Debtor.

1.11 "Advisory Board" means the Plan Trust Advisory Board to be created pursuant to the terms of the Plan Trust Agreement, which shall be comprised solely of certain holders of Impaired Unsecured Claims as identified in the Plan Trust Agreement.

1.12 "Aetna" means Aetna Health Management, LLC and any of its affiliates, including but not limited to Aetna Health, Inc.

1.13 "Allowed," when used with respect to a Claim (other than an Administrative Expense), means a Claim (a) to the extent it is not Contested; or (b) a Contested Claim, proof of which was filed timely with the Bankruptcy Court, and (i) as to which no Objection was filed by the Objection Deadline, or (ii) as to which an Objection was filed by the Objection Deadline, to the extent, if any, such Claim is ultimately allowed by a Final Order; provided however, if a Claim is to be determined in a forum other than the Bankruptcy Court, such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court.

1.14 "Assets" includes all right, title, and interest in and to all property of every type or nature owned or claimed by the Debtor as of the Petition Date, together with all such property of every type or nature subsequently acquired by the Debtor through the Effective Date, whether real or personal, tangible or intangible, and wherever located. Without limiting the generality of the foregoing, this shall include all Outreach Claims, Debtor Claims and Debtor Defenses.

1.15 "Athenahealth" shall mean athenahealth, Inc. and any affiliates, parents, subsidiaries, and successors thereof, or any other entities related thereto.

1.16 "Avoidance Action" means a cause of action assertable by the Debtor against any Person, including but not limited to any Creditor, pursuant to any provision of chapter 5 of the Bankruptcy Code applicable in this Case, including without limitation, actions brought, or which may be brought, under sections 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code.

1.17 "Ballot" means the form of ballot provided to holders of Claims entitled to vote pursuant to Bankruptcy Rule 3017(d), by which each such holder may accept or reject the Plan.

1.18 "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and codified at title 11 of the United States Code.

1.19 "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.

1.20 "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, including all applicable local rules of the Bankruptcy Court.

1.21 "Bar Date" is the date established by the Bankruptcy Court, including through any standing order, for filing proofs of Claim; provided, however, that if the Bankruptcy Court has ordered an extension of the time by which a particular Creditor may file a proof of Claim, the date set with respect to such Creditor shall be the Bar Date with respect to such Creditor, but only as to such Creditor.

1.22 "BCBS" means Blue Cross and Blue Shield of Texas, an unincorporated division of Health Care Services Corporation, a Mutual Legal Reserve Company, and any of its affiliates.

1.23    "Benchmark" shall mean Benchmark Health Network, LLC and any affiliates, parents, subsidiaries, and successors thereof, or any other entities related thereto.

1.24    "Bison" shall mean Bison Trails, LLC and any affiliates, parents, subsidiaries, and successors thereof, or any other entities related thereto.

1.25    "Business Day" means any day other than Saturday, Sunday, a legal holiday, or a day on which national banking institutions in Texas are authorized or obligated by law or executive order to close.

1.26    "CARES Act" means the Coronavirus Aid, Relief, and Economic Security (CARES) Act, P.L. 116-136.

1.27    "Case" means the Debtor's chapter 9 case, which is pending before the Bankruptcy Court under Case No. 20-42012-mxm9 and styled *In re Jack County Hospital District d/b/a Faith Community Health System.*

1.28    "CCA" means that certain Continuing Covenant Agreement dated as of July 25, 2013, as subsequently amended and restated by an Amended and Restated Continuing Covenant Agreement dated as of November 20, 2015 between the Debtor and Regions.

1.29    "Cigna" means Cigna Health Care of Texas, Inc. and any of its affiliates.

1.30    "Claim" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, legal, equitable, secured or unsecured or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, secured or unsecured.

1.31    "Claimant" means the holder of a Claim.

1.32    "Class" means a category or group of holders of Claims as designated in Article II of the Plan.

1.33    "Clinic Contract" shall refer to the Medical Group Agreement from Blue Advantage HMO Network Participation dated December 30, 2015 with Blue Cross Blue Shield Association.

1.34    "Collateral" means any Asset subject to a valid and enforceable Lien to secure payment of a Claim, including any right of offset asserted against any Asset.

1.35    "Confirmation Date" means the date of entry of the Confirmation Order.

1.36    "Confirmation Hearing" means the hearing, as it may be continued from time to time, conducted by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider confirmation of the Plan, as the same may be amended or supplemented.

1.37    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of chapter 9 of the Bankruptcy Code.

1.38    "Contested," when used with respect to a Claim, means a Claim: (a) that is listed in the Creditor List as disputed, contingent, and/or unliquidated, or in the amount of "$0.00" or "Unknown"; (b) that is listed in the Creditor List as undisputed, liquidated, and not contingent and as to which a proof of claim has been filed with the Bankruptcy Court, to the extent the proof of claim amount exceeds the amount stated in the Creditor List; (c) as to which an Objection has been or may be timely filed and which Claim has not been Allowed by a Final Order; or (d) for which the proof of claim is filed after the Bar Date.

1.39    "Creditor" means a "creditor," as defined in section 101(10) of the Bankruptcy Code.

1.40    "Creditor List" means the *Debtor's Third Amended List of Creditors* [Docket No. 126] filed by the Debtor pursuant to section 924 of the Bankruptcy Code on September 29, 2021, as the same may be further amended or supplemented.

1.41    "Curam" shall mean Curam Group, LLC and any affiliates, parents, subsidiaries, and successors thereof, or any other entities related thereto.

1.42    "Cure Amount" shall refer to any amount payable to the counterparty to an Executory Contract pursuant to section 365(b) of the Bankruptcy Code for (a) the payment or other performance required to cure any existing default under an Executory Contract or (b) any actual pecuniary loss resulting from any such default under an Executory Contract.

1.43    "Debtor" shall mean Jack County Hospital District d/b/a Faith Community Health System.

1.44    "Debtor Claims" shall include all claims and causes of action held by the Debtor, including without limitation all Avoidance Actions and Outreach Claims, and shall be subject to all terms of this Plan.  Without limiting the generality of the foregoing, this shall include all claims and causes of action against Aetna, Cigna, Humana, or United for any unreimbursed services or other value given Persons insured by, or within the coverage networks of, Aetna, Cigna, Humana or United; provided, however, that Debtor Claims shall not include any claims or causes of action against Aetna, Cigna, Humana, or United that are released, settled, exculpated or otherwise barred pursuant to the terms of this Plan.

1.45    "Debtor Defenses" shall refer to all defenses, affirmative defenses, counterclaims or offsets by the Debtor against any Person, including but not limited to any Creditor, including all Debtor Claims asserted as offsets.

1.46    "Disallowed," when used with respect to all or any part of a Claim, means that portion of a Claim to which an Objection or motion to disallow has been sustained by a Final Order or, as to a Contested Claim, any portion thereof which is not Allowed by a Final Order of the Bankruptcy Court.

1.47    "Disclosure Statement" means the written statement, as amended, supplemented, or modified from time to time, describing the Plan that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code and Bankruptcy Rule 3017.

1.48  "Distribution" shall refer to and include any payment or other distribution of property pursuant to this Plan.

1.49  "DX Power" shall mean DX Power Move Consulting, LLC and any affiliates, parents, subsidiaries, and successors thereof, or any other entities related thereto.

1.50  "Effective Date" means the first Business Day which is fourteen (14) days after the Confirmation Date if the Confirmation Order is not stayed or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay which is at least fourteen (14) Business Days after the Confirmation Date, and upon which all conditions to the effectiveness of the Plan set forth in Article X below are satisfied.

1.51  "Event of Default" means the failure of the Debtor from and after the Effective Date to perform, keep, or observe any term, covenant, or condition of the Plan, but only if the Event of Default is not cured prior to the expiration of the applicable cure period.

1.52  "Executory Contract" shall refer to any executory contract or unexpired lease which is subject to section 365 of the Bankruptcy Code.

1.53  "Final Order" means an order or judgment of the Bankruptcy Court or any other court or adjudicative body, as to which the time to appeal or seek rehearing or petition for certiorari shall have expired, and which such order or judgment shall no longer be subject to appeal, rehearing, or certiorari proceeding.

1.54  "Global Molecular" shall mean Global Molecular Labs, LLC and any affiliates, parents, subsidiaries, and successors thereof, or any other entities related thereto.

1.55  "Hospital Outreach Program" shall mean the laboratory outreach program initiated prepetition by the Debtor pursuant to which laboratory specimens were collected from patients at locations other than the Debtor's main hospital facility and the tests were performed through third-party laboratories outside the Hospital's main facility, and the conduct of which is alleged by the following Creditors to support their Claims against the Debtor: Aetna, BCBS, Cigna, Humana and United.

1.56  "Humana" means Humana Inc., Humana Insurance Company, Humana Health Plan, Inc., Humana Health Plan of Texas, Inc., CHA HMO, Inc., Humana Government Business, Inc., and Health Value Management, Inc. d/b/a ChoiceCare Network, and any affiliates of any of the foregoing.

1.57  "IGT Loans" means loans by Poynor to the Debtor after the Effective Date to fund an IGT Transaction.

1.58  "IGT Transaction" means an intergovernmental transaction in which the Debtor transfers funds through TEXNET that is sent to CMS to draw down the federal matching funds on behalf of the State of Texas, thereby enabling the Debtor to be reimbursed for performing Medicaid services at higher Medicare reimbursement rates.

1.59  "Impaired Unsecured Claims" means, collectively, the Unsecured Claims held by the following Creditors: (a) AAA; (b) Aetna; (c) BCBS; (d) Cigna; (e) Humana; and (f) United.

1.60    "Initial Distribution Date", when used with respect to any Contested Claim or Rejection Claim, shall mean the later of (i) the first Business Day at least thirty (30) days after the date on which any such Contested Claim or Rejection Claim becomes an Allowed Claim, or (ii) if the payment terms of Article IV of this Plan applicable to each such Claim specify a different date, then the date as calculated pursuant to the terms of Article IV of this Plan applicable to each such Claim.  The Initial Distribution Date shall be separately determined with respect to each Contested Claim or Rejection Claim based upon the date each such Claim became an Allowed Claim.

1.61    "Insider" means a Person described in section 101(31) of the Bankruptcy Code.

1.62    "LGRB" shall mean LGRB Management Services, LLC d/b/a Rise Health Solutions and any affiliates, parents, subsidiaries, and successors thereof, or any other entities related thereto.

1.63    "Lien" means any mortgage, lien, charge, security interest, encumbrance, or other security device of any kind affecting any Asset, including any right of offset asserted against any Asset.

1.64    "Management Group" shall mean the Persons identified on **Exhibit "A"** to this Plan.

1.65    "Objection" includes an objection to the allowance of a Claim interposed by any party entitled to do so within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court.

1.66    "Objection Deadline" shall mean ninety (90) days following the Effective Date unless otherwise extended by order of the Bankruptcy Court.

1.67    "Officers and Directors" shall mean the Persons identified in **Exhibit "A"** to this Plan as "Past and Present Members of Debtor's Management" and "Past and Present Members of Debtor's Board of Directors."

1.68    "Outreach Claims" shall mean the claims, causes of action, defenses and any other rights held by the Debtor arising out of, or related to, the Hospital Outreach Program, and includes all rights and defenses of the Debtor of every type or nature, including any right of netting (whether based on offset or recoupment) which relates to, or arises out of, the Hospital Outreach Program.

1.69    "Outreach Defendants" shall include Adjuvant, Athenahealth, Benchmark, Bison, Curam, DX Power, Global Molecular, LGRB, Regal, Triple Helix, True Health and Universal, and any similarly situated third-party laboratory or management services company involved in the Hospital Outreach Program, and any provider who submitted laboratory test requests that were billed through the Hospital Outreach Program (collectively, the "Named Outreach Defendants"), and any affiliates, successors, insiders, agents, representatives, employees, officers, directors, members, attorneys, or advisors of any of the Named Outreach Defendants; provided, however, that no Person identified on **Exhibit "A"** to this Plan as a part of the Management Group shall constitute an Outreach Defendant except under the limited circumstances expressly stated in **Exhibit "A"** to this Plan under which certain past and present employees of the Debtor may be excluded as members of the Management Group.

1.70    "Outreach Indemnity Claimant" includes any Person asserting, or who may assert a Claim for indemnity, contribution or the like against the Debtor based on any of the Outreach Claims or Payor Outreach Claims, but excluding always therefrom all members of the Management Group.

1.71    "PPP Loan" shall refer to the extension of credit by U.S. Bank-Direct Lending to the Debtor in connection with the Paycheck Protection Program.

1.72    "Payors" shall collectively mean Aetna, Cigna, Humana and United, or individually a "Payor".

1.73    "Payor Agreements" shall include all contracts relating to the provision of healthcare services among the Debtor and Aetna, Cigna, Humana and United that have not expired as of the Effective Date.

1.74    "Payor Outreach Claims" shall mean the claims, causes of action, defenses and any other rights held by any Payor against the Debtor arising out of, or related to, the Hospital Outreach Program, and includes all rights and defenses of any Payor against the Debtor of every type or nature, including any right of netting (whether based on offset or recoupment) which relates to, or arises out of, the Hospital Outreach Program.  For the avoidance of doubt, Payor Outreach Claims shall not include any claims, causes of action, defenses, or any other rights held by any Payor against third parties arising out of, or related to, the Hospital Outreach Program.

1.75    "Person" means any individual, any type of incorporated or registered business or nonprofit entity, including any corporation, general partnership, limited partnership, limited liability company, limited liability partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, governmental entity or unit, or any political subdivision thereof, or other entity.

1.76    "Petition Date" means June 11, 2020.

1.77    "Plan" means this Second Amended Plan of Adjustment, either in its present form or as it may be altered, amended, or modified from time to time.

1.78    "Plan Documents" shall refer to the documents that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court as specified in Article I(D) hereof.

1.79    "Plan Trust" shall refer to the trust created pursuant to this Plan for the benefit of the holders of Allowed Class 4 Claims.

1.80    "Plan Trust Administrator" shall mean the trustee or administrator of the Plan Trust.

1.81    "Plan Trust Agreement" shall mean the trust instrument creating and, subject to this Plan, governing the Plan Trust.

1.82    "Plan Trust Outreach Claims" refers to the Outreach Claims to be assigned by the Debtor to the Plan Trust Administrator, and which are fully defined in Article VI below.

1.83    "Poynor" means G. M. "Max" Poynor, an individual residing in Jack County, Texas.

1.84    "Poynor Note" means that certain Promissory Note dated September 26, 2019 executed by the Debtor in favor of Poynor in the original principal amount of $1,000,000.00.

1.85    "Professional Fee Disclosure" means that disclosure filed with the Bankruptcy Court in accordance with section 943(b)(3) of the Bankruptcy Code and section 6.09 of this Plan, for use by the Bankruptcy Court in assessing the reasonableness of the Professional Fees.

1.86    "Professional Fees" means those fees payable and expenses reimbursable to professional persons employed by the Debtor for services in relation to this Case or incident to the Plan.

1.87    "Prosperity" means Prosperity Bank and any of its affiliates.

1.88    "Regal" shall mean Regal Health Solutions, LLC and any affiliates, parents, subsidiaries, and successors thereof, or any other entities related thereto.

1.89    "Regions" means Regions Capital Advantage, Inc.

1.90    "Regions Claim" means the debt owed by the Debtor to Regions on the 2013 Bonds, the principal outstanding amount of which was $19,406,000.00 as of the Petition Date, and which debt shall be treated as a deemed Allowed and fully Secured Claim under this Plan.

1.91    "Rejection Claim" means a Claim arising under section 502(g) of the Bankruptcy Code as a consequence of the rejection of any Executory Contract.

1.92    "Secured Claim" shall mean (a) a Claim secured by a Lien against an Asset, to the extent such Lien is valid, perfected and enforceable under applicable non-bankruptcy law and is not subject to avoidance under the Bankruptcy Code or other applicable non-bankruptcy law, and which is duly Allowed, but only to the extent that such Claim does not exceed the value of the Assets which the Bankruptcy Court finds are valid security for such Claim (except, if the holder of such Claim makes the election provided for in section 1111(b)(2) of the Bankruptcy Code, the entire amount of the Claim shall be a Secured Claim), and (b) any valid and enforceable right of offset asserted against the Debtor or any Asset.

1.93    "SOTB" means Spirit of Texas Bank, SSB and any of its affiliates.

1.94    "SOTB Claims" means the debts owed by the Debtor to SOTB as evidenced by: (a) SOTB Note 1, which debt is secured by a pledge of certain of the Debtor's tax revenues as set forth in that certain Loan Agreement between the Debtor and SOTB dated December 22, 2020; (b) SOTB Note 2, which debt is secured by a pledge of certain of the Debtor's tax revenues as set forth in that certain Loan Agreement between the Debtor and SOTB dated February 12, 2021; and (c) the 2021 Bonds, which debt is secured by Liens on the Wellness Center and the Debtor's gross revenues.

1.95    "SOTB Loan Documents" means, collectively: (a) SOTB Note 1 and all documents executed or delivered in connection with SOTB Note 1, including without limitation that certain Loan Agreement between the Debtor and SOTB dated December 22, 2020; (b)

SOTB Note 2 and all documents executed or delivered in connection with SOTB Note 2, including without limitation that certain Loan Agreement between the Debtor and SOTB dated February 12, 2021; and (c) the 2021 Bonds and all documents executed or delivered in connection with the 2021 Bonds, including without limitation the 2021 Resolution.

1.96    "SOTB Note 1" means that certain 2020 Tax Anticipation Note dated December 22, 2020 executed by the Debtor in favor of SOTB in the original principal amount of $2,000,000.00.

1.97    "SOTB Note 2" means that certain 2021 Tax Anticipation Note dated February 12, 2021 executed by the Debtor in favor of SOTB in the original principal amount of $1,700,000.00.

1.98    "Spiller" shall mean, collectively: (a) the law firm of Spiller & Spiller; (b) David Spiller; (c) Mason Spiller; and (d) Reid Spiller.

1.99    "Substantial Consummation" means the day on which a Distribution of any kind is first made under the terms and provisions of this Plan.

1.100    "Tax Account" means a deposit account maintained by the Debtor at SOTB into which the Debtor shall deposit and segregate its tax revenues.

1.101    "Transfer" shall have the same meaning as in Section 101(54) of the Bankruptcy Code.

1.102    "Treated Claims" shall mean any Administrative Expense or Claim which is treated in this Plan, including without limitation any Claims treated as a part of one of the Classes set forth in this Plan as well as the PPP Loan Claim.

1.103    "Triple Helix" shall mean Triple Helix Healthcare Consulting, LLC and any affiliates, parents, subsidiaries, and successors thereof, or any other entities related thereto.

1.104    "True Health" shall mean Outreach Management Solutions, LLC, d/b/a True Health Outreach, and any affiliates, parents, subsidiaries, and successors thereof, or any other entities related thereto.

1.105    "Trust Beneficiaries" shall mean holders of Allowed Class 4 Claims.

1.106    "Trust Distributions" shall mean Distributions by the Plan Trust Administrator to Trust Beneficiaries.

1.107    "Unclaimed Property" means any cash, Distribution, payment or any other property unclaimed for a period of one (1) year after the applicable Initial Distribution Date.

1.108    "United" means UnitedHealthcare Insurance Company and any of its affiliates.

1.109    "Universal" shall mean Universal Triumph Laboratory Consultants, LLC and any affiliates, parents, subsidiaries, and successors thereof, or any other entities related thereto.

1.110 "<u>Unsecured Claim</u>" means any Claim that is not secured by a valid and enforceable Lien against any Asset, but excluding always therefrom all Administrative Expenses.

1.111 "<u>Untreated Claim</u>" shall mean any Claim which is not treated as an Administrative Expense or included within one of the Classes set forth in this Plan, but shall not include the PPP Loan Claim.

1.112 "<u>Wellness Center</u>" means the real estate and improvements thereon owned by the Debtor in Jacksboro, Texas and known as the Swan Family Wellness Center.

**B.** **<u>Interpretation</u>**. Unless otherwise specified, all section, Article and exhibit references in this Plan are to the respective section in, Article of, or exhibit to, the Plan as the same may be amended, waived, or modified from time to time. The headings in the Plan are for convenience and reference only and shall not limit or otherwise affect the provisions hereof. The rules of interpretation set forth in section 102 of the Bankruptcy Code shall apply to this Plan.

**C.** **<u>Other Terms</u>**. The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. References herein to "after notice and hearing" or other similar language shall have the same meaning as in section 102(1) of the Bankruptcy Code. Otherwise, terms used herein that are not specifically defined herein shall have the meaning ascribed to those terms, if any, in the Bankruptcy Code.

**D.** **<u>Exhibits and Plan Documents</u>**. All Exhibits to the Plan and all Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein. Any Plan Documents may be filed with the Clerk of the Bankruptcy Court prior to the commencement of the Confirmation Hearing. Holders of Claims may obtain a copy of the Plan Documents, once filed, by a written request sent to the following address: Forshey & Prostok, LLP, 777 Main Street, Suite 1550, Fort Worth, Texas 76102, Attention: Jackie Jones; Fax number (817) 877-4151; email: jjones@forsheyprostok.com.

**E.** **<u>References to Sections of the Bankruptcy Code Outside of Chapter 9</u>**. Unless otherwise indicated, references herein to the Bankruptcy Code are references to sections thereof made applicable to this chapter 9 Case pursuant to section 103 and/or section 901 of the Bankruptcy Code.

**ARTICLE II**

**<u>CLASSIFICATION OF CLAIMS</u>**

2.01 The following is a designation of the Classes of Claims under this Plan. Administrative Expenses have not been classified, are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code, and their treatment is set forth in Article III below. A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class. A Claim is included in a particular Class only to the extent that the Claim is an Allowed Claim in that Class.

2.02 <u>Claims</u>. Allowed Claims against the Debtor are classified under this Plan as follows:

    (a)    <u>Class 1</u> – Regions Claim

    (b)    <u>Class 2</u> – SOTB Claims

    (c)    <u>Class 3</u> – Poynor Claim

    (d)    <u>Class 4</u> – Unsecured Claims

    2.03    <u>No Equity Interests.</u> As a municipality pursuant to section 101(40) of the Bankruptcy Code, there are no equity interests in the Debtor.

    2.04    <u>Impaired Classes of Claims.</u> All Classes of Claims are impaired and entitled to vote on the Plan.

    2.05    <u>Impairment or Classification Controversies.</u> If a controversy arises as to the classification of any Claim, or as to whether any Class of Claims is impaired under the Plan, the Bankruptcy Court shall determine such controversy as a part of the confirmation process.

### ARTICLE III

### TREATMENT OF ADMINISTRATIVE EXPENSES

    3.01    <u>Administrative Expenses.</u>

    (a)    As allowed by section 904 of the Bankruptcy Code, the Debtor has been paying the reasonable and ordinary expenses incurred in operating the Debtor's business from and after the Petition Date, including such expenses accruing before the Effective Date. The Debtor shall continue to pay, after the Effective Date, in the ordinary course of its business, the reasonable and ordinary expenses incurred in operating the Debtor's business before the Effective Date ("<u>Ordinary Course Claims</u>"). The remaining provisions of this section 3.01 shall not apply to the Ordinary Course Claims.

    (b)    Pursuant to section 943(b)(3) of the Bankruptcy Code, all amounts paid or to be paid for Professional Fees in relation to the Case or incident to the Plan must be fully disclosed to the Bankruptcy Court and must be reasonable. The Debtor will disclose such amounts to the Bankruptcy Court prior to and at the Confirmation Hearing. The Bankruptcy Court shall enter an order, which may be the Confirmation Order, determining or approving the reasonableness of Professional Fees. Any unpaid amounts approved as reasonable Professional Fees by the Bankruptcy Court in such order may be paid on or as soon as is reasonably practicable following the date on which the Bankruptcy Court enters such order or at such other time as may be agreed upon in writing by the professional and the Debtor. After the Effective Date, the Debtor may pay for professional services rendered and expenses incurred in connection with such professional services without such approval.

    3.02    <u>No Other Priority Claims.</u> The only category of priority Claims incorporated into a chapter 9 case through section 901(a) of the Bankruptcy Code are Administrative Expense Claims allowable under section 507(a)(2) of the Bankruptcy Code. The treatment of Allowed Administrative Expense Claims under the Plan is described in full in this Article III. No other kinds of priority Claims set forth in section 507 of the Bankruptcy Code are recognized or entitled to priority in this chapter 9 Case.

## ARTICLE IV

## TREATMENT OF CLAIMS

4.01   Class 1 – Regions Claim. The Regions Claim is treated as a deemed Allowed and fully Secured Claim under this Plan and shall be paid and treated according to the terms of the 2013 Bond Documents as amended by the Plan Documents applicable to the Regions Claim, which provide *inter alia* as follows:

(a)   Regions shall retain its Liens on its Collateral until the Regions Claim is paid in full.

(b)   Notwithstanding anything to the contrary in the 2013 Bond Documents, the maturity date of the Regions Claim is hereby amended to be February 1, 2027 (the "Amended Maturity Date").  All outstanding unpaid principal, accrued interest and other charges due and owing to Regions on account of the Regions Claim shall be due and payable on the Amended Maturity Date.

(c)   Interest on the Regions Claim shall continue to accrue at the rate set forth in the 2013 Bond Documents.  Interest payments on the Regions Claim shall continue to be payable to Regions on August 1 and February 1 of each calendar year following the Effective Date until the Amended Maturity Date.  The Debtor has paid the interest payment due to Regions on February 1, 2021, pursuant to section 904(2) of the Bankruptcy Code.

(d)   Notwithstanding anything to the contrary in the 2013 Bond Documents, payments of principal on the Regions Claim shall be due and payable to Regions in the following amounts from and after the Effective Date on the following dates until the Amended Maturity Date:

(i)   $550,000.00 due and payable on February 1, 2023;

(ii)   $550,000.00 due and payable on February 1, 2024;

(iii)   $750,000.00 due and payable on February 1, 2025; and

(iv)   $750,000.00 due and payable on February 1, 2026.

(e)   The financial covenants, financial reporting requirements and compliance certificates contained in the CCA shall be modified as follows:

(i)   The Debtor's compliance with all financial covenants is waived through February 28, 2022 and the Debtor shall not be required to certify compliance with any financial covenants through February 28, 2022 in any compliance certified required to be delivered to Regions prior to May 31, 2022.  The requirement for the Debtor to comply with financial covenants shall resume beginning on May 31, 2022.

(ii)   Commencing with the fiscal quarter ending May 31, 2022, the Debtor shall maintain a Debt Service Coverage Ratio (as that term is defined and calculated in the 2013 Bond Documents) of not less than 1.10 to 1.00, tested as of the last day of each fiscal quarter using unaudited financial statements, and also tested as of each May 31, commencing May 31, 2022, using audited annual financial statements.

(iii)     Commencing on May 31, 2022, the Debtor shall maintain at least 45 Days Cash on Hand (as that term is defined and calculated in the 2013 Bond Documents), tested as of November 30 and May 31 of each calendar year using unaudited financial statements, and also tested as of each May 31 using audited annual financial statements.

(iv)     In addition to complying with the financial reporting requirements contained in the 2013 Bond Documents, the Debtor shall furnish Regions with such other financial and operational information as Regions may reasonably request in writing, with such other financial and operational information being due within ten (10) days of the written request by Regions.

(f)     Notwithstanding anything to the contrary herein or in the 2013 Bond Documents, if the Debtor pays the Regions Claim in full on or before September 28, 2023, Regions shall discount the principal portion of the Regions Claim then outstanding at the time of payoff by an amount equal to five percent (5%) thereof if: (A) each prior payment on the Regions Claim required under this Plan has been made by the Debtor no later than five (5) days after the due date thereof; and (B) no Event of Default with respect to the Debtor's obligations owed to Regions under this Plan have occurred between the Effective Date and that time of payoff.  Regions shall not be required to discount any accrued and unpaid interest owed on the Regions Claim in connection with a payoff of the Regions Claim by the Debtor on or before September 28, 2023.

(g)     In the event of any conflict between the provisions of this section 4.01 and the 2013 Bond Documents as amended by the Plan Documents related to the Regions Claim (including without limitation the Plan Documents attached as exhibits to the *Notice of Filing of Plan Documents Supplementing Debtor's Amended Plan of Adjustment* [Docket No. 86] filed by the Debtor on January 6, 2021 and the *Second Notice of Filing of Plan Documents Supplementing Debtor's Amended Plan of Adjustment* [Docket No. 111] filed by the Debtor on April 9, 2021), the terms of the latter shall control.

(h)     Class 1 is impaired.

4.02     Class 2 – SOTB Claims. The SOTB Claims are treated as fully Secured Claims under this Plan and shall be paid and treated as follows:

(a)     SOTB shall retain its first priority Liens on the Debtor's tax revenues until SOTB Note 1 and SOTB Note 2 are paid in full.  SOTB shall retain its (i) first priority Lien on the Wellness Center, and (ii) its Lien on the Debtor's gross revenues, which such Lien is currently subordinate to the Lien held by Regions on such gross revenues, until the debt owed by the Debtor to SOTB on the 2021 Bonds is paid in full.

(b)     The Debtor shall pay the SOTB Claims in accordance with the terms of the SOTB Loan Documents and the Orders entered by the Bankruptcy Court approving the loans made by SOTB to the Debtor and the issuance of the 2021 Bonds.

(c)     From and after the Effective Date, all payments of interest and/or principal on SOTB Note 1 and SOTB Note 2 shall be made out of funds held in the Tax Account.

(d)     Class 2 is impaired.

4.03     Class 3 – Poynor Claim. The Poynor Claim shall be paid and treated as follows:

(a)      Poynor shall retain his Liens on his Collateral until the Poynor Claim is paid in full.

(b)      From and after the Effective Date, interest shall continue to accrue on the Poynor Claim at the rate of six percent (6%) per annum, as set forth in the Poynor Note.

(c)      From and after the Effective Date, the Debtor shall make payments of accrued interest to Poynor on a quarterly basis, with such payments being due on each March 31, June 30, September 30 and December 31 of each calendar year until December 31, 2023.

(d)      The unpaid balance of the Poynor Claim shall be due and payable December 31, 2023.  It is anticipated that, after the Effective Date, Poynor will make additional IGT Loans to facilitate IGT Transactions.  To the extent that the IGT Transaction yields funds ("Excess IGT Funds") in excess of the amount necessary to repay the IGT Loan in full, then the Debtor may, at the Debtor's sole discretion, use the Excess IGT Funds to repay principal on the Poynor Claim; provided, however, the Debtor shall not make any payment(s) of principal on the Poynor Claim that exceed in the aggregate amount $25,000.00 during any calendar quarter prior to the maturity of the Poynor Claim.

(e)      Class 3 is impaired.

4.04    Class 4 – Unsecured Claims. The holders of Impaired Unsecured Claims, the Outreach Defendants, any Outreach Indemnity Claimants and the holders of any Rejection Claims shall comprise Class 4.  Holders of Allowed Class 4 Claims shall be divided into two (2) subclasses as follows:

(a)      Class 4A shall consist of the holders of Allowed Impaired Unsecured Claims and any Allowed Rejection Claims, other than any Outreach Defendants and Outreach Indemnity Claimants.

(b)      Class 4B shall consist of all Outreach Defendants and all Outreach Indemnity Claimants.

(c)      Holders of Allowed Class 4A and Class 4B Claims are the Trust Beneficiaries of the Plan Trust and shall be entitled to receive Trust Distributions from the Plan Trust.  Holders of Allowed Class 4 Claims shall not be entitled to receive any property or any Distributions pursuant to this Plan other than the Trust Distributions.  Holders of Allowed Class 4B Claims shall not be entitled to receive any Trust Distributions until all Allowed Class 4A Claims have been fully satisfied.

(d)      All Claims asserted against the Debtor by any members of Class 4B shall be subject to sections 502(e) and 509 of the Bankruptcy Code.

(e)      The treatment and benefits provided to the holders of Class 4 Claims shall be in full, final and complete satisfaction and extinguishment of all Claims by any holder of a Class 4 Claim against Spiller or any of the Officers and Directors arising out of or relating to the Hospital Outreach Program.

(f)      Class 4 is impaired.

4.05    Interest and Attorneys' Fees. The following provisions shall apply to all Allowed Claims:

(a)    Interest accrued after the Petition Date will accrue and be paid on Allowed Claims only to the extent specifically provided for in the Plan or the Confirmation Order.

(b)    Except as specifically provided in the Plan or as expressly ordered by the Bankruptcy Court, no award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim.

4.06    PPP Loan. Based on the Debtor's use of the PPP Loan funds in accordance with the applicable guidelines of the Paycheck Protection Program, the PPP Loan has been forgiven in its entirety. Prior to forgiveness of the PPP Loan, the holder of the PPP Loan was given notice of the applicable Bar Date but did not file a timely proof of Claim. The holder of the PPP Loan is not entitled to any Distribution pursuant to this Plan.

## ARTICLE V

## ACCEPTANCE OR REJECTION OF PLAN

5.01    Classes Entitled to Vote. Each impaired Class of Claims entitled to vote shall separately vote to accept or reject the Plan. Any unimpaired Class shall not be entitled to vote to accept or reject the Plan. Any unimpaired Class is deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

5.02    Class Acceptance Requirement. A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan.

5.03    Elimination of Vacant Classes. Any Class of Claims that is not occupied as of the date of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

5.04    Cramdown. This section shall constitute the request by the Debtor, pursuant to section 1129(b) of the Bankruptcy Code, that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of section 1129(a)(8) of the Bankruptcy Code have not been met.

## ARTICLE VI

## MEANS OF IMPLEMENTATION OF THE PLAN

6.01    Consent. Pursuant to and for purposes of section 904 of the Bankruptcy Code, the Debtor consents to entry of the Confirmation Order on the terms and conditions set forth in the Plan and to entry of any further orders as necessary or required to implement the provisions of the Plan or any and all related transactions.

6.02    Payment of Allowed Claims. All Distributions under this Plan will be paid by the Debtor or the Plan Trust Administrator in the manner provided in this Plan.

6.03     Actions by the Debtor to Implement Plan. The entry of the Confirmation Order shall constitute authorization of the Debtor to take or cause to be taken all actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including without limitation, (i) all transfers of Assets that are to occur pursuant to the Plan; (ii) the incurrence of all obligations contemplated by the Plan and the making of all Distributions required under the Plan; and (iii) entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation.

6.04     Retention of Assets; Continuation of Operations.  Except as otherwise expressly stated in this Plan, all Assets of the Debtor shall be retained by the Debtor on and after the Effective Date, free and clear of all Claims, Liens, encumbrances, charges, and interests in relation to the holders of any Treated Claims, except as expressly provided in the Plan.  From and after the Effective Date, the Debtor may continue the operation of its business and otherwise conduct its affairs and use, acquire, and dispose of any property without supervision by or approval of the Bankruptcy Court and free of any and all restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there were not a pending case under any chapter or provision of the Bankruptcy Code, other than any restrictions expressly imposed by the Plan or Confirmation Order.  Except as otherwise provided in this Plan, any Person holding a Treated Claim shall be conclusively deemed to have consented to the vesting of such Assets in the Debtor from and after the Effective Date.  The rights of holders of Treated Claims, including their rights against the Assets, shall be exclusively determined and fixed by this Plan and any applicable Plan Documents and applicable law.

6.05     Source of Funding for Plan Obligations. The Distributions to be made by the Debtor under the Plan shall be funded primarily from (i) the revenues generated by the operation of the Debtor's business, and (ii) proceeds of property taxation realized by the Debtor. Trust Distributions shall be made by the Plan Trust Administrator from the Plan Trust.

6.06     Future Tax Anticipation Note Transactions.  The Debtor anticipates that SOTB Note 1 and SOTB Note 2 will be repaid at maturity through the execution of new tax anticipation notes in reduced amounts to borrow against the Debtor's next year's tax revenues, and that such practice will continue annually in the future.

6.07     IGT Transactions.  The Debtor intends to use certain funds to secure one or more lines of credit to fund long-term IGT Transactions.  The Debtor also anticipates entering into short-term IGT Transactions after the Effective Date.  The Debtor anticipates that such short-term IGT Transactions will be made possible through additional IGT Loans made by Poynor to the Debtor.

6.08     Retention and Assertion of Causes of Action and Defenses. Except as expressly set forth in this Plan, all causes of action, claims, counterclaims, defenses and rights of offset or recoupment (including but not limited to all Debtor Claims, Debtor Defenses and Avoidance Actions) belonging to the Debtor (collectively the "Retained Actions") shall, upon the occurrence of the Effective Date, be retained by the Debtor.  Without limiting the scope of the foregoing, all Plan Trust Outreach Claims are hereby retained by the Debtor for the limited purpose of assignment to the Plan Trust Administrator on the Effective Date.  Except as expressly set forth in this Plan, the rights of the Debtor or the Plan Trust Administrator, as appropriate, to commence, prosecute or settle any Retained Action shall be preserved notwithstanding the

occurrence of the Effective Date. No Person may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any cause of action against them as any indication that the Debtor or the Plan Trust Administrator will not pursue any and all available causes of action (including all Retained Actions, Plan Trust Outreach Claims, Debtor Defenses and Avoidance Actions) against them. Unless any Retained Action against a Person is expressly waived, relinquished, exculpated, released, compromised or settled in this Plan or a Final Order, the Debtor expressly reserves all such Retained Actions for later adjudication or assignment to the Plan Trust Administrator. Therefore, no preclusion doctrine, <u>including</u> without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Retained Actions upon or after the confirmation or consummation of the Plan. The Debtor may also assert Debtor Defenses as a defense to the allowance of any Claim not otherwise Allowed. The right of any counterparty to any Executory Contract other than the Payor Agreements to payment of any Cure Amount shall be subject to all of the Debtor's Retained Actions and Debtor Defenses.

The holders of Untreated Claims are not affected by this Plan. Consequently, the Debtor shall also retain, unaffected and unimpaired, all rights, Claims and defenses against all holders of Untreated Claims, including all rights of netting whether based upon offset or recoupment.

6.09   <u>Professional Fee Disclosure.</u>  The Professional Fee Disclosure will be filed by the Debtor prior to the Confirmation Hearing as required by section 943(b)(3) of the Bankruptcy Code. The Professional Fee Disclosure filed in advance of the Confirmation Hearing will be supplemented, to the extent necessary, at the Confirmation Hearing.

6.10   <u>The Tax Account.</u>  The Debtor shall deposit its tax revenues into the Tax Account. Other general revenues of the Debtor, on which Regions and SOTB possess Liens, shall not be deposited in or transferred to the Tax Account and shall not be commingled with the Debtor's tax revenues. Through use of the Tax Account, the Debtor shall segregate its tax revenues from all other general revenues of the Debtor.

6.11   <u>CARES Act Funds</u>.  Any other term of this Plan notwithstanding, all funds ("<u>CA Funds</u>") received by the Debtor pursuant to the CARES Act shall be handled, administered and disbursed pursuant to this section. The CA Funds shall be held in a separate account which account shall be separate from the Debtor's general operating revenues and the tax revenues held in the Tax Account until disbursed. The CA Funds shall only be used and disbursed by the Debtor in accordance with the terms of the CARES Act. Nothing contained in this Plan shall alter or modify the Debtor's rights in, or obligations with respect to, the CA Funds, including the requirement to return the unused CA Funds to the U.S. Government.

6.12   <u>Plan Trust.</u>

(a)   The Plan Trust shall be created for the benefit of the Trust Beneficiaries. The Plan Trust Agreement shall be prepared by BCBS and the Payors, although subject to approval by the Debtor, and shall constitute one of the Plan Documents. The Plan Trust Administrator shall be chosen by BCBS and the Payors in consultation with the Debtor, and shall be identified in an amendment or supplement to this Plan or in the Confirmation Order. The Confirmation Order shall constitute full, complete and final approval of the Plan Trust Agreement and authorization for the Debtor to do all necessary acts required or contemplated by this Plan in relation to the Plan Trust. The holders of Allowed Class 4 Claims shall receive no Distributions or other property pursuant to this Plan other than their rights as Trust Beneficiaries, including the right to

receive Trust Distributions.  The Plan Trust Administrator shall have the sole right and obligation to make Trust Distributions in accordance with the terms of the Plan Trust Agreement.

(b)     As of the Effective Date, all Plan Trust Outreach Claims (as defined below) shall be fully, finally and completely transferred by the Debtor to the Plan Trust Administrator.  The Plan Trust Outreach Claims are transferred by the Debtor to the Plan Trust Administrator "AS IS", "WHERE IS", "WITH ALL FAULTS", and without any warranties or representations by the Debtor to any Person, either express or implied, and all such representations and warranties by the Debtor are hereby expressly negated and disclaimed except as expressly set forth in this Plan.  Subject to the terms of the Plan Trust Agreement, any Trust Beneficiary may, in its sole discretion, elect to assign additional Claims and causes of action of such Trust Beneficiary against Outreach Defendants relating to the Hospital Outreach Program to the Plan Trust Administrator.  In addition, on the Effective Date, the Debtor shall transfer the cash sum of $250,000.00 to the Plan Trust Administrator.  The Debtor shall not be required to transfer any Assets to the Plan Trust Administrator except as expressly set forth in this subsection.

(c)     The term "Plan Trust Outreach Claims" shall mean all Claims and causes of action of the Debtor, including any associated defenses, rights and privileges relating to such Claims and causes of action, against or with respect to any Person (including any of the Outreach Defendants), other than any Excluded Person as defined below, that participated in, or benefited from, the Hospital Outreach Program, and shall include without limitation the following Claims, causes of action and remedies:

i.     Breach of contract, tortious interference with contract, fraud, conspiracy, RICO, negligent misrepresentation, money had and received, professional negligence, malpractice, unjust enrichment, alter ego liability, fraudulent transfer, and preferential transfer; and

ii.     Avoidance Actions of the Debtor based on Transfers arising out of or relating to the Hospital Outreach Program.

The Plan Trust Outreach Claims shall also include all Claims and causes of action against any Person (including any of the Outreach Defendants), other than any Excluded Person as defined below, alleged to be a successor to, a subsequent transferee of, or a co-conspirator with any of the Outreach Defendants in connection with the Hospital Outreach Program.

For clarity and to avoid any doubt, the Plan Trust Outreach Claims do not include: (A) any Claim, cause of action, right or remedy against any Excluded Person, including any such Claim, cause of action, right or remedy to pierce or disregard the corporate veil to hold any Excluded Person liable for any Plan Trust Outreach Claim, or against any Excluded Person as an alleged conspirator with any other Person, or (B) any Claim, cause of action, right or remedy by, between or against the Debtor, BCBS and any Payor, or (C) any Claim, cause of action, right or remedy against the Debtor.

**All Plan Trust Outreach Claims are hereby specifically retained by the Debtor and shall be assigned to the Plan Trust Administrator on the Effective Date.  The remaining Outreach Claims of the Debtor which do not qualify as Plan Trust Outreach Claims are retained by the Debtor subject to the remaining terms of this Plan.**

(d)     Except as may be released under the express terms of this Plan, the Debtor shall retain and reserve all Claims, causes of action, defenses, rights or remedies against any

Excluded Person, in all capacities, including without limitation all Outreach Claims against any Excluded Person, and no Claim, cause of action, defense, right or remedy against or in relation to any Excluded Person shall be transferred by Debtor to the Plan Trust Administrator.

(e)     The "Excluded Persons" are comprised of the Persons reflected in the attached **Exhibit "C"** to this Plan.

(f)     On the Effective Date, the Plan Trust shall be created pursuant to the Plan Trust Agreement.  The Plan Trust shall not terminate upon the death or incapacity of the Plan Trust Administrator and shall continue until its termination in accordance with the terms of this Plan and the Plan Trust Agreement.  The Plan Trust Agreement shall, *inter alia*, (i) provide for the creation of the Advisory Board which shall oversee the actions of the Plan Trust Administrator and possess the ability to remove the Plan Trust Administrator, (ii) provide authorization for the Plan Trust to obtain financing in whatever form (including, but not limited to, financing to facilitate the investigation and/or prosecution of the Plan Trust Outreach Claims) and (iii) authorize the Plan Trust Administrator to retain, compensate and reimburse professionals without the necessity of further order of the Bankruptcy Court.  The Plan Trust Administrator's duties and compensation, to the extent not set forth in this Plan, shall be as set forth in the Plan Trust Agreement.  From the Effective Date, the Plan Trust Administrator shall have the exclusive standing and authority to prosecute, settle or compromise all Plan Trust Outreach Claims transferred to the Plan Trust for the benefit of the Trust Beneficiaries pursuant to the Plan Trust Agreement; provided, however, the Plan Trust Administrator shall never have any right, standing or power to assert any Claim (including without limitation any Plan Trust Outreach Claim) against any Excluded Person.  The Plan Trust Administrator may settle or compromise any Plan Trust Outreach Claim so transferred to the Plan Trust without notice to any Person, except such as may be required in the Plan Trust Agreement, and Bankruptcy Rule 9019 shall not apply to any such compromise or settlement by the Plan Trust Administrator.

(g)     The Plan Trust Administrator shall have the exclusive standing to object to the Allowance of any Class 4 Claims.

(h)     As set forth more fully in the Plan Trust Agreement, the Advisory Board shall have the authority to direct the actions of the Plan Trust Administrator consistent with the Plan Trust Administrator's duties and powers under the Plan Trust Agreement.  The Plan Trust Administrator shall be held to a traditional fiduciary standard, subject to the oversight of the Advisory Board.

(i)     The Plan Trust Administrator may resign as provided in the Plan Trust Agreement, and may be replaced in the manner and on the terms as set forth therein.  If the Plan Trust Administrator dies or becomes incapacitated or otherwise unable to serve, a substitute Plan Trust Administrator may be appointed in the manner set forth in the Plan Trust Agreement.

(j)     Debtor shall reasonably co-operate with the Plan Trust Administrator in the performance of the Plan Trust Administrator's duties pursuant to this Plan or the Plan Trust; provided, however, that the Debtor shall not be required to directly incur additional out-of-pocket expenses in order to perform its duties to co-operate with the Plan Trust Administrator.  The Debtor's reasonable cooperation shall include granting the Plan Trust Administrator or such Person's representatives reasonable access to, at reasonable times in reasonable manners, all without the necessity of a subpoena, the Debtor's books and records and to the Debtor's management, directors, and employees.  However, the Debtor may reasonably condition any

such access to Debtor's books and records, or information obtained from its management, directors, and employees, on the execution of appropriate confidentiality agreements by the Plan Trust Administrator and such Person's agents and representatives.  The Debtor, within fourteen (14) days after the Effective Date, shall provide to the Plan Trust Administrator all documents remaining in the Debtor's possession which had been previously produced by the Debtor in connection with the prepetition arbitration proceeding between the Debtor and BCBS, although subject to the terms of any confidentiality order or agreement relating to any of such documents.  In the event of any dispute relating to this subsection, either the Debtor or the Plan Trust Administrator may seek appropriate relief from the Bankruptcy Court.  Any communication or disclosure between the Debtor and the Plan Trust Administrator (including the Advisory Board) or their respective professionals shall not constitute a waiver of the attorney-client privilege, work product protection, or any other applicable privilege.

6.13  <u>No admission</u>.  Nothing in this Plan, the Disclosure Statement or any Plan Document shall act as an admission by the Debtor as to any wrongdoing by the Debtor or anyone affiliated with the Debtor in connection with the Hospital Outreach Program.  Furthermore, the Debtor asserts that it used third-party laboratories at the beginning of the Hospital Outreach Program on a temporary basis only while the Debtor was in the process of expanding its on-site laboratory.  The assertions contained in the preceding sentence: (a) state the Debtor's position; (b) do not state the position of BCBS and/or any of the Payors; (c) are disagreed with by one or more of BCBS and the Payors; and (d) do not constitute statements that shall be binding on any Creditor or other party in interest if this Plan is confirmed.

6.14  <u>Indemnity Rights of the Management Group</u>.  Nothing contained in this Plan shall impair, modify or impact any right to indemnity or contribution which any member of the Management Group may have or assert against the Debtor, including any such right pursuant to any contractual covenant of indemnity by the Debtor in favor of any member of the Management Group.

6.15  <u>Post-Effective Date Additions to the Management Group</u>.  From and after the Effective Date, if the Debtor identifies a Person not listed on **Exhibit "A"** to this Plan who the Debtor believes should be included as a member of the Management Group, but was omitted by mistake or inadvertence, the Debtor shall give written notice to the Plan Trust Administrator identifying such Person and stating the basis for inclusion of such Person in the Management Group.  After such notice is given by the Debtor in accordance with the Plan, the Plan Trust Administrator shall have twenty-one (21) days to serve a written response to such notice on the Debtor in accordance with this Plan.  If the Plan Trust Administrator does not serve any response to such notice within the time permitted by this section, or the Plan Trust Administrator serves a timely written response consenting to the inclusion of such Person in the Management Group, then the Person identified in the notice shall be automatically deemed a member of the Management Group for purposes of the Plan, without the need for any further action by the Debtor or further order of the Bankruptcy Court.  In the event that the Plan Trust Administrator serves a timely response to such a notice objecting to the inclusion of a Person in the Management Group, such Person shall only be deemed a member of the Management Group if: (a) the Debtor receives a subsequent writing executed by the Plan Trust Administrator in which the Plan Trust Administrator consents to the inclusion of the Person as a member of the Management Group, or (b) a Final Order is entered deeming such Person as a member of the Management Group.  In the event of an objection by the Plan Trust Administrator to the post-Effective Date inclusion of a Person in the Management Group, either the Debtor or the Plan Trust Administrator may seek appropriate relief from the Bankruptcy Court, including but not

limited to a determination as to the eligibility of the Person for inclusion in the Management Group.

6.16    U.S. Trustee Fees.  Nothing in this Plan may be construed to require the Debtor, either before or after the Effective Date, to file any monthly or quarterly operating reports or pay any fees to the U.S. Trustee.  The U.S. Trustee shall not be entitled to the payment of any fees or expenses of any kind from the Debtor in connection with this Case, either before or after the Effective Date.

# ARTICLE VII

# PROVISIONS GOVERNING DISTRIBUTION

7.01    Source of Distributions. All Distributions under this Plan, other than Trust Distributions, shall be made by the Debtor.  Trust Distributions shall be made by the Plan Trust Administrator in the manner set forth in the Plan Trust Agreement.  The remaining provisions of this Article VII shall not apply to Trust Distributions.

7.02    Timing and Amount of Distributions. No Distribution shall be made on account of any Claim until such Claim is Allowed, except as otherwise set forth in the Plan or ordered by the Bankruptcy Court pursuant to a Final Order.  No Distribution shall be made on account of any Contested Claim until such Claim is Allowed. Any Distributions pursuant to the Plan shall be made on the respective Initial Distribution Dates applicable to each such Allowed Claim except as otherwise provided in the Plan or ordered by the Bankruptcy Court.  Any Unclaimed Property may be paid into the registry of the Bankruptcy Court or otherwise distributed in accordance with the orders of the Bankruptcy Court.  Except as expressly set forth in the Plan or in the Confirmation Order, the Debtor shall determine the timing and amount of all Distributions which are required to be made under the Plan, consistent with the goal of making such Distributions as expeditiously as possible.  The Debtor may, but shall not be required to, seek approval of the Bankruptcy Court for any such Distributions.

7.03    Proofs of Claim by Holders of Untreated Claims.  Proofs of claim filed by holders of Untreated Claims shall have no effect and shall not entitle the Person filing such proof of claim to any Distribution pursuant to this Plan.  The Debtor need not object to or take any action with regard to any such proof of claim which, as of the Effective Date, shall be deemed as automatically expunged and deleted from the Claims Register.  However, by filing a proof of claim, the holder of any Untreated Claim does not waive or release any rights and the Debtor shall retain all rights and defenses as to any such Untreated Claim.

7.04    Means of Cash Payment.  All payments to be made from time to time under this Plan shall be made by check drawn on, or by wire transfer from, a domestic bank, or by other means agreed to by the payor and payee.

7.05    Record Date for Distributions. As of the close of business on the Effective Date, (the "Distribution Record Date"), the register for Claims will be closed, and there shall be no further changes in the holder of record of any Claim.  The Debtor shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date, and shall instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those holders of record stated on the register of Claims as of the Distribution Record Date for Distributions under the Plan.

7.06　Delivery of Distributions. All Distributions, deliveries and payments to the holders of any Allowed Claims shall be made to the addresses set forth on the respective proofs of Claim filed in this Case.  Any such Distribution, delivery or payment shall be deemed as made for all purposes relating to this Plan when deposited in the United States Mail and served as provided in section 13.05 below.  Whether secured or unsecured, if no proof of claim is filed, any Distribution shall be made to the Creditor at the last known address or as reflected in the Creditor List.  If any Distribution is returned as undeliverable, no further Distribution shall be made on account of such Allowed Claim unless and until the Debtor is notified of such holder's then current address, at which time all missed Distributions shall be made to the holder of such Allowed Claim.  All claims for undeliverable Distributions shall be made on or before the first anniversary of the attempted Distribution.  After such date, all Unclaimed Property shall revert to the Debtor and the Claim of any holder with respect to such property shall be discharged and forever barred.

7.07　Time Bar to Cash Payments. Checks issued in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Debtor by the holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the later of the first anniversary of the Initial Distribution Date or ninety (90) days after the date of issuance of such check.  After such date, all claims in respect of void checks shall be discharged and forever barred.

7.08　Cure Period.　Except as otherwise set forth herein, the failure by the Debtor to timely perform any term, provision or covenant contained in this Plan, or to make any payment or Distribution required by this Plan to any Creditor, or the failure to make any payment or perform any covenant as to any holder of an Allowed Class 4 Claim, shall not constitute an Event of Default unless and until the Debtor has been given twenty-one (21) days written notice of such alleged default in the manner provided in this Plan, and provided an opportunity to cure such alleged default.  Until the expiration of such twenty-one (21) day cure period, the Debtor shall not be in default, and performance during such twenty-one (21) day cure period shall be deemed as timely for all purposes.  Such written notice and passage of the twenty-one (21) day cure period shall constitute conditions precedent to declaring or claiming any default under this Plan or bringing any action or legal proceeding by any Person to enforce any right granted under this Plan.

7.09　Distributions after Substantial Consummation. Upon the Effective Date, the Debtor may proceed with Substantial Consummation of this Plan unless the Confirmation Order is stayed by order of a court of competent jurisdiction.  All Distributions of any kind made to any of the Creditors after Substantial Consummation and any and all other actions taken under this Plan after Substantial Consummation shall not be subject to relief, reversal or modification by any court unless the implementation of the Confirmation Order is stayed by an order granted under Bankruptcy Rule 8005.

## ARTICLE VIII

## PROCEDURES FOR RESOLVING AND TREATING CONTESTED AND CONTINGENT CLAIMS

8.01　Objection Deadline. All Objections to Claims shall be served and filed by the Objection Deadline; provided, however, the Objection Deadline shall not apply to Claims which are not reflected in the claims register, including any alleged informal proofs of Claim.  Either the

Debtor or the Plan Trust Administrator may seek to extend the Objection Deadline pursuant to a motion filed on or before the then applicable Objection Deadline with respect to any Claims. Any such motion may be granted without notice or a hearing. In the event that the Debtor or Plan Trust Administrator files such a motion and the Bankruptcy Court denies such motion, the Objection Deadline shall nevertheless be automatically extended to that date which is ten (10) Business Days after the date of entry of the Bankruptcy Court's order denying such motion. Any proof of claim filed more than thirty (30) days after the Effective Date shall be of no force and effect and need not be objected to by either the Debtor or the Plan Trust Administrator. Nothing contained herein shall limit the right of the Debtor or the Plan Trust Administrator to object to Claims, if any, filed or amended after the Objection Deadline.

8.02    Contested Class 4 Claims.    Sections 8.03 through 8.06 below shall not apply to holders of Class 4 Claims which Claims shall be administered as set forth in the Plan Trust Agreement.

8.03    Responsibility for Objecting to Claims and Settlement of Claims.

(a)    From and after the Effective Date, the Debtor shall have the sole and exclusive right to (i) file, settle, or litigate to Final Order any Objections to any Claims; and (ii) seek to subordinate any Claim. Any Contested Claim may be litigated to Final Order.

(b)    From and after the Effective Date, the Debtor shall have the sole and exclusive right to settle, compromise or otherwise resolve any Contested Claim without the necessity of any further notice or approval of the Bankruptcy Court. Bankruptcy Rule 9019 shall not apply to any settlement or compromise of a Contested Claim after the Effective Date and the Debtor may negotiate and effectuate any such settlement or compromise without the necessity of further notice or approval by the Bankruptcy Court.

8.04    Distributions on Account of Contested Claims. If a Claim is Contested, then the Initial Distribution Date as to such Contested Claim shall be determined based upon its date of Allowance, and thereafter distribution shall be made on account of such Allowed Claim pursuant to the provisions of the Plan. No Distribution shall be made on account of a Contested Claim until Allowed. Until such time as a contingent Claim becomes fixed and absolute by a Final Order allowing such Claim, such Claim shall be treated as a Contested Claim for purposes of estimates, allocations, and Distributions under the Plan. Any contingent right to contribution or reimbursement shall continue to be subject to section 502(e) of the Bankruptcy Code.

8.05    No Waiver of Right to Object. Except as expressly provided in this Plan, nothing contained in the Disclosure Statement, this Plan or the Confirmation Order shall waive, relinquish, release or impair the Debtor's right to object to any Claim.

8.06    Offsets and Defenses. Except as expressly provided in this Plan, the Debtor shall retain all Debtor Claims and Debtor Defenses, including without limitation all rights of offset or recoupment and all counterclaims against any Claimant holding a Claim. Assertion of counterclaims by the Debtor against any Claimants shall constitute "core" proceedings.

8.07    Claims Paid or Reduced Prior to Effective Date. Notwithstanding the contents of the Creditor List, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtor prior to the Effective Date, including pursuant to orders of the Bankruptcy Court. To the extent such payments are not reflected in the Creditor List, such Creditor List will be deemed amended and reduced to reflect that such

payments were made. Nothing in the Plan shall preclude the Debtor from paying Claims that the Debtor was authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

## ARTICLE IX

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.01    Assumption and Rejection of Executory Contracts. All Executory Contracts of the Debtor shall be deemed as assumed by the Debtor upon the Effective Date unless an Executory Contract (a) has been previously assumed or rejected pursuant to an order of the Bankruptcy Court, (b) is otherwise identified in this Plan or the Confirmation Order to be rejected or ride through this Case, or (c) is the subject of a motion to reject filed on or before the Effective Date. The Executory Contracts reflected in the attached **Exhibit "B"** are all to be assumed. Any Executory Contract so assumed shall be deemed as assumed as of the Effective Date. Likewise, any Executory Contract rejected shall be deemed as rejected as of the Effective Date. Any Executory Contract to be assumed under this Plan that has been amended or modified at any time after the Petition Date shall be deemed assumed as amended or modified. This Plan shall constitute a motion to assume all Executory Contracts which the Debtor seeks to assume. However, the Debtor may file a separate motion for the assumption or rejection of any Executory Contract at any time through the Effective Date.

9.02    BCBS Contracts and BCBS Cure Amount Claims. Any Executory Contract with BCBS other than the Clinic Contract shall be deemed as rejected. The Clinic Contract shall be assumed. The Plan shall be deemed as a motion to reject any such Executory Contract with BCBS other than the Clinic Contract. Any Claim for a Cure Amount asserted by BCBS shall be limited to amounts allegedly due under the Clinic Contract as a result of alleged defaults under the terms of the Clinic Contract itself. No Claim by BCBS for a Cure Amount in connection with the Debtor's assumption of the Clinic Contract shall be Allowed to the extent such Claim is for amounts allegedly owed by the Debtor to BCBS for any reason other than a default under the terms of the Clinic Contract itself. BCBS shall not be entitled to assert any setoff rights as a Claim for a Cure Amount in connection with the Debtor's assumption of the Clinic Contract. For the avoidance of doubt, no Claims asserted by BCBS against the Debtor based on the conduct of the Hospital Outreach Program or based on amounts allegedly owed by the Debtor to BCBS under any past or present contract, other than the Clinic Contract, including without limitation any Class 4 Claim asserted by BCBS, shall be allowable as a Cure Amount in connection with the Debtor's assumption of the Clinic Contract.

9.03    Cure Amount Payments. Except as provided in Section 9.04 below in relation to the Payor Agreements, unless the holder of a Claim for a Cure Amount and the Debtor agree in writing to other treatment of such holder's Cure Amount, or other treatment of such holder's Cure Amount is otherwise provided for under the Plan, each Cure Amount shall be determined and treated as follows:

(a)    Any Cure Amount shall be deemed to constitute a full and final satisfaction of all defaults, including any arrearages, relating to any Executory Contract as of the Effective Date. As of the Effective Date, the Debtor shall be relieved and discharged from any liability arising on or before the Effective Date under any of the Assumed Executory Contracts other than the obligation to satisfy the Cure Amount.

(b)    The payment of any Cure Amount shall be made by the Debtor as soon

as reasonably practicable after the Effective Date. Any dispute relating to any Cure Amount, the cure of any other defaults, the provision of adequate assurance of future performance, or any other matter pertaining to assumption of any Executory Contract, shall be resolved through the entry of a Final Order by the Bankruptcy Court resolving any such dispute as a core proceeding.

9.04    <u>Payor Agreement Treatment</u>. The Payor Agreements shall be assumed by the Debtor as of the Effective Date. However, any other term of this Plan notwithstanding, this section shall govern the assumption of the Payor Agreements and the determination and treatment of all Cure Amounts in relation to each of the Payor Agreements.

(a)    The Debtor hereby releases: (i) each of the Payors and their respective officers, directors, employees, agents, representatives and legal counsel from all Outreach Claims, regardless of when the acts, transactions or circumstances which form the basis of any such Outreach Claim occurred; and (ii) Aetna, Cigna, United and their respective officers, directors, employees, agents, representatives and legal counsel from any claim, cause of action, right, defense or remedy (including all rights of offset and recoupment) of Debtor which arises out of, or is based upon, any acts, transactions, circumstances, or services which occurred, transpired or were provided before February 1, 2019; <u>provided</u>, <u>however</u>, the Debtor retains the Plan Trust Outreach Claims for the sole purpose of transferring them to the Plan Trust Administrator.

(b)    The treatment of the Payors' Impaired Unsecured Claims set forth in this Plan and the other terms, conditions, rights and remedies provided in this Plan shall constitute full and final satisfaction of the following, including any Cure Amount in relation to any Payor Agreement included in any of the following: (i) all Payor Outreach Claims, regardless of when the transactions which form the basis of the Payor Outreach Claims occurred; and (ii) all of Aetna's, Cigna's and United's Claims, causes of action, rights, defenses, or remedies (including all rights of offset and recoupment) against the Debtor which arise out of, or are based upon, any acts, circumstances, transactions, or services which occurred, transpired or were furnished before February 1, 2019.

(c)    By virtue of the above subsections (a) and (b) above: (i) the Debtor and each of Aetna, Cigna and United shall retain their respective Claims, causes of action, rights, defenses and remedies pursuant to the applicable Payor Agreements as to all transactions, occurrences, acts, omissions or services which occurred, transpired or were provided on or after February 1, 2019, and which do not constitute Outreach Claims or Payor Outreach Claims (collectively the "<u>Retained Payor Contract Claims</u>"); and (ii) the Debtor and Humana shall retain their respective Claims, causes of action, rights, defenses and remedies pursuant to the applicable Payor Agreements as to all transactions, occurrences, acts, omissions or services which do not constitute Outreach Claims or Payor Outreach Claims (collectively the "<u>Retained Humana Contract Claims</u>").

(d)    None of the Payors shall retain any Payor Outreach Claims against the Debtor, and none of the Payors shall assert any Payor Outreach Claims as a defense to or counterclaim against, including as an offset or right of recoupment against, any Retained Payor Contract Claim of the Debtor or Retained Humana Contract Claim of the Debtor.

(e)    Any Cure Amount which relates to or arises out of the Retained Payor Contract Claims or the Retained Humana Contract Claims shall be determined and administered as between the Debtor and the applicable Payor in the ordinary course of business in accordance with the terms of the applicable Payor Agreement and other non-

bankruptcy law. The Payors shall have no obligation to file any Claim or request for payment of administrative expense to be entitled to payment of Retained Payor Contract Claims or Retained Humana Contract Claims.

9.05    <u>Bar to Rejection Claims.</u> Except as otherwise ordered by the Bankruptcy Court, any Rejection Claim based on the rejection of an Executory Contract shall be forever barred and shall not be enforceable against the Debtor or the Assets unless a proof of claim is filed with the Bankruptcy Court and served upon the Debtor and its counsel by the earlier of thirty (30) days after the Effective Date or thirty (30) days after entry of the Final Order approving rejection of such Executory Contract.

9.06    <u>Rejection Claims.</u>  Any Rejection Claim not barred by section 9.05 above shall be classified as a Class 4 Impaired Unsecured Claim subject to the provisions of sections 502(b)(6) and 502(g) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that any Rejection Claim based upon the rejection of an unexpired lease of real property, either prior to the Confirmation Date, upon the entry of the Confirmation Order, or upon the Effective Date, shall be limited in accordance with section 502(b)(6) of the Bankruptcy Code and state law mitigation requirements.  All Rejection Claims shall be deemed as Contested Claims until Allowed.  Nothing contained herein shall be deemed as an admission by the Debtor that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtor of any objections to such Claim if asserted.

9.07    <u>Reservation of Rights.</u> Nothing contained in the Plan shall constitute an admission by the Debtor that any contract or lease is in fact an Executory Contract or that the Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

9.08    <u>Ride-through of Executory Contracts.</u>  In accordance with the authority of *Stumpf v. McGee*, 258 F.3d 392, 404-405 (5th Cir. 2001), *ASCARO, LLC v. Mont. Res. Inc.*, 858 F.3d 949, 959 (5th Cir. 2017), and *In re Hardeman County Hosp. Dist.*, 540 B.R. 229, 247 (Bankr N.D. Tex. 2015), the Debtor reserves the right to designate any Executory Contract at any time through the Effective Date as one which will ride through this Case and shall be neither assumed nor rejected by the Debtor.  If the counterparty to an Executory Contract has not received appropriate notice of this Case, such Executory Contract shall ride through this Case and shall neither be assumed nor rejected.

<u>**ARTICLE X**</u>

<u>**CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF PLAN**</u>

10.01    <u>Conditions to Confirmation and Effectiveness of Plan.</u> The Plan shall not become effective until the following conditions shall have been satisfied:  (a) the Confirmation Order shall have been entered, in form and substance acceptable to the Debtor; (b) the Plan Trust Agreement shall be executed or the form thereof otherwise approved in writing by each of the Debtor, BCBS and the Payors; and (c) all other conditions specified by the Debtor have been satisfied.

# ARTICLE XI

# EFFECT OF THE PLAN ON CLAIMS

11.01  <u>Compromise and Settlement.</u> In consideration of the classification, potential Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interest of the Debtor, Creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.

11.02  <u>Satisfaction of Claims.</u>  The rights afforded in the Plan and the treatment of all Treated Claims herein shall be in exchange for and in complete satisfaction, discharge, and release of all Treated Claims resolved pursuant to the Plan of any nature whatsoever against the Debtor and the Assets.  Except as otherwise provided herein, on the Effective Date, all Treated Claims against the Debtor resolved pursuant to the Plan shall be satisfied, discharged, and released in full. Except as otherwise provided herein, all Persons who hold a Treated Claim that is resolved pursuant to the Plan shall be precluded and forever barred from asserting (i) against the Debtor or the Assets any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature; or (ii) against the individuals included in the Officers and Directors or Spiller, any event, occurrence, condition, thing, or other or further Claims or causes of action arising out of or relating to the Hospital Outreach Program, in either case that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

11.03  **<u>Discharge.</u> On the Effective Date, the Debtor and its Assets are forever discharged and released from all debts to the fullest extent permitted under section 944 of the Bankruptcy Code.  Except as otherwise set forth in this Plan or the Confirmation Order, the terms, covenants and consideration under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims resolved pursuant to the Plan of any nature whatsoever against the Debtor or the Assets.  Except as set forth in this Plan or the Confirmation Order, and as provided in sections 524(a)(1) and 524(a)(2) of the Bankruptcy Code, such discharge shall void any judgment against the Debtor at any time obtained to the extent that it relates to a discharged Claim.  Upon the Effective Date, all Persons shall be forever precluded and enjoined, pursuant to sections 524(a)(1) and 524(a)(2) of the Bankruptcy Code, from prosecuting or asserting any discharged Claim against the Debtor and its Assets, in any manner inconsistent with this Plan.  Pursuant to section 944(a) of the Bankruptcy Code, such discharge is binding on all Creditors, whether or not such Creditor filed a proof of claim, or was deemed to have filed a proof of claim, whether such Claim has been Allowed, or whether such Creditor accepted the Plan.  <u>Notwithstanding the foregoing, this section 11.03 shall not apply to any Untreated Claim.  The occurrence of the Effective Date shall not operate to discharge any Untreated Claim.  The rights of a holder of an Untreated Claim, as well as all rights and defenses by the Debtor, with respect to such Untreated Claim, shall not be affected, impaired, or prejudiced in any manner by this Plan, the confirmation of the Plan, or the occurrence of the Effective Date.</u>**

11.04   **Injunction. On the Effective Date and <u>except</u> as otherwise provided herein, all Persons who have been, are, or may be holders of Treated Claims against the Debtor provided for in the Plan shall be permanently restrained and enjoined from (i) taking any of the following actions against or affecting the Debtor or the Assets with respect to such Claims (other than actions brought to enforce any rights or obligations under the Plan), or (ii) taking any of the following actions against the individuals included in the Officers and Directors or Spiller with respect to such Claims or other or further claims or causes of action arising out of or relating to the Hospital Outreach Program (other than actions brought to enforce any rights or obligations under the Plan):  (a) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind with respect to (1) any such Claim or (2) such other or further claims or causes of action arising out of or relating to the Hospital Outreach Program; (b) enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order; (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind; (d) asserting any control over, interest, rights or title in or to any of the Assets except as expressly provided in the Plan; (e) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Debtor, except upon order of the Bankruptcy Court; and (f) performing any act, by any manner or means, whether directly or indirectly, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; <u>provided</u>, <u>however</u>, that this injunction shall not bar any Creditor from asserting any right granted pursuant to this Plan; <u>provided, further, however,</u> that each holder of a Contested Claim shall be entitled to enforce its rights under the Plan, including seeking allowance of such Contested Claim pursuant to the Plan.  <u>Notwithstanding the foregoing, this section 11.04 shall not apply with respect to any Untreated Claim.  The occurrence of the Effective Date shall not operate to enjoin or restrain a holder of an Untreated Claim from taking any action or exercising any of its rights with respect to such Untreated Claim.</u>**

11.05   <u>Setoffs.</u> Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Debtor may setoff against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim (before such Distribution is made), any claims, rights, Debtor Claims and Debtor Defenses of any nature that the Debtor may hold against the holder of such Allowed Claim, to the extent such claims, rights, Debtor Claims and Debtor Defenses against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); <u>provided</u>, <u>however</u>, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtor of any such claims, rights, Debtor Claims and Debtor Defenses that the Debtor may possess against such Claimant.  In no event shall any Claimant be entitled to setoff any Claim against any claim, right, or Debtor Claim of the Debtor without the consent of the Debtor unless such holder files a motion with the Bankruptcy Court requesting the authority to perform such setoff notwithstanding any indication in any proof of claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.  This section shall not apply to the Payors in respect of any of the Payor Agreements.

11.06   <u>Recoupment.</u> Except as otherwise expressly provided for in the Plan, in no event shall any holder of a Claim be entitled to recoup any Claim against any claim, right, account receivable, or Debtor Claim of the Debtor unless (a) such holder actually provides notice thereof in writing to the Debtor of its intent to perform a recoupment; (b) such notice includes the

amount to be recouped by the holder of the Claim and a specific description of the basis for the recoupment, and (c) the Debtor has provided a written response to such Claimant, stating unequivocally that the Debtor consents to the requested recoupment. The Debtor shall have the right, but not the obligation, to seek an order of the Bankruptcy Court allowing any or all of the proposed recoupment. In the absence of a written response from the Debtor consenting to a recoupment or an order of the Bankruptcy Court authorizing a recoupment, no recoupment by the holder of a Claim shall be allowed. This section shall not apply to Payors in respect of any of the Payor Agreements.

11.07    No Effect on Claims Not Resolved Under the Plan.    It is the Debtor's intent that this Plan only affect the rights of Creditors holding Treated Claims that are provided for in this Plan. The rights of the holders of Untreated Claims, including but not limited to any Lien rights or rights of setoff or recoupment, shall not be affected or altered in any manner by the Plan. Each Untreated Claim shall constitute a debt that is excepted from discharge by this Plan pursuant to section 944(c)(1) of the Bankruptcy Code. The injunction contained in section 11.04 above shall not apply to any act taken with respect to an Untreated Claim.

11.08    Automatic Stay.    The automatic stay pursuant to sections 362 and 922 of the Bankruptcy Code, except as previously modified by the Bankruptcy Court, shall remain in effect until the Effective Date of the Plan as to the Debtor and all Assets. As of the Effective Date, the automatic stay shall be replaced by the injunction contained in section 11.04 above.

11.09    Patient Care Ombudsman.    On the Effective Date of the Plan, the Patient Care Ombudsman, who was appointed by the United States Trustee [see Docket No. 30], shall be released and fully discharged of her duties in this Case as ordered by the Bankruptcy Court in the *Order Directing Appointment of a Patient Care Ombudsman Under 11 U.S.C. § 333* [Docket No. 29] entered on July 16, 2020.

## ARTICLE XII

## JURISDICTION OF COURTS AND MODIFICATIONS TO THE PLAN

12.01    Retention of Jurisdiction.    Pursuant to sections 105(a) and 945 of the Bankruptcy Code, the Bankruptcy Court shall retain exclusive jurisdiction on a core basis of all matters arising in, arising under, and related to the Debtor's chapter 9 Case and the Plan, for the purposes of section 1142(b) of the Bankruptcy Code, and for, among other things, the following purposes:

(a)    To hear and determine any and all Objections to or applications concerning the allowance of Claims or the allowance, classification, priority, compromise, estimation, or payment of any Administrative Expense;

(b)    To hear and determine pending applications for the rejection, assumption, or assumption and assignment of Executory Contracts and the allowance of Claims resulting therefrom, and to determine the rights of any party in respect to the assumption or rejection of any Executory Contract;

(c)    To determine any Cure Amount (other than any disputes that constitute Retained Payor Contract Claims or Retained Humana Contract Claims between the Debtor and any Payor, which disputes shall not be subject to the jurisdiction of the Bankruptcy Court);

(d)     To hear and determine any and all adversary proceedings, applications, or contested matters, including allowance of any Claim;

(e)     To hear and determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan or in connection with the enforcement of any remedies made available under the Plan, including without limitation, (i) adjudication of all rights, interests or disputes relating to any of the Assets, (ii) the valuation of all Collateral, (iii) the determination of the validity of any Lien or claimed right of offset; and (iv) determinations of Objections to Contested Claims;

(f)     To hear and determine all controversies in relation to the Plan Trust, including without limitation the Plan Trust Outreach Claims;

(g)     To liquidate and administer any disputed, contingent, or unliquidated Claims, including the Allowance of all Contested Claims;

(h)     To administer Distributions to holders of Allowed Claims as provided herein;

(i)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(j)     To consider any modification of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation the Confirmation Order;

(k)     To enforce the injunction contained in section 11.04 above;

(l)     To enter and implement all such orders as may be necessary or appropriate to execute, interpret, construe, implement, consummate, or enforce the terms and conditions of the Plan and the transactions required or contemplated pursuant hereto;

(m)     To hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan; and

(n)     To enter a final decree closing this chapter 9 Case.

12.02   <u>Abstention and Other Courts.</u> If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to this chapter 9 Case, this Article of the Plan shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

12.03   <u>Modifications of the Plan.</u> The Debtor may amend, alter, or modify the Plan or any Plan Documents (except with respect to the treatment of the Regions Claim) pursuant to section 942 of the Bankruptcy Code at any time prior to the Confirmation Date.  Pursuant to section 1127(d) of the Bankruptcy Code, any holder of a Claim that has accepted or rejected the Plan is deemed to have accepted or rejected the Plan, as the case may be, as modified, unless

such holder changes such holder's previous acceptance or rejection within the time allotted for voting on the Plan or any later date set by Final Order of the Bankruptcy Court.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

13.01    Severability. Should the Bankruptcy Court determine any provision of the Plan is unenforceable either on its face or as applied to any Claim or transaction, the Debtor may modify the Plan so that any such provision shall not be applicable to the holder of any Claim. Such a determination of unenforceability shall not (a) limit or affect the enforceability and operative effect of any other provision of the Plan or (b) require the resolicitation of any acceptance or rejection of the Plan.

13.02    Oral Agreements; Modification of Plan; Oral Representations or Inducements. The terms of the Plan, Disclosure Statement and Confirmation Order may only be amended in writing and may not be changed, contradicted or varied by any oral statement, agreement, warranty or representation. No Person may reasonably rely upon any such oral modification of this Plan or the Confirmation Order. Neither the Debtor nor its attorneys have made any representation, warranty, promise or inducement relating to the Plan or its confirmation except as expressly set forth in this Plan, the Disclosure Statement, or the Confirmation Order or other order of the Bankruptcy Court.

13.03    Waiver. The Debtor shall not be deemed to have waived any right, power or privilege pursuant to the Plan unless the waiver is in writing and signed by the Debtor. There shall be no waiver by implication, course of conduct or dealing, or through any delay or inaction by the Debtor, of any right pursuant to the Plan, including the provisions of this anti-waiver section. The waiver of any right under the Plan shall not act as a waiver of any other or subsequent right, power or privilege.

13.04    Construction. This Plan shall control over any inconsistent term of the Plan Trust Agreement. This Plan and the Plan Trust Agreement shall control over any inconsistent term of the Disclosure Statement. The Confirmation Order shall control over any inconsistent provision of the Plan or the Plan Trust Agreement.

13.05    Notice. Any notice or communication required or permitted by the Plan shall be given, made or sent as follows:

(a)    If to a Creditor, notice may be given as follows: (i) if the Creditor has filed no proof of Claim, then to the address reflected in the Creditor List, or (ii) if the Creditor has filed a proof of Claim, then to the address reflected in the proof of Claim.

(b)    If to the Debtor, notice shall be sent to the following address:

Jack County Hospital District
215 Chisholm Trail
Jacksboro, Texas 76458
Attn: Frank L. Beaman, CEO
Email: fbeaman@fchtexas.com

Concurrently with service of such notice on the Debtor, a copy thereof shall be concurrently served in the same manner on the following legal counsel as follows:

> J. Robert Forshey
> Matthew G. Maben
> FORSHEY & PROSTOK, L.L.P.
> 777 Main Street, Suite 1550
> Fort Worth, Texas 76102
> Facsimile: (817) 877-4151
> E-mail: bforshey@forsheyprostok.com
> E-mail: mmaben@forsheyprostok.com

> and

> David Spiller
> Mason Spiller
> Reid Spiller
> SPILLER & SPILLER
> P.O. Drawer 447
> Jacksboro, Texas 76458
> Facsimile (940) 567-3999
> E-mail: david@spillerlaw.net
> E-mail: mason@spillerlaw.net
> E-mail: reid@spillerlaw.net

(c)     Any Creditor desiring to change its address for the purpose of notice may do so by giving notice to the Debtor of its new address in accordance with the terms of this section.

(d)     Any notice given, made or sent as set forth above shall be effective upon being (i) deposited in the United States Mail, postage prepaid, addressed to the addressee at the address as set forth above; (ii) delivered by hand or messenger to the addressee at the address set forth above; (iii) telecopied to the addressee as set forth above, with a hard confirmation copy being immediately sent through the United States Mail; or (iv) delivered for transmission to an expedited or overnight delivery service such as FedEx.

13.06   Compliance with All Applicable Laws. If notified by any governmental authority that it is in violation of any applicable law, rule, regulation, or order of such governmental authority relating to its business, the Debtor shall comply with such law, rule, regulation, or order; provided, however, that nothing contained herein shall require such compliance if the legality or applicability of any such requirement is being contested in good faith in appropriate proceedings and, if appropriate, an adequate reserve has been set aside on the books of the Debtor.

13.07   Binding Effect. The Plan shall be binding upon, and shall inure to the benefit of the Debtor, the holders of the Claims or Liens, and their respective successors in interest and assigns.

13.08   Governing Law, Interpretation. Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any

Plan Documents without regard to conflicts of law. The Plan shall control any inconsistent term or provision of any other Plan Documents.

13.09   Payment of Statutory Fees. All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid on or before the Effective Date, and thereafter shall be paid by the Debtor as such statutory fees, if any, become due.

13.10   Filing of Additional Documents. On or before Substantial Consummation of the Plan, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

13.11   Computation of Time. If the final day for any Distribution, performance, act or event under the Plan is not a Business Day, then the time for making or performing such Distribution, performance, act or event shall be extended to the next Business Day. Any payment or Distribution required to be made hereunder on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

13.12   Elections by the Debtor. Any right of election or choice granted to the Debtor under this Plan may be exercised, at the Debtor's election, separately as to each Claim, Creditor or Person.

13.13   Release of Liens. Except as otherwise provided in this Plan or the Confirmation Order, all Liens against any of the Assets shall be deemed to be released, terminated and nullified.

13.14   Rates. The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

13.15   Compliance with Tax Requirements. In connection with the Plan, the Debtor shall comply with all withholding and reporting requirements imposed by federal, state and local Taxing Authorities and all Distributions under the Plan shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution under the Plan.

13.16   Notice of Entry of Confirmation Order. Promptly after entry of the Confirmation Order, the Debtor, as directed by the Bankruptcy Court, shall serve on parties in interest and holders of Claims, notice of entry of the Confirmation Order.

13.17   Notice of Occurrence of the Effective Date. Promptly after occurrence of the Effective Date, the Debtor, as directed by the Bankruptcy Court, shall serve on parties in interest and holders of Claims, notice of the occurrence of the Effective Date.

[The remainder of this page has been left intentionally blank.]

Dated:  September 30, 2021.

Respectfully submitted,

**JACK COUNTY HOSPITAL DISTRICT**


By:    */s/ Frank L. Beaman*
        Frank L. Beaman, CEO


APPROVED:

*/s/ J. Robert Forshey*
J. Robert Forshey
State Bar No. 07264200
Matthew G. Maben
State Bar No. 24037008
**FORSHEY & PROSTOK, LLP**
777 Main Street, Suite 1550
Fort Worth, Texas 76102
Telephone:  (817) 877-8855
Telecopier:  (817) 877-4151
bforshey@forsheyprostok.com
mmaben@forsheyprostok.com

-and-

*/s/ David Spiller*
David Spiller
State Bar No. 18934950
Mason Spiller
State Bar No. 24095168
Reid Spiller
State Bar No. 24111067
Spiller & Spiller
P.O. Drawer 447
Jacksboro, Texas 76458
Telephone: (940) 567-6644
Facsimile: (940) 567-3999
david@spillerlaw.net
mason@spillerlaw.net
reid@spillerlaw.net

COUNSEL FOR THE DEBTOR


L:\BFORSHEY\Jack County Hospital District #6046 (Ch 9)\Plan and DS\Second Amended Plan of Adjustment 09.30.21.docx

Exhibit "A" to Second Amended

Plan of Adjustment

**EXHIBIT "A" TO THE
SECOND AMENDED PLAN OF ADJUSTMENT OF JACK COUNTY HOSPITAL DISTRICT
(PERSONS COMPRISING THE "MANAGEMENT GROUP")**

## Past and Present Members of the Debtor's Management

Frank L. Beaman, Chief Executive Officer

Bonnie Blevins, Controller

Kim Lee, Chief Financial Officer

Dr. Robert Cooper, Chief Medical Officer

Joy Henry, Chief Nursing Officer

## Past and Present Members of the Debtor's Board of Directors

Lori McBrayer (present Board President)

Mark Maples (present Board Secretary)

Leslie Chalmers (present Board Member)

Larry Hopwood (present Board Member)

Rod Hammond (present Board Member)

Shelley Owen (past Board Member)

Edwina Swan (past Board Member; deceased)

## Past and Present Employees

**Each of the following past and present employees shall constitute a member of the Management Group with respect to actions taken and Transfers received solely in their exclusive capacity as an employee, agent and/or independent contractor of the Debtor. To the extent that any past or present employee listed below was an employee, agent and/or independent contractor of any Named Outreach Defendant, then such Person shall not constitute a member of the Management Group with respect to actions taken and Transfers received as an employee, agent and/or independent contractor of the Named Outreach Defendant.**

LAST NAME, FIRST NAME

| | | |
|---|---|---|
| Abrau, Maria | Aguilera, T | Alderete, Dale |
| Aguilar, Isaac | Ahiante, A | Allen, Amanda |

Alonso, Paulo
Alvarado, Dariela
Alvarez, A
Amin, Bhagowatgita
Anderson, Portia
Appiah, Martha
Aquino, Edrick
Ardales, Andre
Argo, Kaitlyn
Armelin, Sherquetta
Arnold, C
Austin, Kimberly
Austin, R
Autry, Caitlyn
Avalos, Flor
Avendano, Joann
Bailey, E
Baker, Rachel
Banuelos, Esther
Barcenas, Lisa
Barraza, Jacquelyn
Barrios, Amairani
Bayala, M
Bayalas, Florence
Beaman, Frank
Beaman, Natalie
Beatty, Brittany
Becker, Katherine
Bell, Charles
Beltran, Martha
Bennett, Brandi
Bergman, Timothy
Bertoli, L
Blevins, Ashleigh
Blevins, Bonnie
Bolin, Jaime
Bonham, Nikki
Booker, Heather
Bounthanh, Soubanh
Bostick, S
Bowen, Scarlett
Boyer, Christopher
Bradley, Elizabeth
Brinkley, R
Brinkley, Reginald
Brooks, Juli
Brown, Deverre
Brown, Kellie
Brown, Paul
Brundige, Ladonna
Bui, K

Burns, Destiny
Burns, Michael
Burrows, Michael
Burt, Sarah
Byler, A
Camacho, M
Campbell, T
Candler, Stacia
Cansler, Nesha
Cantu, K
Carbone, Lauren
Carlon, Ashley
Carranza, K
Carbajal, Kimberly
Carver, Candace
Casa, Yelena
Cash, T
Casteel, Phyllis
Castellanos, A
Catlin, Sondra
Cavins, Kelli
Chapoy, Megan
Charles, Tina
Charping, Lindsey
Chatman, S
Chavez, Daisy
Choat, Caitlin
Christian, Peggy
Clark, Jennifer
Coker, Jessica
Colbert, Debra
Collins, Dionne
Collom, Vanessa
Condori, Kara
Conner, Cheynne
Cook, April
Cooper, Robert
Copeland, Jeannie
Copeland, Joe
Coplen, C
Cornelisc, Pam
Cornish, Shilo
Coronel, Luis
Cortez, Adrana
Corwin, Jeremiah
Costlow, D
Coufal, J'Cee
Coufal, Melissa
Covey, Shelby
Cox, Scharlean
Cox, Thomas

Cristobal, M
Crow, Kowa
Cruz, J
Cruz, Yessica
Cubillas-Guevara,
Mariedil
Culanag, Eustaquio
Cunningham, Angela
Cura, Maria
Curtner, Courtney
Cutter, J
Damron, Denise
Damron, Lori
Damron, Tanya
Davenport, Melissa
Davis, Jessica
Davis, Lacresia
Davis, S
De La Rosa, Gloria
De La Rosa, Sandra
Demoss, Shanon
Dena, S
Dennis, Ginger
Donohoe, Phyllis
Dougless, Lindsay
Drennan, Tahlia
Duggan, Stephenie
Dunson, Donnell
Dyson, Sonja
Eberly, Mackenzi
Elenburg, Allie
Elkins, Chelsie
Esati, Yvette
Escobar, J
Espinoza, Maria
Estrida, S
Evans, Kristen
Exalus, Maxime
Faatz, Karie
Fenter, Kelly
Fenter, Terri
Fernandez, Nannette
Figueroa, G
Fitchett, E
Flores, Idalia
Flores, Irlanda
Flores, Julia
Flores, Shirley
Flowers, A
Flowers, Asma
Flowers, Lori

Fore, Jesse
Foster, Tyler
Fulfer, Katie
Fussell, Karen
Galo, Marjoarichell
Gammage, Phoebe
Garcia, A
Garcia, J
Garcia, James
Garcia, Marysol
Gardner, Timothy
Garner, Baeli
Gasca, Jessica
Garza, Christina
Geer, Becky
Gentry, Stephen
George, Ashley
Gilbertson, Jannie
Godinez, Graciela
Gonzales, R
Gonzalez, Brittany
Gonzalez, I
Gonzalez, Lucina
Gonzalez, Michael
Gonzalez, V
Goodson, Dana
Graham, Jan
Green, Brooklyn
Guajardo, J
Guevara, Edilmaryhs
Gunter, Vickie
Gutierrez, Crystal
Gutierrez, L
Gutierrez, Lorena
Guzman, M
Haddad, Steven
Haight, Charles
Haile, Brenda
Hailey, James
Hailey, Jana
Hall, Dinah
Hallum, Ronda
Hamblin, Faith
Hammond, William
Hancock, Denise
Harris, Vanita
Harrison, Jamee
Hart, Lisa
Harvey, Mancylens
Hauger, Tammy
Hawkins, A

Hawkins, Camanecia
Hawkins, Leslie
Hawkins, Taryn
Hayhurst, Melisa
Henderson, Onita
Henderson, Tabatha
Henry, Joy
Herbold, Carl
Heredia, Nicole
Hernandez, Jennifir
Hernandez, Jocelyn
Herrera, Jessica
Herrera, Margarita
Herring, Margaret
Hess, Selena
Hicks, Sheree
Hill, Ann
Hobson, Estella
Hoffman, Madalyn
Holloway, Melissa
Holman, Kristy
Holub, Clinton
Honneycutt, A
Horton, Maria
Horton, Sallie
Hotz, Kelley
Housewright, Lajuana
Howard, Keely
Howard, Octavia
Hurgoiu, Lacrimioara
Huston, Ronald
Inman, Andrea
Isaacs, S
Jack, Ruth
James, Kerrie
Jennings, Kelly
Jimenez, Juan
Jimenez, M
Jimenez Av, Yaksury
Johnson, Debra
Johnson, Sharile
Johnson, Velena
Jones, Alycia
Jones, Dawn
Jones, T
Kennedy, Lauren
Kenvin, Staci
King, Mary
Knutson, Tana
Lackey, Thomas
Lamance, Brandi

Lamberson, Jared
Lambert, Marcus
Landers, Taylor
Landis, Beth
Lane, Ashley
Lane, Lacy
Lane, Shanna
Lara, M
Lara, Vanessa
Larios, Lilian
Lawrence, Dylan
Lawson, Codi
Lawson, Elizabeth
Lawson, Lisa
Leach, Carol
Lee, Brigitte
Lee, Jamie
Lee, Rhonda
Lee, Tonya
Lewis, Marion
Liebherr, Nicholas
Liendo, Anita
Linthicum, Lauren
Long, Desiree
Lopez, Jocelyn
Lott, Shelia
Low, Deborah
Lowery, Nicholas
Lowrie, R
Luevanos, Estela
Lyon, Dale
Macias, Maria
Mack, J
Malone, Alexandr
Malone, Charles
Mangum, William
Marion, Susan
Marquez, V
Marrufo, Marilu
Marschall, Brenda
Martin, Jessica
Martinez, Joanna
Martinez, O
Martinez, V
Mason, Areain
Mata, A
Matlock, Becky
Matull, Cynthia
May, Jenell
Mayhugh, Marili
McCaig, Zachary

McDonald, Brandi
McFarland, Kelsey
McKay, Benjamin
McKenzie, Troy
McKenzie, Vicki
McKinney, Matthew
McShan, Shelley
Medina, Indira
Melgarejo, S
Mercado, Audelia
Miller, Jeffery
Miller, Karla
Ming, Melissa
Mitchell, Yvonne
Moffit, John
Moffit, Leah
Montgomery, Beverly
Moody, Chelsy
Moralez, Margaret
Mordeno, Louel
Moreno, Edith
Morrel, Janice
Morrow, Linda
Moss, J
Mota, P
Mower, Kate
Musser, Tami
Myers, Ashley
Myers, Jennifer
Nash, Kayla
Neal, Fredrick
Nerio, A
Newland, Staci
Noles, Lyndsey
Noriega, Joe
Norman, Lydia
Norris, Christopher
Novellano, Jennifer
Ocanas, Kassandra
Olsen, Ava
Ornelas, Josejuan
O'Shields, Selena
Padron, E
Palomar-A, Maria
Palomino, L
Paredes, Lalaine
Parish, H
Parks, Alma
Parrish, Shawnace
Partridge, Derbi
Pena, M

Pennington, Misti
Perales, Claudia
Percival, Betsie
Perez, Leticia
Perez, Rita
Perez, Vanita
Perez, Zulma
Perry, L
Perry, Laquetha
Pettit, Sarah
Phillips, James
Phillips, Leea
Pippin, Heather
Pirkle, T
Ponce-Sau, Paulina
Powell, Chandra
Powell, Evelyn
Preuninger, Randall
Pruitt, David
Pruitt, J
Puente, Belinda
Raley, Norma
Raley, Peggy
Raley, Thomas
Ramirez, M
Ramos, Adrian
Ramos, Guadalupe
Ramos, Licy
Ramsey, Amber
Randle, Jelicia
Rater, Janice
Read, Tiffany
Reado, T
Reaves, Amber
Reaves, Quentin
Reed, Ashley
Reed, Audrey
Regalado, D
Reyes, D
Reynolds, Denise
Richardson, S
Riley, D
Riley, Dani
Rivas, Blanca
Rivon, Shantel
Robertson, Cynthia
Robertson, Teri
Robertson, William
Robinson, Donnas
Robinson, James
Rodriguez, Jesica

Rodriguez, M
Rodriguez, Patricia
Rodrigus, Patricia
Roland, Robin
Rosas, A
Rotzler, Amy
Rouillard, Desirae
Rowe, Lindsay
Ruiz, Ariana
Ruiz, O
Ruiz, Omar
Russell, Heather
Russell, Virgil
Salas, Elsa
Salazar, Griselda
Salazar, Janet
Salinas, Angelina
Salinas, Pedro
Salter, Chancy
Sanchez, A
Sanchez, Shirley
Sanders, Kenneth
Sanders, T
Scanlan, Edward
Scarborough, Misty
Schrader, Ashlee
Schraub, Gail
Scott, K
Seigler, Sharon
Self, C
Self, Jared
Sells, Jacklyn
Serrano, Flordiles
Sherman, Tamikia
Shillingb, Shelby
Simmons, Heather
Simon, Francis
Simpson, T
Sioco, Eva
Small, Bridget
Smith, Debra
Smith, Diane
Smith, Kimberly
Smith, Mccawlea
Smith, R
Smith, Tonya
Smith, Whitney
Snell, Blake
Soubanh, Bounthanh
Sparks, Fiona
Stagg, Kandace

Stahr, Andrea
Staley, Kimberly
Stewart, J
Stone, Tina
Strange, Lashonda
Suarez, Karen
Sumners, B
Swarmke, Sherry
Swoboda, Joel
Taylor, Tonya
Tejeda, Marvbia
Thomas, A
Thompson, Amanda
Thompson, Rachael
Thurman, Kymberlee
Tierrablania Maris, Michelle
Tinajero, Emelda
Tman, Sharika
Tomasits, N
Toscano, Beatrice
Tovar, S
Trejo, Patricia
Trevino, M
Tristan, M
Troncoso, Norma
Turcios, Veronica

Valez, Monica
Valliant, Latasha
Van Vleet, Karen
Vanderkaa, Alysha
Vanderkaa, David
Vanderkaa, Rowdy
Varela, Brianna
Vasser, Ashley
Vasser Williams, Wendy
Vaughn, Heather
Vaughn, Jacob
Verdin, Natali
Vielma, Veronica
Wailes, Ladonna
Walger, B
Walger, Becky
Walker, Lakeshia
Walters, Klynton
Walton, H
Ward, James
Wardrup, Kaylee
Warmke, Sherry
Warnell, Kathy
Washburn, Connie
Watkins, C
Watts, Carole
Weaver, Kathy

Weertman, Allison
Weertman, Andrew
West, Lynda
West, M
Westervelt, H
Westervelt, Holly
White, Chance
White, Deborah
Wilcutt-Lassend, Desirea
Wilhoit, Kelly
Williams, Amy
Williams, Melissa
Wilson, Allison
Wood, James
Workman, Cynthia
Wright, Larae
Wynn, Kristina
Wynne, Aftyn
Wynter, N
Yanez, Juana
Yarbro, Cathy
Zambrano, Christina
Zevallos, Rosario

## **Past and Present Attorneys, Accountants, Auditors and Consultants**

Alfred, Michael S.

Brown, Fletcher

CROWE LLP

Davis, Tommy L.

DISCOVERY HEALTHCARE CONSULTING GROUP, LLC

DURBIN & COMPANY, LLP

Durbin, J. Brandon

HALLETT & PERRIN, P.C.

Keller, Dana, PhD

Kohler, Charlotte

Kᴏʜʟᴇʀ HᴇᴀʟᴛʜCᴀʀᴇ Cᴏɴꜱᴜʟᴛɪɴɢ, Iɴɢ.

Krienke, Trent

Meier, William W., III

Needham, Allyn, PhD

Pendleton, Mark F.

Rᴇᴇᴅ, Cʟᴀʏᴍᴏɴ, Mᴇᴇᴋᴇʀ & Hᴀʀɢᴇᴛᴛ, PLLC

Sᴘɪʟʟᴇʀ & Sᴘɪʟʟᴇʀ

Spiller, David

Spiller, Mason

Spiller, Reid

Strate, Susan, MD

Wᴀʟʟᴇʀ Lᴀɴꜱᴅᴇɴ Dᴏʀᴛᴄʜ & Dᴀᴠɪꜱ, LLP

Any reference to any firm or organization above shall include any member, associate or employee of such firm.

Exhibit "B" to Second Amended

Plan of Adjustment

**EXHIBIT "B"**
**TO THE SECOND AMENDED PLAN OF ADJUSTMENT**
**ASSUMED EXECUTORY CONTRACTS[1]**

| Item | Counterparty | Address | Executory Contract Title or Description | Cure Amount |
|------|-------------|---------|----------------------------------------|-------------|
| 1. | Advanced HCS, LLC | Attn: Eliezer Scheiner 3839 Flatlands Avenue Suite 218 Brooklyn, NY 11234 | Management Agreement | $0.00 |
| 2. | Aetna Health Management, LLC | c/o Aaron McCollough McGwireWoods LLP 77 W. Wacker Dr., Ste. 4100 Chicago, Illinois 60601 | Hospital Participation Agreement | To be determined in accordance with section 9.04 of the Plan |
| 3. | Alvord Medical Clinic, PA | Attn: Jefferson B. Alling, MD 115 E. Bypass 287 Alvord, Texas 76225 | Equipment Lease Agreement | $0.00 |
| 4. | Beckman Coulter | 250 South Kraemer Blvd. PO Box 8000 Brea, California 92821-8000 | Equipment rental agreement (UniCel DxC 600 Pro) | $0.00 |
| 5. | Beckman Coulter | 250 South Kraemer Blvd. PO Box 8000 Brea, California 92821-8000 | Equipment rental agreement (Hematology Analyzer) | $0.00 |
| 6. | Beckman Coulter | 250 South Kraemer Blvd. PO Box 8000 Brea, California 92821-8000 | Equipment rental agreement (ACCESS 2, Single System SG; monthly payment $1,223.62) | $0.00 |
| 7. | Beckman Coulter | 250 South Kraemer Blvd. PO Box 8000 Brea, California 92821-8000 | Equipment rental agreement (ACCESS 2, Single System SG; monthly payment $275.00) | $0.00 |

---

[1] The listing or description of any contract or lease in this Exhibit "B" shall not constitute an admission by the Debtor or a determination by the Bankruptcy Court that such contract or lease constitutes an Executory Contract subject to 11 U.S.C. § 365.

| Item | Counterparty | Address | Executory Contract Title or Description | Cure Amount |
|------|-------------|---------|----------------------------------------|-------------|
| 8. | Blue Cross and Blue Shield of Texas | c/o Michael Cooley Reed Smith LLP 2850 N. Harwood Street Suite 1500 Dallas, Texas 75201 | Medical Group Agreement for Blue Advantage HMO Network Participation executed by the Debtor on December 30, 2015 | $0.00 |
| 9. | Cigna Health Care of Texas, Inc. | c/o Eliot Burriss 200 Crescent Court, Suite 1600 Dallas, Texas 75201 | Hospital Services Agreement | To be determined in accordance with section 9.04 of the Plan |
| 10. | Collinsville Nursing Operations, LLC | c/o John Broude Broude Smith Jennings & McGlinchey PC 309 West 7th Street, Suite 1100 Fort Worth, Texas 76102 | Sublease Agreement | $0.00 |
| 11. | Collinsville Nursing Operations, LLC | c/o John Broude Broude Smith Jennings & McGlinchey PC 309 West 7th Street, Suite 1100 Fort Worth, Texas 76102 | Operations Transfer Agreement | $0.00 |
| 12. | Collinsville Nursing Operations, LLC | c/o John Broude Broude Smith Jennings & McGlinchey PC 309 West 7th Street, Suite 1100 Fort Worth, Texas 76102 | Management Agreement | $0.00 |
| 13. | Decatur Physician Investment Group, Inc. | 1001 Eagle Dr. Decatur, Texas 76234 | Medical Office Lease Agreement | $0.00 |
| 14. | De Lage Landen Financial Services, Inc. | Rental Processing Center 1111 Old Eagle School Road Wayne, Pennsylvania 19087 | Rental Agreement | $0.00 |
| 15. | Flex Financial, a division of Stryker Sales Corp. | 1901 Romence Road Parkway Portage, Michigan 49002 | Short Form Lease Agreement No. 2110054304 | $0.00 |

| Item | Counterparty | Address | Executory Contract Title or Description | Cure Amount |
|------|--------------|---------|----------------------------------------|-------------|
| 16. | Frank L. Beaman, Jr. | 1346 Corvadura Street Graham, Texas 76450 | Hospital Administrator Employment Agreement | $0.00 |
| 17. | TIAA Commercial Finance, Inc. (successor-in-interest by assignment from GE HFS, LLC) | PO Box 414, W-490 Milwaukee, Wisconsin 53201 | Lease Agreement Dated as of June 29, 2016 (Contract No. 9873041-001 / Four (4) GE Healthcare Coro 259cx Series Units) | $0.00 |
| 18. | TIAA Commercial Finance, Inc. (successor-in-interest by assignment from GE HFS, LLC) | PO Box 414, W-490 Milwaukee, Wisconsin 53201 | Master Lease Agreement Dated as of 07/13/2016 | $0.00 |
| 19. | TIAA Commercial Finance, Inc. (successor-in-interest by assignment from GE HFS, LLC) | PO Box 414, W-490 Milwaukee, Wisconsin 53201 | Maxiservice Schedule Dated as of 07/13/2016 to Master Lease Agreement Dated as of 07/13/2016 (Contract No. 9874613-001 / GE Healthcare Optima CT660) | $0.00 |
| 20. | TIAA Commercial Finance, Inc. (successor-in-interest by assignment from GE HFS, LLC) | PO Box 414, W-490 Milwaukee, Wisconsin 53201 | Maxiservice Schedule Dated as of 07/22/2016 to Master Lease Agreement Dated as of 07/13/2016 (Contract No. 9875872-001 / GoldSeal OEC 9800 Plus Digital Mobile Super C-arm) | $0.00 |

| Item | Counterparty | Address | Executory Contract Title or Description | Cure Amount |
|------|-------------|---------|----------------------------------------|-------------|
| 21. | TIAA Commercial Finance, Inc. (successor-in-interest by assignment from GE HFS, LLC) | PO Box 414, W-490 Milwaukee, Wisconsin 53201 | Maxiservice Schedule Dated as of 07/22/2016 to Master Lease Agreement Dated as of 07/13/2016 (Contract No. 9875844-001 / GoldSeal Logiq E9) | $0.00 |
| 22. | Health Value Management, Inc. d/b/a ChoiceCare Network | c/o Jennifer L. Sucher Fox Swibel Levin & Carroll LLP 200 W. Madison Street Suite 3000 Chicago, Illinois 60606 | Hospital Participation Agreement | To be determined in accordance with section 9.04 of the Plan |
| 23. | Humana Government Business, Inc. d/b/a Humana Military | c/o Jennifer L. Sucher Fox Swibel Levin & Carroll LLP 200 W. Madison Street Suite 3000 Chicago, Illinois 60606 | Institutional Agreement | To be determined in accordance with section 9.04 of the Plan |
| 24. | Jacksboro Nursing Operations, LLC | c/o John Broude Broude Smith Jennings & McGlinchey PC 309 West 7th Street, Suite 1100 Fort Worth, Texas 76102 | Sublease Agreement | $0.00 |
| 25. | Jacksboro Nursing Operations, LLC | c/o John Broude Broude Smith Jennings & McGlinchey PC 309 West 7th Street, Suite 1100 Fort Worth, Texas 76102 | Consent and Assignment of Management Agreement | $0.00 |
| 26. | Jacksboro Nursing Operations, LLC | c/o John Broude Broude Smith Jennings & McGlinchey PC 309 West 7th Street, Suite 1100 Fort Worth, Texas 76102 | Amended and Restated Management Agreement | $0.00 |
| 27. | Laodicea Management, LLC | c/o Erich Wahl 2040 N Loop 336 W Conroe, Texas 77304 | Management Agreement | $0.00 |

| Item | Counterparty | Address | Executory Contract Title or Description | Cure Amount |
|---|---|---|---|---|
| 28. | LaSalle Solutions | c/o Jason A. Enright Winstead PC 500 Winstead Building 2728 N. Harwood Street Dallas, Texas 75201 | Master Lease Agreement #2217 | $0.00 |
| 29. | LaSalle Solutions | c/o Jason A. Enright Winstead PC 500 Winstead Building 2728 N. Harwood Street Dallas, Texas 75201 | LaSalle Lease 1 (as defined in the Plan and to be assumed as amended by the terms of the Plan) | $0.00 |
| 30. | LaSalle Solutions | c/o Jason A. Enright Winstead PC 500 Winstead Building 2728 N. Harwood Street Dallas, Texas 75201 | Equipment Schedule #001A to Master Lease Agreement #2217 | $0.00 |
| 31. | LaSalle Solutions | c/o Jason A. Enright Winstead PC 500 Winstead Building 2728 N. Harwood Street Dallas, Texas 75201 | LaSalle Lease 2 (as defined in the Plan and to be assumed as amended by the terms of the Plan) | $0.00 |
| 32. | LaSalle Solutions | c/o Jason A. Enright Winstead PC 500 Winstead Building 2728 N. Harwood Street Dallas, Texas 75201 | Equipment Schedule #003 to Master Lease Agreement #2217 | $0.00 |
| 33. | LaSalle Solutions | c/o Jason A. Enright Winstead PC 500 Winstead Building 2728 N. Harwood Street Dallas, Texas 75201 | LaSalle Lease 3 (as defined in the Plan and to be assumed as amended by the terms of the Plan) | $0.00 |
| 34. | LaSalle Solutions | c/o Jason A. Enright Winstead PC 500 Winstead Building 2728 N. Harwood Street Dallas, Texas 75201 | Equipment Schedule #005 to Master Lease Agreement #2217 | $0.00 |

| Item | Counterparty | Address | Executory Contract Title or Description | Cure Amount |
|---|---|---|---|---|
| 35. | LaSalle Solutions | c/o Jason A. Enright Winstead PC 500 Winstead Building 2728 N. Harwood Street Dallas, Texas 75201 | Equipment Schedule #006 to Master Lease Agreement #2217 | $0.00 |
| 36. | UnitedHealthcare Insurance Company | Attn: CDM/Bankruptcy 185 Asylum Street 03B Hartford, Connecticut 06103 | Facility Participation Agreement | To be determined in accordance with section 9.04 of the Plan |
| 37. | WBR Properties, LLC | PO Box 1234 Bowie, Texas 76230 | Medical Office Lease Agreement | $0.00 |

Exhibit "C" to Second Amended

Plan of Adjustment

**EXHIBIT "C" TO THE**
**SECOND AMENDED PLAN OF ADJUSTMENT OF JACK COUNTY HOSPITAL DISTRICT**
**(PERSONS COMPRISING THE "EXCLUDED PERSONS")**

A.     Each Person identified in Exhibit "A" to the Plan to the extent such Person constitutes a member of the Management Group

B.     Each Person identified in Exhibit "B" to the Plan

C.     Regions

D.     Prosperity

E.     SBOT

F.     Poynor

G.     BCBS

H.     Each Payor

I.     The Debtor

J.     The Debtor's trade vendors and suppliers with respect to Transfers made to such trade vendors and suppliers in the ordinary course, but excluding always therefrom any Person who is a Named Outreach Defendant.

K.     Any lessor pursuant to any lease to which the Debtor is a party, whether such lease is an operating lease or capital lease, with respect to Transfers made to such lessors in the ordinary course, but excluding always therefrom any Person who is a Named Outreach Defendant.

# EXHIBIT "B"

## TO FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE SECOND AMENDED PLAN OF ADJUSTMENT OF JACK COUNTY HOSPITAL DISTRICT, AS MODIFIED

J. Robert Forshey
State Bar No. 07264200
Matthew G. Maben
State Bar No. 24037008
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
bforshey@forsheyprostok.com
mmaben@forsheyprostok.com

ATTORNEYS FOR THE DEBTOR

David Spiller
State Bar No. 18934950
Mason Spiller
State Bar No. 24095168
Reid Spiller
State Bar No. 24111067
Spiller & Spiller
P.O. Drawer 447
Jacksboro, Texas 76458
Telephone: (940) 567-6644
Facsimile: (940) 567-3999
david@spillerlaw.net
mason@spillerlaw.net
reid@spillerlaw.net

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 9 Case |
| JACK COUNTY HOSPITAL DISTRICT d/b/a | ) | |
| FAITH COMMUNITY HEALTH SYSTEM | ) | Case No. 20-42012-mxm9 |
| | ) | |
| Debtor. | ) | |

**FIRST MODIFICATION TO THE SECOND AMENDED PLAN OF ADJUSTMENT OF JACK
COUNTY HOSPITAL DISTRICT**

TO THE HONORABLE MARK X. MULLIN, UNITED STATES BANKRUPTCY JUDGE:

Comes now Jack County Hospital District d/b/a Faith Community Hospital, debtor in the

above-captioned chapter 9 case, and files this First Modification (the "First Modification") to the

Second Amended Plan of Adjustment of Jack County Hospital District (the "Plan") [Docket No.

128].

1. Reference is here made to the Plan for all purposes. This First Modification

modifies the Plan.

2. **Modification to Section 1.94**. Section 1.94 of the Plan is hereby modified to

read as follows:

"SOTB Claims" means the debts owed by the Debtor to SOTB as
evidenced by: (a) SOTB Note 1, which debt is secured by a pledge
of certain of the Debtor's tax revenues; (b) SOTB Note 2, which debt
is secured by a pledge of certain of the Debtor's tax revenues; and

Page 1 of 6

(c) the 2021 Bonds, which debt is secured by Liens on the Wellness Center and the Debtor's gross revenues.

3. **Modification to Section 1.95**. Section 1.95 of the Plan is hereby modified to read as follows:

"SOTB Loan Documents" means, collectively: (a) SOTB Note 1 and all documents executed or delivered in connection with SOTB Note 1; (b) SOTB Note 2 and all documents executed or delivered in connection with SOTB Note 2; and (c) the 2021 Bonds and all documents executed or delivered in connection with the 2021 Bonds, including without limitation the 2021 Resolution.

4. **Modification to Section 1.96**. Section 1.96 of the Plan is hereby modified to read as follows:

"SOTB Note 1" means that certain 2021 Tax Anticipation Note dated December 21, 2021 executed by the Debtor in favor of SOTB in the original principal amount of $1,000,000.00.

5. **Modification to Section 1.97**. Section 1.97 of the Plan is hereby modified to read as follows:

"SOTB Note 2" means that certain 2022 Tax Anticipation Note dated February 11, 2022 executed by the Debtor in favor of SOTB in the original principal amount of $1,600,000.00.

6. **Modification to Section 4.01(c)**. Section 4.01(c) of the Plan is hereby modified to read as follows:

Interest on the Regions Claim shall continue to accrue at the rate set forth in the 2013 Bond Documents. Interest payments on the Regions Claim shall continue to be payable to Regions on August 1 and February 1 of each calendar year following the Effective Date until the Amended Maturity Date. The Debtor has paid the interest payments due to Regions on February 1, 2021, August 1, 2021 and February 1, 2022 pursuant to section 904(2) of the Bankruptcy Code.

7. **Modification to Section 4.01(g)**. Section 4.01(g) of the Plan is hereby modified to read as follows:

In the event of any conflict between the provisions of this section 4.01 and the 2013 Bond Documents as amended by the Plan Documents related to the Regions Claim (including without limitation the Plan Documents attached as exhibits to the *Notice of Filing of*

*Plan Documents Supplementing Debtor's Second Amended Plan of Adjustment* [Docket No. 164] filed by the Debtor on February 11, 2022), the terms of the latter shall control.

8.    **Modification to Section 9.04(a)**.  Section 9.04(a) of the Plan is hereby modified

to read as follows:

> The Debtor hereby releases: (i) each of the Payors and their respective officers, directors, employees, agents, representatives and legal counsel from all Outreach Claims, regardless of when the acts, transactions or circumstances which form the basis of any such Outreach Claim occurred; and (ii) Aetna and United and their respective officers, directors, employees, agents, representatives and legal counsel from any claim, cause of action, right, defense or remedy (including all rights of offset and recoupment) of Debtor which arises out of, or is based upon, any acts, transactions, circumstances, or services which occurred, transpired or were provided before February 1, 2019; provided, however, the Debtor retains the Plan Trust Outreach Claims for the sole purpose of transferring them to the Plan Trust Administrator.

9.    **Modification to Section 9.04(b)**.  Section 9.04(b) of the Plan is hereby modified

to read as follows:

> The treatment of the Payors' Impaired Unsecured Claims set forth in this Plan and the other terms, conditions, rights and remedies provided in this Plan shall constitute full and final satisfaction of the following, including any Cure Amount in relation to any Payor Agreement included in any of the following: (i) all Payor Outreach Claims, regardless of when the transactions which form the basis of the Payor Outreach Claims occurred; and (ii) all of Aetna's and United's Claims, causes of action, rights, defenses, or remedies (including all rights of offset and recoupment) against the Debtor which arise out of, or are based upon, any acts, circumstances, transactions, or services which occurred, transpired or were furnished before February 1, 2019.

10.   **Modification to Section 9.04(c)**.  Section 9.04(c) of the Plan is hereby modified

to read as follows:

> By virtue of the above subsections (a) and (b) above: (i) the Debtor and each of Aetna and United shall retain their respective Claims, causes of action, rights, defenses and remedies pursuant to the applicable Payor Agreements as to all transactions, occurrences, acts, omissions or services which occurred, transpired or were provided on or after February 1, 2019, and which do not constitute Outreach Claims or Payor Outreach Claims (collectively the

"Retained Payor Contract Claims"); and (ii) the Debtor and each of Humana and Cigna shall retain their respective Claims, causes of action, rights, defenses and remedies pursuant to the applicable Payor Agreements as to all transactions, occurrences, acts, omissions or services which do not constitute Outreach Claims or Payor Outreach Claims (collectively the "Retained Humana/Cigna Contract Claims").

11.    **Modification to Section 9.04(d)**.  Section 9.04(d) of the Plan is hereby modified

to read as follows:

None of the Payors shall retain any Payor Outreach Claims against the Debtor, and none of the Payors shall assert any Payor Outreach Claims as a defense to or counterclaim against, including as an offset or right of recoupment against, any Retained Payor Contract Claim of the Debtor or Retained Humana/Cigna Contract Claim of the Debtor.

12.    **Modification to Section 9.04(e)**.  Section 9.04(e) of the Plan is hereby modified

to read as follows:

Any Cure Amount which relates to or arises out of the Retained Payor Contract Claims or the Retained Humana/Cigna Contract Claims shall be determined and administered as between the Debtor and the applicable Payor in the ordinary course of business in accordance with the terms of the applicable Payor Agreement and other non-bankruptcy law.  The Payors shall have no obligation to file any Claim or request for payment of administrative expense to be entitled to payment of Retained Payor Contract Claims or Retained Humana/Cigna Contract Claims.

13.    **Addition of Section 9.09**.  A new section 9.09 is hereby added to the Plan to read

as follows:

As clarification requested by Cigna: (a) the Payor Agreement between the Debtor and Cigna means that certain Hospital Services Agreement with an effective date of February 1, 2013, as amended pursuant to section 6.8.1 thereof by (i) that certain notice given to the Debtor by Cigna by letter dated February 15, 2018, and (ii) that certain notice given to the Debtor by Cigna by letter dated February 16, 2018; and (b) the Debtor's assumption of the Payor Agreements shall not eliminate or in any manner cause the disallowance of any timely filed proof of Claim filed by a Payor, and all timely filed proofs of Claim filed by the Payors shall constitute Class 4A Claims and shall be administered, treated and satisfied in accordance with the provisions of the Plan and the Plan Trust Agreement.

14. **Modification to Section 12.01(c)**. Section 12.01(c) of the Plan is hereby modified to read as follows:

> To determine any Cure Amount (other than any disputes that constitute Retained Payor Contract Claims or Retained Humana/Cigna Contract Claims between the Debtor and any Payor, which disputes shall not be subject to the jurisdiction of the Bankruptcy Court);

[The remainder of this page has been left intentionally blank.]

Dated:  February 18, 2022.

Respectfully submitted,

**JACK COUNTY HOSPITAL DISTRICT**

By:     */s/ Frank L. Beaman*
        Frank L. Beaman, CEO

APPROVED:

*/s/ J. Robert Forshey*
J. Robert Forshey
State Bar No. 07264200
Matthew G. Maben
State Bar No. 24037008
**FORSHEY & PROSTOK, LLP**
777 Main Street, Suite 1550
Fort Worth, Texas 76102
Telephone:  (817) 877-8855
Telecopier:  (817) 877-4151
bforshey@forsheyprostok.com
mmaben@forsheyprostok.com

-and-

*/s/ David Spiller*
David Spiller
State Bar No. 18934950
Mason Spiller
State Bar No. 24095168
Reid Spiller
State Bar No. 24111067
Spiller & Spiller
P.O. Drawer 447
Jacksboro, Texas 76458
Telephone: (940) 567-6644
Facsimile: (940) 567-3999
david@spillerlaw.net
mason@spillerlaw.net
reid@spillerlaw.net

COUNSEL FOR THE DEBTOR

L:\BFORSHEY\Jack County Hospital District #6046 (Ch 9)\Plan and DS\First Modification to Second Amended Plan 02.15.22.doc

# EXHIBIT "C"

## TO FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE SECOND AMENDED PLAN OF ADJUSTMENT OF JACK COUNTY HOSPITAL DISTRICT, AS MODIFIED

REED SMITH DRAFT: ~~03.15.2022~~03.16.2022

## TRUST AGREEMENT

This Trust Agreement (this "***Trust Agreement***"), dated as of March [●], 2022, by and among Jack County Hospital District d/b/a Faith Community Health System (the "***Debtor***" and, from and after the Effective Date of the Plan, the "***Reorganized Debtor***") and Jason Rae, solely in his capacity as trustee (the "***Trustee***"), is executed in connection with the Plan (as defined below).

## PREAMBLE

WHEREAS, on June 11, 2020, the Debtor commenced a voluntary case in the Bankruptcy Court under chapter 9 of the Bankruptcy Code;

WHEREAS, on March [●], 2022 (the "***Confirmation Date***"), the Bankruptcy Court entered an order confirming the Plan;

WHEREAS, the Plan provides for the creation of a post-confirmation trust (the "***Trust***") to hold and administer the Trust Assets for the benefit of holders of Allowed Class 4 Claims (the "***Trust Beneficiaries***");

WHEREAS, this Trust Agreement is executed to establish the Trust and grant the Trustee authority to hold, administer, and distribute the Trust Assets in accordance with the Plan;

WHEREAS, the Trust is established for the sole purpose of the administration and orderly liquidation of the Trust Assets for the benefit of the Trust Beneficiaries in accordance with Treasury Regulation Section 301.770l-4(d), with no objective or authority to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Trust's purpose;

WHEREAS, the Trust is intended to qualify as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d) for United States federal income tax purposes;

WHEREAS, the respective powers, authority, responsibilities and duties of the Trustee and the Trust Advisory Board shall be governed by this Trust Agreement, the Plan, the Confirmation Order, and other applicable orders issued by the Bankruptcy Court;

WHEREAS, this Trust Agreement is intended to supplement, complement and implement the Plan;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein and, in the Plan, the Reorganized Debtor[1] and the Trustee agree as follows:

---

[1] **NOTE: This is fine, but is "Reorganized Debtor" somewhere defined in the Plan?**

Page 1

# ARTICLE I
# DEFINITIONS

### 1.1    Defined Terms.

The following terms shall have the meanings set forth below (such  meanings to be equally applicable to both the singular and plural, masculine and feminine forms of the terms defined). Capitalized terms used but not defined in this Trust Agreement shall have the meanings ascribed to them in the Plan.

"*Allowed*" means, when used with respect to a Claim (other than an Administrative Expense), means a Claim (a) to the extent it is not Contested; or (b) a Contested Claim, proof of which was filed timely with the Bankruptcy Court, and (i) as to which no Objection was filed by the Objection Deadline, or (ii) as to which an Objection was filed by the Objection Deadline, to the extent, if any, such Claim is ultimately allowed by a Final Order; provided however, if a Claim is to be determined in a forum other than the Bankruptcy Court, such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas or, if such court ceases to exercise jurisdiction over the Case, any other court or adjunct thereof that exercises jurisdiction over the Case.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, including all applicable local rules of the Bankruptcy Court.

"*Bar Date*" means the date established by the Bankruptcy Court, including through any standing order, for filing proofs of Claim; provided, however, that if the Bankruptcy Court has ordered an extension of the time by which a particular Creditor may file a proof of Claim, the date set with respect to such Creditor shall be the Bar Date with respect to such Creditor, but only as to such Creditor.

"*Business Day*" means any day other than Saturday, Sunday, a legal holiday, or a day on which national banking institutions in Texas are authorized or obligated by law or executive order to close.

"*Cash*" means the legal tender of the United States of America or the equivalent thereof.

"*Case*" means the Debtor's chapter 9 case, which is pending before the Bankruptcy Court under Case No. 20-42012-mxm9 and styled *In re Jack County Hospital District d/b/a Faith Community Health System*.

"*Claim*" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, legal, equitable, secured or unsecured or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right

of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, secured or unsecured.

"*Claims Register*" means the official register of Claims filed against the Debtor in the Case.

"*Confidential Party*" shall have the meaning assigned in Section 11.4 of the Trust Agreement.

"*Class*" means a category of holders of Claims or Interests pursuant to Bankruptcy Code § 1122(a) as set forth in Article II and Article IV of the Plan.

"*Confirmation*" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Case.

"*Confirmation Date*" means March [●], 2022, the date on which the Bankruptcy Court entered the Confirmation Order on the docket of the Case within the meaning of Bankruptcy Rules 5003 and 9021.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of chapter 9 of the Bankruptcy Code.

"*Contested*," when used with respect to a Claim, means a Claim: (a) that is listed in the Creditor List as disputed, contingent, and/or unliquidated, or in the amount of "$0.00" or "Unknown"; (b) that is listed in the Creditor List as undisputed, liquidated, and not contingent and as to which a proof of claim has been filed with the Bankruptcy Court, to the extent the proof of claim amount exceeds the amount stated in the Creditor List; (c) as to which an Objection has been or may be timely filed and which Claim has not been Allowed by a Final Order; or (d) for which the proof of claim is filed after the Bar Date.

"*Debtor*" means Jack County Hospital District d/b/a Faith Community Health System, the debtor in the Case.

"*Disallowed*" means, when used with respect to all or any part of a Claim, means that portion of a Claim to which an Objection or motion to disallow has been sustained by a Final Order or, as to a Contested Claim, any portion thereof which is not Allowed by a Final Order of the Bankruptcy Court.

"*Disputed Claim Reserve*" means the reserve established on account of Disputed Claims in accordance with Section 5.9Article V hereof.

"*Distribution*" means any payment or other distribution of property distributed to Trust Beneficiaries pursuant to the terms of the Plan and this Trust Agreement.

"*Distribution Agent*" means the Trustee, or the Entity or Entities selected by the Trustee to make or facilitate Distributions contemplated under the Plan and this Trust Agreement.

REED SMITH DRAFT: ~~03.15.2022~~ 03.16.2022

"*Distribution Date*" means any date established by the Trustee, in his sole discretion, for a Distribution to Trustee Beneficiaries.

"*Distribution Record Date*" means the record date for purposes of determining which holders of Allowed Claims against the Debtor are eligible to receive distributions under the Plan, which date shall be the first day of the Confirmation Hearing, or such other day that is designated in a Final Order of the Bankruptcy Court.

"*Effective Date*" means the first Business Day which is fourteen (14) days after the Confirmation Date if the Confirmation Order is not stayed or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay which is at least fourteen (14) Business Days after the Confirmation Date, and upon which all conditions to the effectiveness of the Plan set forth in Article X of the Plan are satisfied.

"*Entity*" shall have the meaning set forth in Bankruptcy Code § 101(15).

"*Estate*" means the estate of the Debtor created under Bankruptcy Code §§ 301 and 541 upon commencement of the Debtor's Case.

"*Exchange Act*" means the Securities and Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Case.

"*Final Order*" means an order or judgment of the Bankruptcy Court or any other court or adjudicative body, as to which the time to appeal or seek rehearing or petition for certiorari shall have expired, and which such order or judgment shall no longer be subject to appeal, rehearing, or certiorari proceeding.

"*Investment Company Act*" means the Investment Company Act of 1940, as amended.

"*Lien*" means any mortgage, lien, charge, security interest, encumbrance, or other security device of any kind affecting any Asset, including any right of offset asserted against any Asset.

"*Objection Deadline*" means ninety (90) days following the Effective Date unless otherwise extended by order of the Bankruptcy Court.

"*Person*" means any individual, any type of incorporated or registered business or nonprofit entity, including any corporation, general partnership, limited partnership, limited liability company, limited liability partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, governmental entity or unit, or any political subdivision thereof, or other entity.

"*Petition Date*" means June 11, 2020.

"*Plan*" means the *Second Amended Plan of Adjustment* [Docket No. 128] dated as of September 30, 2021, including all exhibits, supplements, appendices, and schedules thereto, either in its present form or as the same may be amended, supplemented, or modified from time to time.

"*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

"*Proof of Claim*" means a proof of Claim or Interest Filed against the Debtor in the Case.

"*Protected Parties*" shall have the meaning assigned in Section 7.1(a) of the Trust Agreement.

"*Related Matters*" shall have the meaning assigned in Section 7.2 of the Trust Agreement.

"*Reorganized Debtor*" means the Debtor and any successor thereto after the Effective Date.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"*Treasury Regulations*" means the regulations, including temporary regulations or any successor regulations, promulgated under the United States Internal Revenue Code, as amended from time to time.

"*Trust*" means a creditor recovery trust established pursuant to the terms of this Trust Agreement and the Plan.  The name of the Trust shall be the JCHD ~~Plan~~Liquidating Trust.

"*Trustee*" means Jason Rae, in his capacity as the trustee of the Trust and any successor thereto appointed pursuant to this Trust Agreement.

"*Trust Advisory Board*"  means the advisory board that shall oversee the Trust in accordance with this Trust Agreement, the initial composition of which shall consist of BCBS, Aetna, Cigna, Humana, and United.. After the Effective Date, the members of the Trust Advisory Board shall be appointed in accordance with the terms of this Trust Agreement.

"*Trust Assets*" means the Trust Funding, the Plan Trust Outreach Claims, and such additional Claims and causes of action as any Trust Beneficiary may assign to the Trust in accordance with Section 6.12 of the Plan.

"*Trust Beneficiaries*" means holders of Allowed Class 4 Claims, comprising all Allowed Impaired Unsecured Claims, Outreach Defendants, any Outreach Indemnity Claimants, and the holders of any Rejection Claims.

"*Trust Funding*" means the cash sum of $250,000.00 funded to the Trust under Section 6.12(b) of the Plan.

"*Trust Indenture Act*" means the Trust Indenture Act of 1939, as amended.

"*Trust Reserve*" means the reserve to be established by the Trustee in an amount as the Trustee, in his sole discretion, determines is or may be necessary: (a) to meet contingent liabilities and maintain the value of the Trust Assets; (b) to administer the Trust and pay administrative expenses including costs, fees, and expenses of the Trustee (including fees and expenses of attorneys, financial advisors, and distribution agents); and (c) to satisfy any other liabilities of the Trust.

"*U.S. Trustee*" means the Office of the United States Trustee for the Northern District of Texas.

"*Voting Period*" shall have the meaning assigned in Section 4.1 of the Trust Agreement.

### 1.2 Interpretation.

The headings in this Trust Agreement are for convenience only and shall not affect the meaning or understanding of this Trust Agreement or any provision hereof. Words defined, denoted or stated in the singular form also include the plural form and vice versa, and words defined, denoted or stated in the masculine, feminine or neuter form include each of the masculine, feminine and neuter forms. The word "or" is not exclusive.

### 1.3 Particular Words.

Reference in this Trust Agreement to any Section or Article is, unless otherwise specified, to that such Section or Article under this Trust Agreement. The words "hereof," "herein," "hereto" and similar terms shall refer to this Trust Agreement and not to any particular Section or Article of this Trust Agreement.

## ARTICLE II
## ESTABLISHMENT OF THE TRUST

### 2.1 Establishment of the Trust.

Jason Rae hereby accepts his appointment as the Trustee. Pursuant to the Plan, the Reorganized Debtor and the Trustee hereby establish the Trust on behalf of the Trust Beneficiaries. The Trustee agrees to accept and hold the Trust Assets in trust for the Trust Beneficiaries subject to the terms of this Trust Agreement and agrees to assume the role and duties of the Trustee as provided in the Plan and in this Agreement.

### 2.2 Purpose of the Trust.

The Trust is hereby established for the purpose of administering the Trust Assets, in accordance with Treasury Regulations Section 301.7701-4(d).

**2.3** **Transfer of Assets and Rights to the Trust.**

(a) In consideration of consummation of the Plan, the Reorganized Debtor hereby irrevocably transfers and assigns to the Trust all of its rights, title and interest in and to the Trust Funding and the Plan Trust Outreach Claims, and in accordance with Bankruptcy Code § 1141, the Trust Assets shall automatically vest in the Trust free and clear of all Claims and Liens, subject only to (a) the beneficial interests in the Trust, and (b) the expenses of the Trust as provided for in this Trust Agreement. The Plan Trust Outreach Claims are transferred and assigned by the Reorganized Debtor "AS IS", "WHERE IS", WITH ALL FAULTS", and without any warranties or representations by the Reorganized Debtor to any Person, either express or implied, and all such representations and warranties by the Reorganized Debtor are hereby expressly negated and disclaimed except as set forth in the Plan.

(b) As of the Effective Date, the Debtor and the Reorganized Debtor will have no claim to, right, or interest in the Trust Assets, whether direct, residual, contingent or otherwise once such assets have been transferred to the Trust. In no event shall any part of the Trust Assets revert to or be distributed to the Debtor or the Reorganized Debtor. To the extent that any Trust Assets cannot be transferred to the Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by Bankruptcy Code § 1123 or any other provision of the Bankruptcy Code, such Trust Assets shall be deemed to have been retained by the Reorganized Debtor, and the Trust shall be deemed to have been designated as a representative of the Reorganized Debtor pursuant to Bankruptcy Code § 1123(b)(3)(B) to enforce and pursue such Trust Assets on behalf of the Reorganized Debtor for the benefit of the Trust Beneficiaries.[21] The Reorganized Debtor shall transfer all net proceeds of any such Trust Assets to the Trust to be distributed in accordance with this Trust Agreement.

**2.4** **Title of Trust Assets.**

(a) The transfer of the Trust Assets to the Trust shall be made for the benefit of the Trust Beneficiaries, whether the Claims of the Trust Beneficiaries are Allowed on or after the Effective Date. In this regard, the Trust Beneficiaries shall be treated as the grantors of the Trust and as the deemed owners of the Trust Assets. Upon the transfer of the Trust Assets, the Trustee shall succeed to all of the Reorganized Debtor's rights, title and interest in and to the Trust Assets and the Reorganized Debtor shall have no further interest in or with respect to the Trust Assets or this Trust.

---

[21] **NOTE: What's the concern here? We see this language as a normal backstop, consistent with § 1123, to ensure the intent of the transfer of Plan Outreach Claims is fulfilled.**

(b)     For all United States federal income tax purposes, all parties (including the Reorganized Debtor, the Trustee, and the Trust Beneficiaries) shall treat the transfer of Trust Assets to the Trust described in Section 2.3 of this Trust Agreement and Section 6.12(b) of the Plan (and any subsequent transfers of Assets) as a transfer to the Trust Beneficiaries followed by a deemed transfer by such Trust Beneficiaries to the Trust, and the Trust Beneficiaries shall be treated as the grantors and owners hereof.

### 2.5     Valuation of the Trust Assets.

As soon as practicable after the transfer of the Trust Assets to the Trust, the Trustee shall make a good faith valuation of the Trust Assets, and shall use such valuation for all federal income tax purposes.

### 2.6     Appointment of the Trustee.

Jason Rae is hereby appointed, pursuant to the terms of the Plan, as the Trustee. Confirmation of the Plan shall constitute the Bankruptcy Court's approval of Jason Rae as the Trustee, and Mr. Rae shall hold such position until his removal, resignation, or death.

### 2.7     Incidents of Ownership.

The Trust Beneficiaries shall be the sole beneficiaries of the Trust, and the Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized in this Trust Agreement, the Plan and the Confirmation Order.

### 2.8     Interest Beneficial Only.

The ownership of a beneficial interest in the Trust shall not entitle any Trust Beneficiary to any title in or to the Trust Assets or to any right to call for a partition or division of such assets or to require an accounting, except as specifically provided herein or in the Plan. A Trust Beneficiary shall have no title or right to, or possession, management, or control of, the Trust Assets and the interest of a Trust Beneficiary in the Trust is in all respects personal property, and the death, insolvency, or incapacity of an individual Beneficiary shall not terminate or affect the validity of this Trust Agreement. No surviving spouse, heir, or devisee of any deceased Trust Beneficiary shall have any right of dower, homestead, inheritance, partition, or any other right, statutory or otherwise, in the Trust Assets, and their sole interest shall be the rights and benefits given to the Trust Beneficiaries under this Trust Agreement.

### 2.9     Evidence of Beneficial Interest.

Ownership of a beneficial interest in the Trust Assets shall not be evidenced by any certificate, security or receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the Trust by the Trustee.

### 2.10    Bond.

The Trustee shall serve without bond.

### 2.11    Securities Law.

It is intended that the interests of the Trust Beneficiaries in the Trust and the entitlements hereunder, if any, of such Trust Beneficiaries, shall not constitute "securities." Under section 1145 of the Bankruptcy Code, the issuance of beneficial interests in the Trust to the Trust Beneficiaries under the Plan shall be exempt from registration under the Securities Act, and all applicable state and local laws requiring registration of securities. If the Trustee determines, with the advice of counsel, that the Trust is required to comply with the registration and reporting requirements of the Exchange Act, the Trust Indenture Act or the Investment Company Act, then the Trustee shall take any and all actions to comply with such reporting requirements and file necessary periodic reports with the Securities and Exchange Commission. Nothing herein shall be deemed to preclude the Trustee from amending this Trust Agreement to make such changes as are deemed necessary or appropriate bythe Trustee, with the advice of counsel, to ensure that the Trust is not subject to registration or reporting requirements of the Securities Act, the Exchange Act, the Trust Indenture Act or the Investment Company Act.

## ARTICLE III
## THE TRUSTEE

### 3.1    Role of the Trustee.

The Trust shall be administered by the Trustee with oversight by the Trust Advisory Board pursuant to this Trust Agreement. The Trustee shall (a) hold the Trust Assets for the benefit of the Trust Beneficiaries, (b) make distributions of proceeds of the Trust Assets, (c) facilitate the orderly liquidation of the Trust Assets and (d) have the power and authority to prosecute and resolve any Plan Trust Outreach Claims, all while subject to the oversight of the Trust Advisory Board.

### 3.2    Authority of Trustee.

In connection with the management of the Trust Assets, except as otherwise expressly limited in this Trust Agreement, the Trustee shall have, in addition to any powers conferred on the Trustee by any other provision of this Trust Agreement and the Plan (including the powers and duties as described in Section 6.12 of the Plan), the power to take any and all actions as are necessary or advisable to effectuate the purposes of the Trust, including the power and authority:

    (a)    to accept and administer the Trust Assets transferred and provided to the Trust under this Trust Agreement and the Plan;

    (b)    to prosecute, sell, convey, transfer, assign, liquidate, collect, investigate, or abandon, as applicable, the Plan Trust Outreach Claims or other Trust Assets, or any part thereof or any interest therein, on such terms and for such consideration as the Trustee deems desirable or appropriate, as required by the Plan and this Trust Agreement;

    (c)    without limiting the generality of the rights and powers set forth in this section and subject to all applicable rules, regulations, procedures, defenses and objections, to take discovery in connection with the investigation and prosecution of the Plan Trust Outreach Claims, whether through

depositions, oral examinations, document requests, interrogatories and/or other discovery devices providedfor under applicable law, and to exercise any and all investigatory powers provided for under Rule 2004 of the Bankruptcy Rules to the extent authorized to do so by order of the Bankruptcy Court or other court of competent jurisdiction;

(d)    to review, settle, compromise, resolve, or object to any or all Class 4 Claims, including Disputed Class 4 Claims, and consent to the settlement, compromise or objection to any other Claims as set forth in the Plan;

(e)    to endorse the payment of notes or other obligations of any person or to make contracts with respect thereto;

(f)    to engage in all acts that would constitute ordinary course of business in performing the obligations of a trustee under a trust of this type;

(g)    calculate and make Distributions to the Trust Beneficiaries (directly or through a third party Distribution Agent);

(h)    to extend or terminate the Trust in accordance with this Trust Agreement;

(i)    to protect and enforce the rights in and value of the Trust Assets by any method reasonably determined to be appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similarlaw and general principles of equity;

(j)    to perform all actions and execute all agreements, instruments and other documents necessary to implement the Plan as it pertains to the Trust, the Trust Assets, the Trust Beneficiaries, and the Class 4 Claims, and to make all necessary filings in accordance with any applicable law, statute, or regulation;

(k)    to take such actions that will, or are intended to, address such different tax consequences in the event that the Trustee determines that the Trust Beneficiaries or the  Trust may, will, or have become subject to different tax consequences than those described in this Trust Agreement;

(l)    in connection with any property held under this Agreement that is distributable or payable to a minor, to transfer and pay over all or any portion of the property to the minor, or to a guardian of the minor's property, whenever appointed, without requiring ancillary guardianship, or to the minor's parent or the person with whom the minor resides, or to any custodian under any Uniform Gifts to Minors Act or Uniform Transfer to Minor Act with power to select any person or trust company (including any fiduciary hereunder) to be such custodian and with power to extend such custodianship to age 21 years, without any obligation to see to the use or application of the property or to make inquiry with respect to any other property available for the use of the minor, the receipt by such minor,

guardian, parent, person or custodian to be a complete discharge as to such transfer or payment;

(m) to borrow sums of money, at any time and from time to time, for periods of time and on terms and conditions from persons or corporations (including any fiduciary hereunder) for purposes as may be deemed advisable, and secure such loans by the pledge or hypothecation of any property held under this Agreement;

(n) to establish the funds, accounts (other than investment accounts), and reserves (which may be done by book entry) within the Trust as deemed by the Trustee, in his discretion, to be useful in carrying out the purposes of the Trust and opening and maintaining bank accountson behalf of or in the name of the Trust;

(o) to sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitration or other proceeding and to assert, *inter alia,* the Estate's rights under Bankruptcy Code § 558 in connection with the Plan Trust Outreach Claims;

(p) to determine and satisfy from the Trust Assets any and all taxes and ordinary course liabilities, including reasonable professional fees and expenses, incurred by or on behalf of the Trust;

(q) retain, compensate and employ professionals to represent the Trust;

(r) to have the right, but not the obligation, to provide periodic reports and updates to the Trust Beneficiaries regarding the status of the administration of the Trust Assets, liabilities, and transfers of the Trust;

(s) in reliance upon the Claims Register (which the Trustee shall have the absolute right to rely on as accurate), maintain appropriate books and records, including a register evidencing the beneficial interest in the Trust held by each of the Trust Beneficiaries;

(t) to purchase insurance indemnifying the Trustee and/or the Trust Advisory Board and to indemnify (and purchase insurance indemnifying) the employees, agents, members and representatives of the Trust, the Trust Advisory Board or the Trustee (including the professionals thereto), including errors and omissions policies, to the fullest extent that a corporation organized under the laws of the Trust's domicile is from time to time entitled to indemnify its directors, officers, employees, agents, and representatives, and to purchase and maintain any other customary insurance coverage that the Trustee deems necessary or advisable to protect the Trust Assets;

(u) exercise such other powers as may be vested in or assumed by the Trust or the Trustee pursuant to the Plan, any Bankruptcy Court order, or as may be

necessary, proper, and appropriate to carry out the provisions of the Plan and this Trust Agreement;

(v)     all powers and authority as the Plan Trust Administrator as provided under the Plan.

### 3.3     Limitation of Trustee's Authority.

The Trustee shall have no power or authority except as set forth in this Trust Agreement, the Plan, the Confirmation Order, or in any other Bankruptcy Court order. Notwithstanding anything herein to the contrary, the Trustee shall not be authorized to engage in any trade or business, and shall only take such actions consistent with the orderly administration of the Trust Assets as are required or contemplated by applicable law, the Plan and this Trust Agreement, and the actions necessary to administer the Trust Assets.

### 3.4     Books and Records.

(a)     The Trustee shall maintain in respect of the Trust books and records relating to the Trust Assets (including the Plan Trust Outreach Claims), income of the Trust and the payment of expenses of, and liabilities of claims against or assumed by, the Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Such books and records shall be maintained on a modified Cash or other comprehensive basis of accounting necessary to facilitate compliance with the tax reporting requirements of the Trust. Except as otherwise may be expressly provided in this Trust Agreement, nothing in this Trust Agreement requires the Trustee to file any accounting or seek approval of any court with respect to the administration of the Trust, or as a condition for managing any payment or distribution out of the Trust Assets. The Trust Advisory Board may inspect the books and records upon reasonable notice to the Trustee. One (1) year after dissolution of the Trust, the Trustee is authorized to destroy any and all books and records without further notice or Bankruptcy Court order, unless the Bankruptcy Court has ordered otherwise; *provided*, *however*, that the Trustee may move the Bankruptcy Court for entry of an order authorizing the destruction of any and all books and records prior to expiration of the one (1) year period following dissolution of the Trust.

(b)     [On or immediately prior to the Effective Date,[3] the Debtor shall provide to the Trustee with a true and correct copy of the Claims Register setting forth the names, addresses, any tax identification numbers and Claim amounts of holders of Class 4 Claims, and noting whether any such Claims are Disputed and whether any Disputed Class 4 Claims became Allowed Claims and if so the Allowed amount. The Trust and the Trustee shall have the absolute

---

[3] **NOTE: What was the reason for this deletion?  A claims register seems an easy thing for the Debtor to provide.**

and unconditional right to rely on the information provided by the Debtor for purposes of notices and distributions under this Trust Agreement and neither the Trust, the Trustee nor the members of the Trust Advisory Board shall incur any liability by relying on the information it receives under this Agreement.]

(c)     The Reorganized Debtor shall cooperate with the Trustee and provide access to and preserve all books and records which shall be necessary for the Trustee to carry out his duties under this Trust Agreement and the Plan as set forth in section 6.12(j) of the Plan.

### 3.5     Debtor Cooperation

The Reorganized Debtor shall reasonably co-operate with the Trustee in the performance of the Trustee's duties pursuant to the Plan or this Trust Agreement as set forth in section 6.12(j) of the Plan.

### 3.6     Additional Powers.

Except as otherwise set forth in this Trust Agreement or in the Plan, and subject to the Treasury Regulations governing liquidating trusts and the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, but without prior or further authorization, the Trustee may control and exercise authority over the Trust Assets and over the protection, conservation and disposition thereof. No Person dealing with the Trust shall be obligated to inquire into the authority of the Trustee or his agents in connection with the protection, conservation or disposition of the Trust Assets. There is no obligation on any Person dealing with the Trustee to inquire into the validity, expediency or propriety of any transaction by the Trustee or any agent of the Trustee.

### 3.7     Tax and Reporting Duties of the Trustee.

The Trustee shall file returns for the Trust as a liquidating trust pursuant to Treasury Regulation Section 301.7701-4(d) and as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a), and, as appropriate, for the Disputed Claims Reserve, and shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, including any requirements imposed with respect to Distributions hereunder and under the Plan. The Trustee shall also file (or cause to be filed) any other statements, returns, reports or disclosures relating to the Trust and Disputed Claims Reserve that are required by any governmental  authority, and all such statements, returns, reports or disclosures shall be prepared in reasonable detail in accordance with all applicable laws.

In the event that the Trustee determines that the Trust Beneficiaries or the Trust may, will, or have become subject to adverse tax consequences, the Trustee may take such commercially reasonable actions that will, or are reasonably intended to, alleviate such adverse tax consequences.

### 3.8    Compliance with Laws.

Any and all Distributions of Trust Assets and proceeds of borrowings, if any, shall be in compliance with applicable laws, including applicable federal and state securities laws. The Trustee may withhold a Distribution from any Trust Beneficiary if the Trustee is unable, after reasonable investigation, to obtain taxpayer identification information for any Trust Beneficiary sufficient to permit the Trustee to administer and make any distribution in compliance with applicable law.

### 3.9    Tax Information.

The Trustee may withhold a Distribution from any Trust Beneficiary if the Trustee is unable, afterreasonable investigation, to obtain taxpayer identification information for any  Trust Beneficiary sufficient to permit the Trustee to administer and make any distribution in compliance with applicable law. The Trustee shall be entitled to require any Trust Beneficiary to furnish to the Trustee in writing their name, address, Employer or Taxpayer Identification Number as assigned by the IRS and completed IRS Form W-9 or, if applicable, IRS Form W-8, within thirty (30) days of a written request, and the Trustee shall make two (2) such requests. Failure of a Trust Beneficiary to respond to the Trustee's second request for such tax information within 30 days of the second request shall result in the Trust Beneficiary forfeiting its Trust interest and rights to any Distribution, and such forfeited amounts shall revest in the Trust and be distributed to the remaining Trust Beneficiaries on the next Distribution Date.

### 3.10    Compensation of the Trustee.

The Trustee shall be entitled to reasonable compensation as set forth in Exhibit A attached hereto. Confirmation of the Plan shall constitute the Bankruptcy Court's approval of the Trustee's compensation. The Trustee may be compensated for time expended and expenses incurred (including reasonable legal fees and costs) prior to the Effective Date in connection with the preparation of this Trust Agreement and other related tasks.

### 3.11    Costs and Expenses of the Trustee.

All costs and expenses of the Trustee and Trust shall be borne by and as a charge against the Trust Assets.

### 3.12    Compensation Procedures.

If applicable, fees and expenses of the Trustee and all professionals employed by him or her, and fees and expenses of the members of the Trust Advisory Board, shall be made on a monthly basis by the Trustee from the Trust Assets.

### 3.13    Bankruptcy Court Approval of Trustee Actions.

Except as provided in the Plan or otherwise specified in this Trust Agreement, the Trustee need not obtain an order or approval of the Bankruptcy Court in the exercise of any power, rights or discretion conferred hereunder, or account to the Bankruptcy Court, including with respect to the sale of any Trust Asset or the settlement of any Plan Trust Outreach Claim. The Trustee shall

exercise his business judgment in order to maximize the value of the Trust Assets and Distributions, giving due regard to the cost, risk and delay of any course of action. Notwithstanding the foregoing, the Trustee may submit to the Bankruptcy Court any question or matter for which the Trustee may desire to have the Bankruptcy Court's explicit approval for the taking of any specific action proposed to be taken by the Trustee with respect to the Trust Assets, the Trust, this Trust Agreement, the Plan, or the Reorganized Debtor.

### 3.14 Reliance by Trustee.

(a) The Trustee may rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by him to be genuine and to have been signed or presented by the proper party or parties including, but not limited to, the Claims Register maintained in this Case.

(b) Persons dealing with the Trustee shall look only to the Trust Assets to satisfy any liability incurred by the Trustee to such person in carrying out the terms of this Trust Agreement, and the Trustee shall not have any personal obligation to satisfy any such liability, except to the extent that actions taken or not taken after the Effective Date by the Trustee are determined by a Final Order to be solely due to the Trustee's gross negligence, fraud, or willful misconduct.

(c) The Trustee may consult with and shall not be liable for any actions taken or suffered by the Trustee in accordance with the advice of such counsel or other professionals. For the avoidance of doubt, and without limitation of applicable law, nothing in this Trust Agreement shall limit the Trustee from engaging the Trustee's firm or its affiliates, to do work for the Trust.

### 3.15 Investment and Safekeeping of Trust Assets.

The right and power of the Trustee to invest Trust Assets, the proceeds thereof, or any income earned by the Trust, shall be limited to the right and power that a liquidating trust, within the meaning of Treasury Regulations Section 301.7701- 4(d), is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise. The Trustee may expend the Cash of the Trust (a) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective assets of the Trust during liquidation, (b) to pay the reasonable costs and expenses (including any taxes imposed on the Trust) and (c) to satisfy other respective liabilities incurred by the Trust in accordance with this Trust Agreement and the Plan. Neither Trustee nor the Trust shall be under any liability for interest or producing income on any moneys received by the Trust under this Trust Agreement and held for distribution orpayment to the Trust Beneficiaries, except as such interest or income shall actually be received by the Trust.

### 3.16 Reliance.

The Trustee and the Trust Advisory Board may rely upon and shall be protected in acting upon the information provided by the Debtor or its representatives to the Trustee and Trust

Advisory Board concerning Claims filed against the Debtor and the Debtor's reconciliation, if any, and other documents supporting such reconciliation.

### 3.17 Authorization to Expend Trust Assets.

The Trustee may expend the Trust Assets: (a) as reasonably necessary to maintain the value of the Trust Assets during liquidation: (b) to pay all costs and expenses of the Trust (including any taxes imposed on the Trust) and (c) to satisfy all other liabilities incurred or assumed by the Trust (or to which the Trust Assets are otherwise subject) in accordance with this Trust Agreement and the Plan.

### 3.18 Termination.

The duties, responsibilities and powers of the Trustee will terminate on the date the Trust is dissolved under applicable law in accordance with this Trust Agreement, or by an order of the Bankruptcy Court.

### 3.19 Trustee's Funds.

No provision of this Trust Agreement or the Plan shall require the Trustee to expend or risk his own funds or otherwise incur any financial liability in the performance of any of his duties as Trustee hereunder or under the Plan, or in the exercise of any of his rights or powers, if the Trustee shall have reasonable grounds for believing that repayment of funds or adequate indemnity or security satisfactory to the Trustee against such risk or liability is not reasonably assured to the Trustee.

### 3.20 Abandonment; Donation.

If, in the Trustee's reasonable judgment, any Trust Asset cannot be sold, liquidated, or distributed in a commercially reasonable manner or the Trustee believes in good faith that such property has inconsequential value to the Trust or the Trust Beneficiaries or is insufficient to render a further Distribution practicable, or exceed the amounts required to be paid under the Plan, the Trustee shall have the right to cause the Trust to abandon or otherwise dispose of such property, including by donation of such remaining funds to a charitable institution qualified as a not-for-profit corporation, under applicable federal and state laws selected by the Trustee.

### 3.21 Limitations on the Trustee.

Notwithstanding anything contained herein to the contrary, the Trustee shall not conduct any trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust. The Trustee shall, on behalf of the Trust, hold the Trust out as a trust in the process of liquidation and not as an investment company. The Trustee shall not engage in any investments or activities inconsistent with the treatment of the Trust as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d) while the Trust qualifies as a liquidating trust, provided, however, that if the Trust shall be classified as a partnership for federal tax purposes under Treasury Regulations 301.7701-3, the foregoing restrictions shall not apply. The Trustee shall not become a market-maker for the Trust Assets or otherwise attempt to create a secondary market for the Trust Assets. The Trustee shall be restricted to the liquidation of the

Trust Assets on behalf, and for the benefit, of the Trust Beneficiaries and the distribution and application of assets of the Trust for the purposes set forth in this Trust Agreement, the Plan and the Confirmation Order.

## ARTICLE IV
## TRUST ADVISORY BOARD

**4.1    Appointment of the Trust Advisory Board.**

(a)    As of the Effective Date, the Trust Advisory Board shall be appointed to consult with the Trustee from time to time on various matters as set forth herein, and to exercise those rights and the duties set forth herein. The Trust Advisory Board shall be composed initially of BCBS, Aetna, Cigna, Humana, and United.

(b)    A quorum for meetings of the Trust Advisory Board shall consist of a majority of the non-recused members of the Trust Advisory Board then serving; *provided*, *however*, that, for purposes of determining whether a quorum is present at such a meeting, a member of the Trust Advisory Board shall be deemed present if a representative of the member is attending in person, by telephone or by proxy, unless such representative is attending solely to protest the meeting in question.

(c)    Except as expressly provided herein, the affirmative vote of a majority of the members of the entire Trust Advisory Board then in office shall be the act of the Trust Advisory Board with respect to any matter that requires the determination, consent, approval or agreement of such board. In the event of a tie vote, the Trustee shall be deemed a voting member for the sole purpose of breaking any such tie vote of the Trust Advisory Board. Any or all of the members of the Trust Advisory Board may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof. Any member of the Trust Advisory Board participating in a meeting by this means is deemed to be present in person at the meeting. In all matters submitted to a vote of the Trust Advisory Board, each Trust Advisory Board member shall be entitled to cast one vote, which vote shall be cast personally by such Trust Advisory Board member or by proxy. Any action required or permitted to be taken by the Trust Advisory Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent, as evidenced by one or more written consents describing the action taken, signed by the members; *provided*, *however*, the Trustee may make recommendations for the action or inaction of the Trust Advisory Board via email on four (4) days' notice (the "***Voting Period***"), and in the absence of a majority of the Members rejecting the recommendation within the Voting

Period, the recommendation shall be deemed to have been approved by a majority of the members, except in emergency circumstances where the Trustee will give as much notice as reasonably practical under the circumstances. In a matter in which the Trustee cannot obtain direction or authority from the Trust Advisory Board, the Trustee may file a motion requesting such direction or authority from the Bankruptcy Court.

(d)     A Trust Advisory Board member and its representative shall be recused from the Trust Advisory Board's deliberations and votes on any matters as to which such member has a conflicting interest. If a Trust Advisory Board member or its representative does not recuse itself from any such matter, that Trust Advisory Board member and its representative may be recused from such matter by the majority vote of the Trustee and the remaining members of the Trust Advisory Board that are not recused or required to be recused from the matter.

(e)     Any action required or permitted to be taken by the Trust Advisory Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent of those Trust Advisory Board members not recused or required to be recused as evidenced by one or more written consents describing the action taken, signed by the Trust Advisory Board and filed with the minutes or proceedings of the Trust Advisory Board.

(f)     The authority of the members of the Trust Advisory Board shall be effective as of the Effective Date and shall remain and continue in full force and effect until the Trust is dissolved in accordance with this Trust Agreement. The service of the members of the Trust Advisory Board shall be subject to the following: (i) each member of the Trust Advisory Board shall serve until the earlier of (A) such member's death or resignation pursuant to clause (ii) below, (B) such member's Allowed Claims being paid in full, or (C) such member's removal pursuant to clause (iv) below; (ii) a member of the Trust Advisory Board may resign at any time by providing a written notice of resignation to the remaining members of the Trust Advisory Board and the Trustee; (iii) if applicable, a member of the Trust Advisory Board shall promptly notify the other members of the Trust Advisory Board and the Trustee of the payment in full of its Allowed Claims; (iv) the members of the Trust Advisory Board may be removed by the unanimous vote of the other members of the Trust Advisory Board only for (A) fraud or willful misconduct in connection with the affairs of the Trust, or (B) cause and shall not be subject to removal without cause; (v) in the event of a vacancy on the Trust Advisory Board for any reason, a new member may be appointed by the vote of the Trust Advisory Board, which shall be evidenced by the filing with the Bankruptcy Court of a notice of appointment unless such appointment would require the Bankruptcy Case to be reopened, which notice shall include the name, address and telephone number of the successor member of the Trust Advisory Board; and (vi) immediately upon appointment of any successor member of the Trust Advisory Board, all

rights, powers, duties, authority and privileges of the predecessor member of the Trust Advisory Board hereunder shall be vested in and undertaken by the successor member of the Trust Advisory Board without any further act; and the successor member of the Trust Advisory Board shall not be liable personally for any act or omissionof the predecessor member of the Trust Advisory Board.

### 4.2 Standard of Care; Business Judgment of the Trust Advisory Board.

The Trust Advisory Board shall exercise its business judgment for the benefit of the Trust Beneficiaries in order to maximize the value of the Trust Assets and Distributions, giving due regard to the cost, risk, and delay of any course of action.

### 4.3 Actions Requiring Trust Advisory Board Approval.

The Trustee shall submit to the Trust Advisory Board for its review and prior approval (by the non-recused members of the Trust Advisory Board) prior to taking any action regarding any of the following matters:

(a)    the commencement, prosecution, settlement, compromise, withdrawal, or other resolution of any Plan Trust Outreach Claim by the Trustee;

(b)    the abandonment of any non-Cash Trust Assets having a valuation of at least $100,000;

(c)    the prosecution of objections to Claims, or the commencement, settlement, compromise, withdrawal, or other resolution of any Disputed Claims, wherein the amount in dispute with respect to the asserted Claim exceeds $100,000;

(d)    the borrowing of any funds by the Trustee or the Trust or pledge of any portion of the Trust Assets; or

(e)    any Distribution to the Trust Beneficiaries.

### 4.4 Compensation of Trust Advisory Board.

In performance of their duties under this Trust Agreement, members of the Trust Advisory Board shall not be entitled to receive any compensation in connection with their duties.

### ARTICLE V
### DISTRIBUTIONS

### 5.1 Distributions; Withholding.

On each Distribution Date, the Trustee shall cause the Distribution Agent to distribute to the Trust Beneficiaries all Cash in the Trust, less the Trust Reserve and the Disputed Claim Reserve. The Trustee may withhold from such Distributions any and all amounts, determined in

the Trustee's sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

### 5.2 Manner of Payment of Distributions.

All Distributions shall be payable only to Trust Beneficiaries of record as of the Distribution Record Date and in amounts equal to such Trust Beneficiaries' Pro Rata portion of the Distribution. All Distributions shall be payable in Cash by wire transfer, check or such other method as the Trustee deems appropriate under the circumstances. All payments of the costs and expenses of the Trust shall be paid in Cash by wire transfer, check or such other method as the Trustee deems appropriate under the circumstances.

### 5.3 Distributions on Business Days.

Any payment or Distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

### 5.4 Reserve for Disputed Claims.

(a) No Distributions shall be made on account of any Claim that is in whole or in part a Disputed Claim unless and until such Claim becomes an Allowed Claim. For each Disputed Claim that exists on a Distribution Date, the Trustee shall reserve and segregate into the Disputed Claim Reserve Cash equal to the Distribution that would be paid on account of such Disputed Claim if it were an Allowed Claim. On each Distribution Date, the Trustee shall reserve and segregate Cash sufficient to pay holders of Disputed Claims their Pro Rata portion, if any, of the Distributions on such Distribution Date into the Disputed Claim Reserve. Any such Distribution reserved shall be held and segregated (by book entry or otherwise) by the Trust for the benefit of holders of Disputed Claims. In the event a Disputed Claim becomes an Allowed Claim, the holder of such Allowed Claim be entitled to payment of such previously withheld Distributions from the Disputed Claim Reserve. In the event a Disputed Claim is Disallowed in whole or in part, any funds held in the Disputed Claim Reserve corresponding to the Disallowed Portion of such Claim shall be released from the Disputed Claim Reserve and made available for Distribution as otherwise provided herein.

(b) The Trustee may make such determinations on Disputed Claims as are appropriate in his sole discretion. The Trustee is authorized to make determinations as to the valuation of the Disputed Claims.

### 5.5 Location for Distributions; Notice of Change of Address.

Distributions to the Trust Beneficiaries shall be made by the Trustee (a) to the addresses set forth on the Claims Register delivered to the Trustee in accordance with this Trust Agreement, or (b) to the addresses set forth in any written notices of address changes delivered to the Trustee

after the Effective Date. The Trustee is not obligated to make any effort to determine the correct address of any Trust Beneficiary.

**5.6    De Minimis Distributions.**

Notwithstanding anything to the contrary contained in the Plan or this Trust Agreement, the Trustee shall not be required to distribute Cash to a Trust Beneficiary if the amount of Cash to be distributed on account of such Claim is less than $50. Any holder of an Allowed Claim on account of which the amount of Cash to be distributed is less than $50 shall have such Claim discharged and shall be forever barred from asserting any such Claim against the Trust or the Trust Assets. Any Cash not distributed pursuant to this provision shall be the property of the Trust, free of any restrictions thereon. The Trustee may, in his sole discretion, remit any Cash not distributed or otherwise utilized by the Trust pursuant to this section of the Trust Agreement to the State of Texas and/or pay such Cash into the registry of the Bankruptcy Court.

**5.7    Setoffs.**

The Trustee may set off against any Distributions to be made to a Trust Beneficiary hereunder, claims, rights and Plan Trust Outreach Claims of any nature that the Trustee may at any time hold against such Trust Beneficiary; *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim under or in accordance with the Plan shall constitute a waiver or release by the Trustee of any such claim, right and Plan Trust Outreach Claims that the Trustee may at any time possess against such Trust Beneficiary.

**5.8    Disputed Payments.**

If any dispute arises as to the identity of a Trust Beneficiary who is to receive any Distribution, the Trustee may, in lieu of making such Distribution to such Person, make reserve for such Distribution. Such Distribution shall be held in reserve until the disposition thereof shall be determined by order of the Bankruptcy Court or other court of competent jurisdiction or by written agreement among the interested parties to such dispute.

**5.9    Unclaimed Distributions.**

Any unclaimed Distributions shall be held and reserved by the Trust for the benefit of the Trust Beneficiaries entitled thereto under the terms of this Trust Agreement and the Plan. All such unclaimed Distributions shall be held for a period of the longer of (i) sixty (60) days after the Distribution Date applicable to the Distribution and (ii) one (1) year after the Effective Date, and during such period shall be released from the Trust and delivered to the Trust Beneficiaries entitled thereto only upon presentation of proper proof by such Trust Beneficiaries of such entitlement. At the end of the period described in the preceding sentence, the Trust Beneficiaries entitled to such Distributions shall cease to be entitled thereto and the Distributions for each such Trust Beneficiary shall be deemed unclaimed property within the meaning of Bankruptcy Code § 347(b) and all title to and beneficial interest in the Trust Assets represented by any such undeliverable Distributions shall be cancelled and revert to and/or remain in the Trust automatically (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary).

### 5.10 Uncashed Checks.

Checks issued in respect of a Distribution will be null and void and cancelled if not negotiated within ninety (90) days after the date of issuance. Distributions with respect to such un-negotiated checks will revert to the Trust for distribution in accordance with the Plan and this Trust Agreement, and payment to such holder with respect to such un-negotiated check shall be discharged, no additional Distribution shall be made to such holder, and the Claims of such holder that may have been entitled to such Distribution shall be discharged and forever barred from receiving Distributions under this Trust Agreement, the Plan and Confirmation Order. The Trustee may, in his sole discretion, attempt to determine a Claim holder's current address or otherwise locate a Claim holder, but nothing in this Trust Agreement or the Plan shall require the Trustee to do so.

### 5.11 Allocation of Tax Items.

Absent definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Trustee shall:

(a)     treat all Trust Assets allocable to, or retained on account of, Disputed Claims, as a "disputed ownership fund" for federal income tax purposes, consisting of separate and independent shares to be established in respect of each Disputed Claim;

(b)     on the last day of each calendar  year, to the extent there is  a reserve for Disputed Claims on that date, treat as taxable income or loss of this separate trust, the portion of the annual taxable income or loss of the Trust that would have been allocated to the holders of such Disputed Claims had such claims been Allowed on the Effective Date;

(c)     treat as a distribution from this separate trust any increased amounts distributed by the Trust as a result of any Disputed Claim resolved earlier in the taxable year; and to the extent permitted by applicable law, report consistently for state and local income tax purposes; and

(d)     to the extent permitted by applicable law, report consistently for state and local income tax purposes.

### ARTICLE VI
### SUCCESSOR TRUSTEE AND SUCCESSOR MEMBERS
### OF THE TRUST ADVISORY BOARD

### 6.1 Removal of Trustee.

At any time, the Trust Advisory Board, in its sole discretion, without approval by the Bankruptcy Court, and by unanimous mutual agreement of its members, may terminate and replace the incumbent Trustee with a successor Trustee chosen by the Trust Advisory Board. Any such removal shall become effective on the later to occur of (i) the expiration of the 30-day notice period without a request to the Bankruptcy Court by the Trustee to continue as Trustee, (ii) five (5)

Business Days after the entry of a Final Order resolving such a request, or (iii) the effective date of the appointment of a successor and the acceptance by such successor of such appointment. In the event such removal occurs, a notice of the identity of the successor trustee shall be filed with the Bankruptcy Court and served on the Trust Beneficiaries.

### 6.2    Resignation of Trustee.

The Trustee may resign by giving written notice thereof to the Trust Advisory Board and filing such notice with the Bankruptcy Court. Such resignation shall become effective on the earlier of (i) thirty (30) days after the filing of such notice, or (ii) the appointment of a successor and the acceptance by such successor of such appointment.

### 6.3    Appointment of Successor Trustee upon Removal, Resignation, or Death.

If the Trustee is removed pursuant to Section 6.1, resigns pursuant to Section 6.2, or dies, the Trust Advisory Board shall, by majority vote, appoint a successor Trustee. If a successor Trustee is not appointed or does not accept his or her appointment within thirty (30) days following such action for removal, or delivery of notice of the resignation or death of the predecessor Trustee, as the case may be, the Bankruptcy Court shall appoint a successor Trustee from a list of three candidates proposed by the Trust Advisory Board. Any successor Trustee appointed hereunder shall execute and file a statement accepting such appointment and agreeing to be bound by the terms of the Plan and upon such filing, the successor Trustee shall immediately become vested with all the rights, powers, trusts, and duties of the Trustee.

### 6.4    Acceptance of Appointment by Successor Trustee.

Any successor Trustee appointed pursuant to this Article 6 shall execute an instrument accepting such appointment as the Trustee under this Trust Agreement and shall file and maintain such acceptance with the books and records of the Trust. Upon acceptance of such appointment as aforesaid, such successor Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts, and duties of his or her predecessor in the Trust with like effect as if originally named herein; *provided*, *however*, that a removed or resigning Trustee shall, nevertheless, when reasonably requested in writing by the successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee under the Trust all the estates, properties, rights, powers, and trusts of such predecessor Trustee.

### 6.5    Successor Members of the Trust Advisory Board.

In the event a member of Trust Advisory Board is no longer willing or able to serve as a member, the remaining members of the Trust Advisory Board shall, to the extent practicable, elect a successor, with any impasse resolved by the vote of the Trustee. The Trustee shall file notice of such appointment with the Bankruptcy Court. If a member of Trust Advisory Board assigns or releases its Claims against the Trust or releases the Trust of the obligations to pay its Claims, such act shall constitute a resignation as a member of Trust Advisory Board. If there are less than three members of the Trust Advisory Board at any time, the remaining members of the Trust Advisory Board shall continue to fulfill their duties in the reduced number.

# ARTICLE VII
# EXCULPATION AND INDEMNIFICATION

**7.1    Exculpation.**

(a)    From and after the Effective Date, the Trustee, his employer, and the Trust Advisory Board, and their respective professionals, non-professionals, employees, officers, directors, members, and representatives (the "***Protected Parties***"), shall be and hereby are exculpated by all Persons and entities, including holders of Claims and other parties in interest, from any and all claims, causes of action and other assertions of liability of any kind or nature arising out of the discharge of the powers and duties conferred upon said parties pursuant to or in furtherance of this Trust Agreement, the Plan, or any order of the Bankruptcy Court or applicable law or otherwise, except only for actions taken or not taken, from and after the Effective Date only to the extent determined by a Final Order to be solely due to their own respective gross negligence, willful misconduct or fraud.

(b)    No holder of a Claim or other party in interest will have or be permitted to pursue any claim or cause of action whatsoever, in tort, contract or otherwise, against the Protected Parties for making payments in accordance with the Plan or this Trust Agreement or for implementing the provisions of the Plan or this Trust Agreement. Any act taken or not taken, in the case of the Trustee, with the approval of the Trust Advisory Board or the Bankruptcy Court, will be conclusively deemed not to constitute gross negligence, willful misconduct, or a breach of fiduciary duty. Other than as set forth in the Plan or Confirmation Order, nothing in this Trust Agreement shall be deemed to release any Trust Beneficiary from any actions or omissions occurring prior to the Effective Date.

**7.2    Indemnification.**

The Trust shall indemnify, defend and hold harmless the Protected Parties, to the fullest extent permitted by law, from and against any and all claims, causes of action, liabilities, obligations, losses damages or expenses (including attorneys' fees and expenses) occurring after the Effective Date which the Protected Parties may incur or which the Protected Parties may become subject to in connection with any action, suit, proceeding, or investigation brought by or threatened against such Protect Parties arising out of or due to their acts or omissions or consequences of such acts or omissions, with respect to the implementation or administration of the Trust or the Plan or the discharge of their duties hereunder or otherwise to the Trust or the Trustee ("***Related Matters***"), other than to the extent determined by a Final Order to be solely due to their own respective gross negligence, willful misconduct, to the fullest extent permitted by applicable law.

**7.3    Expenses.**

In the sole discretion of the Trustee, the Trustee may authorize available funds of the Trust

REED SMITH DRAFT: ~~03.15.2022~~03.16.2022

to be advanced to satisfy any reasonable and documented out-of-pocket costs and expenses (including reasonable attorneys' fees and other costs of defense) incurred by any Protected Party who is threatened to be named or made a defendant or a respondent in any proceeding concerning the administration, business, and affairs of the Trust; *provided*, *however*, that all such payments are subject to disgorgement in the event that the underlying claim against the Protected Party has been finally and judicially determined to have resulted from such Protected Party's own willful misconduct, gross negligence, or fraud. In the event that, at any time whether before or after termination of this Agreement, as a result of or in connection with Related Matters, any Protected Party is required to produce any of its personnel (including former employees) for examination, deposition or other written, recorded or oral presentation, or any Protected Party is required to produce or otherwise review, compile, submit, duplicate, searchfor, organize or report on any material within such Protected Party's possession or control pursuant to a subpoena or other legal (including administrative) process, the Protected Party shall be reimbursed by the Trust for its out-of-pocket expenses, including the reasonable fees and expenses of its counsel, and will be compensated by the Trust for the time expended by its personnel based on such personnel's hourly rate.

### 7.4    Limited Recourse.

All Persons (including any professionals retained by the Trustee in accordance with this Trust Agreement) engaged in transactions with the Trust or the Trustee shall look only to the Trust Assets (or to any insurance that may cover such claim) to satisfy any liability incurred in connection with the carrying out the terms of this Trust Agreement, the Plan or the Confirmation Order.

### 7.5    Non-Liability for Acts of Others.

Except as expressly provided in this Trust Agreement, the Plan or the Confirmation Order, neither the Trust nor the Trustee shall assume any of the liabilities, obligations or duties of the Reorganized Debtor or the Trust Beneficiaries. The Trustee may accept and rely upon any accounting made by or on behalf of the Reorganized Debtor and any statement or representation made by the Reorganized Debtor or its agents and professionals as to the Plan Trust Outreach Claims or as to any other fact bearing upon the creation of the Trust, so long as it has a good faith basis to do so. Any successor Trustee may accept and rely upon any accounting made by or on behalf of any predecessor Trustee hereunder, and any statement or representation made by a predecessor Trustee or its agents as to the assets comprising the Trust Assets, the Reserves or as to any other fact bearing upon the prior administration of the Trust, so long as it has a good faith basis to do so. The Trustee shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue. The Trustee or successor Trustee shall not be liable for any act or omission of any predecessor Trustee, nor have a duty to enforce any claims against any predecessor Trustee on account of any such act or omission. The Trustee or the members of the Trust Advisory Board may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with their attorneys, accountants, financial advisors and agents, and shall not be liable for any act or omission done in good faith reliance upon the adviceor opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Trustee nor the members of the Trust Advisory Board

shall be under any obligation to consult with attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Trustee or the members and/or their designees, unless such determination is based on fraud, willful misconduct, or gross negligence.

### 7.6 Reliance by Trustee.

The Trustee may absolutely and unconditionally rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the Trustee in good faith to be genuine and to have been signed or presented by the proper party or parties. The Trustee may consult with legal counsel, financial or accounting advisors, and other professionals to be selected by the Trustee and may rely, in good-faith, on the advice thereof, and shall not be liable for any action taken or omitted to be taken in accordance with the advice thereof.

### 7.7 Confirmation of Survival of Provisions.

Without limitation in any way of any provision of this Trust Agreement, the provisions of this Article 7 shall survive the death, dissolution, liquidation, resignation, replacement, or removal, as may be applicable, of theTrustee or members of the Trust Advisory Board, or the termination of the Trust or this Trust Agreement, and shall inure to the benefit of the Trustee's and the Trust Advisory Board members' respective heirs, successors, and assigns.

## ARTICLE VIII
## REPORTS TO TRUST BENEFICIARIES

### 8.1 Tax Reports to Trust Beneficiaries.

The Trustee shall submit to each Trust Beneficiary appearing on its records during such year a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit. The Trust'staxable income, gain, loss, deduction, and credit will be allocated Pro Rata to the holders of Trust in accordance with such holders' respective beneficial interests in the Trust Assets. In addition, the Trustee shall file all tax returns required to be filed and shall pay all taxes on such returns, if any. The Trustee shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Trust that are required by any governmental authority.

## ARTICLE IX
## TERMINATION AND FINAL DISTRIBUTION

### 9.1 Termination of Trust.

The Trust will terminate on the earlier of (a) thirty (30) days after the full and final Distribution of the Trust Assets or proceeds thereof in accordance with the terms of this Trust Agreement and the Plan, and (b) the fifth anniversary of the Effective Date; *provided*, *however*, that within six months of the fifth anniversary of the Effective Date, the Bankruptcy Court, upon a motion by the Trustee or any party in interest,may extend the term of the Trust for an additional term of not more than five years if it is necessary for the liquidation of the Trust Assets. Multiple extensions may be obtained so long as Bankruptcy Court approval is obtained within six months

of the beginning of each such extended term. Notwithstanding the foregoing, the Trustee shall not unduly prolong the duration of the Trust and shall at all times endeavor to resolve, settle or otherwise dispose of all property and Claims that constitute Trust Assets and to effect the full and final Distribution of the Trust Assets to the Trust Beneficiaries in accordance with the terms hereof and the Plan and, thereafter, terminate the Trust as soon as practicable.

**9.2    Final Distribution.**

Prior to and upon termination of the Trust, the Trust Assets will be finally distributed to the Trust Beneficiaries pursuant to the provisions set forth herein.

## ARTICLE X
## AMENDMENT AND WAIVER

**10.1    Amendment and Waiver.**

This Trust Agreement may not be amended, modified or supplemented, and no provision hereof or rights hereunder may be waived, except with the written consent of the Trustee and the approval of the Trust Advisory Board. Any amendments to this Trust Agreement shall not be inconsistent with the purpose and intention of the Trust to administer and liquidate in an expeditious but orderly manner the Trust Assets. Notwithstanding anything to the contrary herein, no amendment, modification, supplement or waiver shall be effective if it materially and adversely affects the liquidation and Distributions contemplated by the Plan, or if it would adversely affect the federal income tax status of the Trust as a "grantor trust." The Trustee shall promptly send a copy of each amendment, modification, supplement or waiver of this Trust Agreement to the Trust Advisory Board after approval thereof.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

**11.1    Intention of Parties to Establish Trust.**

This  Trust Agreement is intended to create a liquidating trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent with such intent and purpose and, if necessary, this Trust Agreement may be amended to comply with such federal income tax laws,which amendments may be made to apply retroactively.

**11.2    Preservation of Privilege and Defenses.**

In connection with the vesting  and transfer of the Trust Assets, including rights and Plan Trust Outreach Claims, any attorney-client privilege or other privilege or immunity attaching or relating to any documents or communications (of any kind, whether written or oral, electronic or otherwise) held by the Debtor shall be transferred to the Trust and shall vest in the Trust. Accordingly, in connection with the prosecution or investigation of the Plan Trust Outreach Claims by the Trustee, director, officer, employee, counsel, agent, or attorney-in-fact of the Debtor may assert any attorney-client privilege or other privilege or immunity attaching or relating to any documents or communications (of any kind, whether written or oral, electronic or otherwise) held

by the Debtor or otherwise prevent, hinder, delay, or impede production or discussion of documents or communications requested by the Trustee in discovery (whether formal or informal, and including depositions, written discovery, and interviews). The Debtor will take reasonable precautions to protect privileged information as to the Plan Trust Outreach Claims. and Trustee and Trust Advisory Board shall take all necessary actions to protect the transfer of such privileges, protections and immunities. The Trust Advisory Board and each of its members and their respective attorneys shall at all times be deemed within the Trust's attorney-client privilege relationship, and no communication among the Trustee, the Trust Advisory Board, or their respective professionals shall be deemed to waive any such privilege. Notwithstanding anything herein to the contrary, all professionals shall reserve all rights at law regarding work product privilege.

### 11.3 Confidentiality.

The Trustee and the Trust Advisory Board, and each of their respective employees, members, agents, professionals and advisors (each a "*Confidential Party*" and collectively, the "*Confidential Parties*") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party except as necessary for prosecution or investigation of the Plan Trust Outreach Claims and fulfilling the other obligations of the Trust and the Trust Advisory Board; *provided, however*, that such information may be disclosed if (a) the Trustee (after consultation with the Trust Advisory Board) consents to disclosure or use of such information, (b) such information is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties, (c) such information was previously known to the Confidential Party or is separately learned by the Confidential Party outside of its capacity as such, or (d) such disclosure is required of the Confidential Parties pursuant to legal process including but not limited to subpoena or other court order or other applicable laws or regulations. In the event that any Confidential Party is requested to divulge confidential information pursuant to this subparagraph (d), such Confidential Party shall promptly, in advance of making such disclosure, provide reasonable notice of such required disclosure to the Trustee to allow him sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the Trustee in making any such objection, including but not limited to appearing in any judicial or administrative proceeding in support of any objection to such disclosure.

### 11.4 Laws as to Construction.

This Trust Agreement shall be governed and construed in accordance with the laws of the State of Texas, without giving effect to rules governing the conflict of laws.

### 11.5 Severability.

If any provision of this Trust Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

REED SMITH DRAFT: ~~03.15.2022~~03.16.2022

**11.6     Retention of Jurisdiction.**

Notwithstanding the Effective Date and to the fullest extent permitted by law, the Bankruptcy Court shall retain exclusive jurisdiction over the Trust after the Effective Date, including jurisdiction to resolve any and all controversies, suits and issues that may arise in connection with theTrust, this Trust Agreement, or any entity's obligations incurred in connection with the Trust, and any action against the Trustee, the Trust Advisory Board or any professional retained by the Trustee, the Trust Advisory Board or the Trust, in each case in its capacity as such. Each party to this Trust Agreement hereby irrevocably consents to the exclusive jurisdiction of the Bankruptcy Court in any action to enforce, interpret or construe any provision of this Trust Agreement or of any other agreement or document delivered in connection with this Trust Agreement, and also hereby irrevocably waives any defense of improper venue, forum non conveniens or lack of personal jurisdiction to anysuch action brought in the Bankruptcy Court. Each party further irrevocably agrees that any action to enforce, interpret or construe any provision of this Trust Agreement will be brought only in the Bankruptcy Court. Each party hereby irrevocably consents to service by certified or registered mail, return receipt requested, to be sent to its address set forth in this Trust Agreement or in the official Schedules filed in the Case or to such other address as it may designate from time to time by notice given in the manner provided above, of any process inany action to enforce, interpret or construe any provision of this Trust Agreement.

**11.7     Notices.**

Any notice or other communication under this Trust Agreement shall be in writing and shall be given by either (i) hand-delivery, (ii) first class mail (postage prepaid), reliable overnight commercial courier (charges prepaid), or (iv) telecopy or other means of electronic transmission, if confirmed promptly by any of the methods specified in clauses (i), (ii) and (iii) of this sentence, to the following addresses:

If to the Trustee:

Jason Rae
Lain Faulkner LLP
400 N. St. Paul, Suite 600
Dallas, Texas 75201
Telephone: (214) 777-0271
Email: jrae@lainfaulkner.com

with copies to counsel for BCBS (for dissemination to the Trust Advisory Board):

Michael P. Cooley
Reed Smith LLP
2850 North Harwood Street, Suite 1500
Dallas, TX  75201
Telephone: (469) 680-4213
Email:  mpcooley@reedsmith.com

REED SMITH DRAFT: 03.15.2022 03.16.2022

and to such counsel for the Trustee as may be designated by the Trustee to the Debtor or Reorganized Debtor in writing.

Notice given by telecopy or other means of electronic transmission shall be deemed to have been given and received when sent. Notice by overnight courier shall be deemed to have been given and received on the date scheduled for delivery. Notice by mail shall be deemed to have been given and received three (3) calendar days after the date first deposited in the United States Mail. Notice by hand delivery shall be deemed to have been given and received upon delivery. A party may change its address by giving written notice to the other party as specified herein.

### 11.8 Headings.

The section headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

### 11.9 Integration.

This Trust Agreement and the Plan constitute the entire agreement of the parties with respect to the subject matter hereof and thereof and supersede all oral negotiations and prior writings with respect to the subject matter hereof and thereof.

### 11.10 Further Assurances.

From and after the Effective Date, the parties hereto covenant and agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes of the Trust and to consummate the transactions contemplated hereby.

### 11.11 Successors and Assigns.

The terms of this Trust Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, and their respective successors and assigns.

### 11.12 Counterparts.

This Trust Agreement may be signed by the parties hereto in counterparts, which, taken together, shall constitute one and the same document, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

### 11.13 Third Party Beneficiary.

Nothing in this Trust Agreement is intended to benefit or create any right or cause of action in or on behalf of any person other than the parties hereto unless expressly set forth herein.

### 11.14 Relationship to the Plan.

The principal purpose of this Trust Agreement is to aid in the implementation of the Plan

and therefore this Trust Agreement incorporates the provisions of the Plan. To that end, the Trustee shall have full power and authority to take any action consistent with the purpose and provisions of the Plan, and to seek any orders from the Bankruptcy Court in furtherance of implementation of the Plan and this Trust Agreement.

[This space left intentionally blank]

REED SMITH DRAFT: 03.15.2022 03.16.2022

        IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Trust Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

                                        **JACK COUNTY HOSPITAL DISTRICT**
                                        **d/b/a Faith Community Health System**


                                        _____
                                        Name:_____
                                        Title:_____


                                        **TRUSTEE**


                                        _____
                                        Jason Rae, in his capacity as Trustee

# EXHIBIT A

## [TO FOLLOW]

### Description of Trustee's Proposed Compensation

Jason Rae will serve as the Trustee on and after the Effective Date. In compensation for his services as Trustee, Mr. Rae will not receive a retainer. Rather, he will be compensated using his standard rate of $425/hour, plus reimbursement for necessary out-of-pocket expenses incurred, which accrue and will be payable monthly during the term of his service as Trustee. Mr. Rae will also retain Lain Faulkner (of which he is a Director and member) to provide accounting and financial services to the Trust under their standard employment agreement using their standard hourly rates.

Mr. Rae's compensation arrangement may be modified in consultation with the Trust Advisory Board should circumstances regarding the Trust activity level change substantially.